Amir M. Nassihi (SBN: 235936)
anassihi@shb.com
Joan R. Camagong (SBN: 288217)
jcamagong@shb.com
SHOOK, HARDY & BACON L.L.P.
One Montgomery, Suite 2600
San Francisco, California 94104
Telephone:    415-544-1900
Facsimile:    415-391-0281

James P. Muehlberger (*admitted pro hac vice*)
jmuehlberger@shb.com
Elizabeth A. Fessler (*admitted pro hac vice*)
efessler@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
Telephone:    816-474-6550
Facsimile:    816-421-5547

Attorneys for Defendant
WELLPET LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL ZEIGER, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>    v.<br><br>WELLPET LLC, a Delaware corporation,<br><br>           Defendant. | Case No. 3:17-cv-04056-WHO<br><br>**WELLPET LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

1

## **TABLE OF CONTENTS**

2    INTRODUCTION……………………………………….... .............................................. 1

3    FACTS.........................................................................................................…...2

4    LEGAL STANDARD ...................................................................................... 10

5    ARGUMENT ................................................................................................. 10

6    I.    Zeiger has not proven that common issues predominate as to any claims. .................... 11

7         A.  Zeiger has not shown he can demonstrate deception and causation using class-wide
              proof. ......................................................................................................... 11

8
              1.    The challenged statements have not appeared uniformly on the products during
9                   the proposed class period. ................................................................. 11

10            2.    Zeiger has not proven that the challenged statements have a uniform meaning
                    to consumers or are material across the proposed class...................................... 14
11

12        B.  Zeiger has not proven that damages can be measured on a class-wide basis. ................ 18

13            1.    The survey doesn't provide a relevant or reliable measure of the alleged harm.... 19

14            2.    The survey unreliably and impermissibly results in price premiums that
                    exceed the purchase price. .............................................................. 20
15
              3.    The survey's presentation of the challenged statements and product prices
16                  does not reflect the "real-world" marketplace. .................................... 21

17            4.    The damages model improperly reflects only consumers' purported willingness
                    to pay without consideration of supply-side factors and other
18                  marketplace realities ...................................................................... 23

19   II.   The named class representative's claims are not typical of the class members' claims. ... 24

20   III.  Zeiger lacks standing to represent a class challenging the "natural" representation. ....... 27

21   IV.   Zeiger has not shown a Rule 23(b)(2) class should be certified. ................................. 27

22   V.    Zeiger has not shown a Rule 23(c)(4) class should be certified. ................................. 29

23   CONCLUSION ............................................................................ 30

24

25

26

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                    **Page(s)**

3

*Adkins v. Facebook, Inc.*,

4
424 F. Supp. 3d 686 (N.D. Cal. 2019) ......................................................................... 29

5

*Amchem Prods., Inc. v. Windsor*,

521 U.S. 591 (1997) .............................................................................................. 10, 11

6

*Bates v. United Parcel Serv., Inc.*,

7
511 F.3d 974 (9th Cir. 2007) ....................................................................................... 28

8

*Brazil v. Dole Packaged Foods, LLC*,

660 F. App'x 531 (9th Cir. 2016) ................................................................................. 20

9

*Chapman v. Pier 1 Imports (U.S) Inc.*,

10
631 F.3d 939 (9th Cir. 2011) ....................................................................................... 28

11

*Comcast Corp. v. Behrend*,

12
569 U.S. 27 (2013) ....................................................................................... 10, 18, 19

13

*Copelan v. Infinity Ins. Co.*,

14
359 F. Supp. 3d 926 (C.D. Cal. 2019) ........................................................................ 29

15

*D.C. by and through Garter v. County of San Diego*,
783 F. App'x 766 (9th Cir. 2019) ................................................................................ 30

16

*Davidson v. Apple, Inc.*,

17
2018 WL 2325426 (N.D. Cal. May 8, 2018) ............................................................... 30

18

*Davis v. HSBC Bank Nevada, N.A.*,

691 F.3d 1152 (9th Cir. 2012) ..................................................................................... 15

19

*Ellis v. Costco Wholesale Corp.*,

20
657 F.3d 970 (9th Cir. 2011) ................................................................................. 10, 27

21

*Fenerjian v. Nongshim Co.*,

22
72 F. Supp. 3d 1058 (N.D. Cal. 2014) ........................................................................ 27

23

*Hadley v. Kellogg Sales Co.*,

324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...................................................................... 12

24

*Hanon v. Dataproducts Corp.*,

25
976 F.2d 497 (9th Cir. 1992) ....................................................................................... 24

26

*Hodgers-Durgin v. de la Vina*,

27
199 F.3d 1037 (9th Cir. 1999) ..................................................................................... 28

28

ii

*In re 5-Hour Energy Mktg. and Sales Practices Litig.*,
  2017 WL 2559615 (C.D. Cal. June 7, 2017) .......................................................................... 15

*In re Conagra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) ..................................................................................16, 19

*In re MyFord Touch Consumer Litig.*,
  2016 WL 6873453 (N.D. Cal. Nov. 22, 2016) ...................................................................... 17

*Khasin v. R.C. Bigelow, Inc.*,
  2016 WL 1213767 (N.D. Cal. Mar. 29, 2016) ........................................................... 10, 20, 21

*Kosta v. Del Monte Foods, Inc.*,
  308 F.R.D. 217 (N.D. Cal. 2015) ..................................................................................12, 14

*Lanovaz v. Twinings North America, Inc.*,
  726 F. App'x 590 (9th Cir. 2018) .......................................................................................... 28

*Lee v. State of Oregon*,
  107 F.3d 1382 (9th Cir. 1997) .............................................................................................. 27

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003) .........................................................................................25, 27

*Loeb v. Champion Petfoods USA Inc.*,
  359 F. Supp. 3d 597 (E.D. Wis. 2019) .................................................................................... 1

*MacDougall v. Am. Honda Motor Co.*,
  2020 WL 5583534 (C.D. Cal. Sept. 11, 2020) ...................................................................22, 23

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ......................................................................................12, 13, 18

*Nguyen v. Nissan North Am., Inc.*,
  2020 WL 5517261 (N.D. Cal. Sept. 13, 2020) ........................................................... 24, 25, 26

*Oracle America, Inc. v. Google, Inc.*,
  2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ........................................................................ 21

*Philips v. Ford Motor Co.*,
  2016 WL 7428810 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 F. App'x 608 (9th Cir.
  2018) .............................................................................................................. 13, 14, 18, 29

*Philips v. Ford Motor Co.*,
  726 F. App'x 608 (9th Cir. 2018) .......................................................................................... 29

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*,
  2016 WL 5920345 (C.D. Cal. June 23, 2016) .....................................................................12, 15

*Rahman v. Mott's LLP*,
2014 WL 6815779 (N.D. Cal. Dec. 3, 2014), *aff'd*, 693 F. App'x 578 (9th Cir.
2017) ............................................................................................................................ 30

*Rahman v. Mott's LLP*,
2018 WL 4585024 (N.D. Cal. Sept. 25, 2018) ........................................................ 28

*Rahman v. Mott's LLP*,
693 F. App'x 578 (9th Cir. 2017) ............................................................................ 29

*Reitman v. Champion Petfoods USA, Inc.*,
2019 WL 7169792 (C.D. Cal. Oct. 30, 2019), *appeal docketed*, No. 19-56467 (9th
Cir. Dec. 19, 2019) ................................................................................... 1, 12, 13

*Renfro v. Champion Petfoods USA, Inc.*,
2020 WL 4433027 (D. Colo. July 31, 2020) ............................................................ 1

*Rhynes v. Stryker Corp.*,
2011 WL 2149095 (N.D. Cal. May 31, 2011) ........................................................ 29

*Ries v. Arizona Beverages USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) ............................................................................ 27

*Sandoval v. PharmaCare US, Inc.*,
730 F. App'x 417 (9th Cir. 2018) ............................................................................ 25

*Sciacca v. Apple, Inc.*,
362 F. Supp. 3d 787 (N.D. Cal. 2019) .................................................................... 28

*Simpson v. Champion Petfoods USA, Inc.*,
397 F. Supp. 3d 952 (E.D. Ky. 2019) ................................................................ 1, 14

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ......................................................................... 14, 24

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ................................................................................................ 28

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
308 F.R.D. 630 (N.D. Cal. 2015) ............................................................................ 29

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ......................................................................................... 10, 28

*Weaver v. Champion Petfoods USA Inc.*,
2019 WL 7370374 (E.D. Wis. Dec. 31, 2019) ........................................................ 1

*Weaver v. Champion Petfoods USA Inc.*,
2020 WL 3847248 (E.D. Wis. July 8, 2020) ...................................................... 1, 17

iv

*Werdebaugh v. Blue Diamond Growers*,
   2014 WL 2191901 (N.D. Cal. May 23, 2014) ........................................................... 20

*Zakaria v. Gerber Prods. Co.*,
   755 F. App'x 623 (9th Cir. 2018) ............................................................ 19, 23, 24

**Regulations**

21 C.F.R. Part 507 .................................................................................................... 4, 9

21 C.F.R. § 507.33 ......................................................................................................... 4

21 C.F.R. § 507.34 ......................................................................................................... 4

**Other Authorities**

1 *McLaughlin on Class Actions* § 4.43 (15th ed. 2018) ........................................... 30

*Center for Veterinary Medicine CY15-17 Report on Heavy Metals in Animal Food*
   (Oct. 24, 2019) ......................................................................................................... 5

*Draft Guidance for Industry, Hazard Analysis and Risk-Based Preventive Controls
   for Food for Animals*
   (F.D.A. Jan. 2018) .............................................................................................. 4, 5, 6

FDA, *Bisphenol A, available at* https://www.fda.gov/food/food-additives-
   petitions/bisphenol-bpa (last visited Sept. 29, 2020) ............................................... 7

FDA, *Arsenic in Food and Dietary Supplements, available at*
   https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-
   supplements (last visited Sept. 29, 2020) ............................................................... 4

FDA, *Lead in Food, Foodwares, and Dietary Supplements, available at*
   https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-
   dietary-supplements (last visited Sept. 29, 2020) ................................................... 4

FDA's 2011 *Target Animal Safety Review Memorandum* ........................................ 5, 7

*Memorandum of Understanding between the United States Food and Drug
   Administration and the Association of American Feed Control Officials*
   (June 2019) ............................................................................................................ 17

### INTRODUCTION

This case is about dog food. Plaintiff claims that he and all putative class members got less than they bargained for when they purchased certain Wellness® brand dog foods, because WellPet represents the dog food as healthy, nutritious, and of high quality, while failing to warn consumers that it contains "dangerous" and "unsafe" amounts of arsenic, lead, and the chemical bisphenol A ("BPA"). Plaintiff contends this has caused consumers to pay more for the Wellness dog foods than they otherwise would have paid. Plaintiff seeks to represent members of three putative classes and brings claims for misrepresentation and omission, and breach of warranty. Courts have granted motions to dismiss or for summary judgment and/or denied motions for class certification in several substantially similar cases against other pet food manufacturers filed by this same plaintiff's counsel.[1] Plaintiff has not carried his burden to show that any of his claims should be certified either.

First, Plaintiff has not proven that common issues predominate as to any claims. The challenged statements on the dog food have not appeared uniformly during the class period. Plaintiff also has not shown that the statements have a uniform meaning to class members and are material across the proposed class. Specifically, Plaintiff has not shown that the proposed class members understand the phrases "uncompromising nutrition," "with nothing in excess and everything in balance," "complete health," "unrivaled quality standards," and "natural" as representing that the dog foods are completely free of trace elements that exist everywhere in the environment (none of which were added by WellPet)—and which are found in nearly all pet food as well as in human food.

Second, Plaintiff has not proven that damages are capable of measurement on a class-wide basis. Plaintiff's damages model is based on a methodologically flawed consumer survey and therefore fails to provide a relevant measure of the alleged impact on consumers of information about the presence of arsenic, lead, and BPA. Most notably, the survey presents information about

---

[1] *See, e.g.*, *Reitman v. Champion Petfoods USA, Inc.*, 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019), *appeal docketed*, No. 19-56467 (9th Cir. Dec. 19, 2019); *Renfro v. Champion Petfoods USA, Inc.*, 2020 WL 4433027 (D. Colo. July 31, 2020); *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952 (E.D. Ky. 2019); *Weaver v. Champion Petfoods USA Inc.*, --- F. Supp. 3d ----, 2020 WL 3847248 (E.D. Wis. July 8, 2020), *appeal docketed*, No. 20-2235 (7th Cir. July 9, 2020); *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 7370374 (E.D. Wis. Dec. 31, 2019); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597 (E.D. Wis. 2019).

the risk of arsenic, lead, and BPA *only* for the Wellness products and not for other dog foods, resulting in unreliable and legally impermissible price premiums that *exceed* the price of the dog foods. This Court has held that "full refund" damages are improper in mislabeling cases.

Third, the named plaintiff's claims are not typical. Plaintiff did not rely on the challenged statements when he first purchased the Wellness dog foods and he understands that arsenic, lead, and BPA exist everywhere. He doesn't have a clear memory as to which of the more than 50 Wellness dry dog foods he bought (only three are at issue), and he couldn't name the three products at issue in his complaint. Plaintiff also said he would rely on FDA to determine the appropriate levels of arsenic and lead in pet food, and believes it is reasonable for WellPet to rely on the levels of arsenic, lead, and BPA identified as safe by regulatory agencies.

Fourth, Plaintiff does not have standing to represent a class challenging the "natural" representation because he does not take issue with the use of that word on the Wellness packaging and doesn't believe product claims of "natural." Because Plaintiff does not have a claim personally, he cannot represent the proposed class as to this alleged misrepresentation.

Fifth, Plaintiff has not shown a Rule 23(b)(2) class should be certified. He is seeking predominantly money damages. Moreover, Plaintiff faces no real and immediate threat of repeat injury because he has no actual plans to purchase the Wellness products again, and he understands that arsenic, lead, and BPA are ubiquitous in the environment and therefore would not be misled in the future. Plaintiff also has an adequate remedy at law.

Finally, Plaintiff has not shown a Rule 23(c)(4) liability-only class should be certified. As with damages, the issue of liability is not subject to common proof. Plaintiff also has not shown that certification under Rule 23(c)(4) would materially advance the overall disposition of the case when numerous individualized issues would remain.

## FACTS

- *The Wellness Products*

WellPet traces its roots back to 1873 as A. Hubbard & Son, a Gloucester, Massachusetts bakery that made hard tack sea biscuits. Declaration of Gregory Kean (Ex. A)[2] ¶ 7. In 1926, the Old

---

[2] Unless otherwise noted, all exhibits are attached to the declaration of Joan R. Camagong.

Mother Hubbard Baking Company was born and began selling natural dog treats. *Id.* Old Mother Hubbard was purchased in 1961 by Jim Scott Sr., a professional in animal nutrition who was committed to developing highly nutritious products for animals. *Id.* In the 1990s, Jim Scott Jr. began working with animal nutrition experts, veterinarians, and scientists to develop pet food featuring the finest natural ingredients. *Id.* This effort resulted in the launch of Wellness® dry dog food in 1997. *Id.* ¶¶ 7-8. The Wellness brand includes among its product lines, Complete Health™ and CORE®. *Id.* ¶ 9. The Complete Health line includes more than 20 dry dog food varieties, while CORE is comprised of about 30 different dry kibble diets. *Id.* Complete Health and CORE together include 10 fish-based diets. *Id.* The three products at issue are Complete Health Adult Whitefish & Sweet Potato ("Sweet Potato"), Complete Health Grain Free Adult Whitefish & Menhaden Fish Meal ("Menhaden"), and CORE Ocean (Whitefish, Herring Meal & Salmon Meal) ("CORE Ocean"). 2d Am. Compl. ("SAC") ¶ 2. The products have been sold in various sizes from 4 lb. to 30 lb. bags. Declaration of Laura Marseglia (Ex. B) ¶ 4.

The Wellness packaging complies with the model pet food regulations established by the Association of American Feed Control Officials ("AAFCO") and endorsed by FDA. Kean Decl. (Ex. A) ¶¶ 11-15. The packaging for the three products reflects the various characteristics of each diet. The front and back labeling explains each diet's philosophy and highlights particular ingredients and benefits. *Id.* ¶ 16; Ex. C through Ex. J (Wellness dog food packages). The back of the packaging includes a list of all ingredients in descending order based on weight, and the AAFCO-required guaranteed analysis, which identifies the percentages of various nutrients (similar to the nutrition facts panel on human food). Kean Decl. (Ex. A) ¶ 15. Each package also contains "The Wellness Guarantee," which informs consumers that if they are dissatisfied for any reason, they can return the unused portion for a full refund. *Id.* ¶ 17. The statements on the packaging have varied from product to product and over time in terms of content, location, and prominence. *Id.* ¶ 16. The statements Plaintiff challenges also have been accompanied by other statements that provide context.

- *Federal Regulation of Pet Food Safety*

FDA takes a risk-based approach to the identification of potential hazards in animal food. In 2015, FDA issued regulations requiring animal food manufacturers to include hazard analysis and

risk-based preventive controls in their food safety programs. *See generally* 21 C.F.R. Part 507. Among other things, these regulations require manufacturers to identify and evaluate known or reasonably foreseeable hazards for each type of animal food manufactured. 21 C.F.R. § 507.33. Only if a substance is determined to constitute a hazard—and a hazard that requires a preventive control— does the manufacturer need to develop and implement a preventive control for the substance. *Id.*; 21 C.F.R. § 507.34. In January 2018, FDA issued draft guidance for industry to help manufacturers identify and address known and reasonably foreseeable hazards for various types of animal food, including pet food. *Draft Guidance for Industry*, *Hazard Analysis and Risk-Based Preventive Controls for Food for Animals* (F.D.A. Jan. 2018) (Ex. K). FDA explains in this guidance that "[c]hemical substances in animal food are not always considered hazards and their occurrence may be unavoidable." *Id.* at 48. Whether a substance is a "hazard," depends on "[t]he particular chemical, and its level in the animal food[.]" *Id.* FDA advises consumers on its website that because arsenic and lead are so prevalent in the environment, "it is not possible to remove" them from the food supply.[3]

According to FDA, "[h]eavy metals are naturally occurring" and whether an animal develops an injury or illness from exposure to them "depends upon the species, level of the mineral in the animal food, and frequency of exposure." *Id.* at 49-50. Because heavy metals are naturally-occurring, nearly all dog foods contain some amount of arsenic and lead. Report of Dr. Robert Poppenga (Ex. L) at 10. FDA expressly states that heavy metals are *not* hazards for kibble or the main ingredients in the Wellness products, including fish, grains, and fruit and vegetables. *Animal Food Draft Guidance* (Ex. K), at 142, 145, 153-54. This is consistent with the scientific literature and FDA's prior analysis of pet foods (and, as discussed below, with WellPet's own testing). *See generally* Poppenga Rep. (Ex. L) at 5-15.

In 2003, the National Research Council of the National Academics of Science ("NRC") formed a committee of independent experts to conduct a thorough review of the scientific literature

---

[3] FDA, *Arsenic in Food and Dietary Supplements*, *available at* https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements (last visited Sept. 29, 2020); FDA, *Lead in Food, Foodwares, and Dietary Supplements*, *available at* https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements (last visited Sept. 29, 2020).

and provide recommendations on the maximum tolerable dietary levels of heavy metals for animals. *Id*. at 10-11. Under the sponsorship of FDA's Center for Veterinary Medicine, the committee published *Mineral Tolerance of Animals* (2d ed. 2005), which identified maximum tolerable levels ("MTLs") for dozens of heavy metals and other substances. *Id*. at 11. The committee's findings are based on a wide variety of studies across multiple domestic species, including dogs and cats. *Id*. The committee determined that the MTLs were the appropriate limits for animal diets and physiology, not the human limits developed by the Environmental Protection Agency ("EPA") and the World Health Organization.[4]  *Id*.

As WellPet's expert says, these MTLs are "the best and most widely used scientific guidance available to veterinary toxicology and nutrition experts for determining what are safe levels of heavy metals in dog food." *Id*. at 12. Indeed, FDA also uses these MTLs when assessing the safety of animal food, along with information provided in AAFCO's *Official Publication*. *See* Poppenga Rep. (Ex. L) at 11-12 (discussing FDA's 2011 *Target Animal Safety Review Memorandum*) (Ex. M); *Center for Veterinary Medicine CY15-17 Report on Heavy Metals in Animal Food* (Oct. 24, 2019) (Pusillo Rep. (Mot., Ex. 9) app. A).

- *WellPet's Testing for Heavy Metals*

WellPet does not add arsenic or lead to its dog food products. Kean Decl. (Ex. A) ¶ 14. Because the company understood that it's possible for certain heavy metals, including arsenic and lead, to accumulate in fish, WellPet began conducting targeted tests of fish-based ingredients in 2013 to determine whether the amounts of heavy metals would be concerning. *Id*. ¶ 36. WellPet conducted approximately 35 tests of its fish-based ingredients over a two-year period using a well-respected third-party laboratory. *Id*. The results showed that WellPet's fish-based ingredients did not contain arsenic or lead in amounts determined to present any health risk for dogs, based on the NRC's and

---

[4] Plaintiff's complaint cites the allowable limits for arsenic in food and drinking water for humans set by FDA and the EPA, although his experts do not reference them. SAC ¶¶ 4-5. Notably, the action limit FDA proposed for inorganic arsenic in infant rice cereal (and recently adopted), which Plaintiff approvingly cites in the complaint, *id*. ¶ 5, wouldn't be acceptable for dog food according to Plaintiff's expert, who claims that *no* level of arsenic is safe is for pet food. Report of Dr. Gary Pusillo (Mot., Ex. 9) at 14-15. But as WellPet's expert explains, among numerous other missteps in Dr. Pusillo's report, he also fails to address the important distinction between organic and inorganic arsenic. Only *inorganic* arsenic poses a health risk to animals—the arsenic in fish-based ingredients is almost entirely *organic*. Poppenga Rep. (Ex. L) at 3, 13, 14-15.

FDA's MTLs. *Id.* ¶¶ 37-38; Poppenga Rep. (Ex. L) at 5. The test results on the Wellness products submitted by Plaintiff are also far below these limits—and even well below the more conservative regulatory limits of the European Union. Poppenga Rep. (Ex. L) at 5-6 (Table 1), 13-14 (Table 9). Moreover, as WellPet's expert explains, the amounts of arsenic and lead Plaintiff found in the Wellness products are comparable to those found in other premium dog foods. *Id.* at 9-10, Table 7.

These test results also align with FDA's 2018 draft guidance for animal food manufacturers, which indicates the ingredients are not a health risk. *See Animal Food Draft Guidance* (Ex. K), at 142, 145, 153-54. Based on these test results, there has been no need for WellPet to establish any preventive controls for heavy metals.

As discussed in a separate *Daubert* motion, the opinion of Plaintiff's expert, Dr. Pusillo, that *no* level of arsenic or lead in pet food is safe for dogs is unreliable and inadmissible. His unscientific report largely relies on his subjective belief, unsupported assumptions, and quotes from irrelevant news reports that don't involve animals.[5]

- *BPA*

BPA is a chemical found in certain plastics and epoxy resins used in food and drink packaging, among many other things. Poppenga Rep. (Ex. L) at 16. WellPet does not intentionally add BPA to any products, nor is BPA used in the manufacture of WellPet's plastic storage containers and conveyor system buckets. Kean Decl. (Ex. A) ¶¶ 40-42. As with heavy metals, BPA is ubiquitous in the environment and humans and animals are exposed to it daily in many ways. Poppenga Rep. (Ex. L) at 16. It is present in our air, dust, and water. *Id.* In fact, a study of residential and office dust samples reported an average concentration of BPA of more than twice the amount found in the Wellness dog food. *Id.* Plaintiff's expert (Sean Callan) testified in a similar (unsuccessful) pet food case that quantifiable amounts of BPA were found in one-third of the several hundred dry kibble dog foods his lab tested.[6] As WellPet's expert explains, BPA is also commonly

---

[5] Although Plaintiff now argues in his class certification motion that no level of arsenic and lead is safe in pet food, Plaintiff's complaint alleges that the Wellness products contain "significant" and "alarming" levels of arsenic and lead. SAC ¶¶ 2, 12.

[6] *Reitman v. Champion Petfoods, USA, Inc.*, No. 2:18-cv-01736-DOC-JPR, Dkt. 190-16, at 54:10-15 (C.D. Cal. Oct. 4, 2019).

found in human foods, particularly canned foods, and in amounts greater than those found in the Wellness dog foods. *Id.*

FDA has reviewed numerous scientific studies in recent years and continues to find that BPA is safe for use in the packaging of human food.[7] Needless to say, FDA has not identified BPA as a potential hazard in pet food either. WellPet's expert explains that based on data from well-designed animal studies, the amount of BPA that would be consumed from eating the Wellness products—assuming the highest level of BPA found in Plaintiff's testing and WellPet's recommended feeding portions—is far less than one-tenth of one percent of the lowest known animal-derived no observable adverse effect level (NOAEL), and therefore well below any level that might cause harm to a dog. Poppenga Rep. (Ex. L) at 17-18. Plaintiff's experts point to no scientific evidence showing such trace amounts are harmful to dogs.

- *WellPet's Food Safety Procedures*

Despite FDA's conclusions that the trace amounts of arsenic, lead, and BPA found in the Wellness dog foods are safe, the lack of scientific evidence to the contrary, and FDA's risk-based approach to whether preventive controls are needed, Plaintiff still contends WellPet hasn't done enough. According to Plaintiff, WellPet should have done more testing and should have tested at the highly-sensitive detection level of parts per billion ("ppb"), rather than parts per million ("ppm")[8], even though the maximum tolerable levels followed by FDA are in ppm (12.5 ppm for arsenic, 10 ppm for lead), and Plaintiff's extra-sensitive ppb testing still showed arsenic and lead at just 12% and 3.1%, respectively, of these maximum tolerable levels.[9] Poppenga Rep. (Ex. L) at 14. Plaintiff

---

[7]   FDA, *Bisphenol A (BPA)*, *available at* https://www.fda.gov/food/food-additives-petitions/bisphenol-bpa (last visited Sept. 29, 2020).

[8]   A helpful illustration may be to think of one part per million as one second in a period of about two weeks, while one part per billion is one second out of roughly 32 years.

[9]   Plaintiff argues that WellPet's corporate designee, Mr. Kean, admitted that the company would have considered arsenic and lead a risk if WellPet had tested at ppb instead of ppm, if results showed what was alleged in the complaint. Mot. at 5. That's not true. Mr. Kean misunderstood the question, which is evident from the reference in his answer to the FDA veterinary medical officer's review of a study on heavy metals in pet food. Kean Dep. (Ex. N) at 131:18-132:3; *see Target Animal Safety Review Memorandum* (Ex. M). The FDA review found that the levels of arsenic and lead in the pet foods were safe and well under the maximum tolerable levels identified by the NRC. Ex. M at 9-10, 12. Mr. Kean's reference to this FDA review as the basis for his answer would have made no sense if he intended to say that WellPet considered the levels of arsenic and lead Plaintiff identified to be a health risk. The FDA review says just the opposite, and Mr. Kean intended to say just the opposite.

7

also claims that WellPet should have screened the dog food for BPA to prevent it from being present, even though BPA is found everywhere, including in the food we eat and other dog foods (Plaintiff's experts never explain how it could be eliminated entirely from the dog food), and FDA says it's safe.

Plaintiff further contends that WellPet's quality manual prohibited the presence of heavy metals and BPA in the pet food. But that's not what the manual says—or conveys. The manual states that heavy metals are not to be *introduced into WellPet's products* from direct or indirect contact, not that the products will be *free of heavy metals entirely*—which even FDA says is not possible.[10] Mot. at 4. Plaintiff also misreads the "Foreign Body Control" section of the manual. The manual references having procedures in place to remove foreign bodies from ingredients and finished product, including "wood, plastic, glass, stone, paper, cloth, human hair, insect parts, filth" and "metalized materials that are detectable by metal detectors and x-ray equipment." WLPT00008059 at 8087 (Mot., Ex. 5). As WellPet explains, however, this section of the manual is about removing solid objects from the food through magnets, sieves, and x-ray equipment; it has nothing to do with a chemical such as BPA that appears in microscopic amounts and which manufacturers could not remove anyway.[11] Kean Decl. (Ex. A) ¶ 44.

Plaintiff's reliance on the quality manual is misplaced in any event. This was a draft document that a member of WellPet's quality team created after Congress passed the Food Safety Modernization Act in 2011. *Id.* ¶ 24. The draft manual was prepared in anticipation of what FDA might subsequently require of manufacturers and was not intended to be a final document until after

---

Quite simply, he mistakenly said "yes" instead of "no." Mr. Kean listened to the question and answer during a recess and subsequently corrected his answer. Kean Dep. (Ex. N) at 141:18-144:2.

[10] *See* note 3, *supra*.

[11] Plaintiff's animal nutrition expert claims that WellPet believed arsenic and lead could enter some of the fish ingredients during the manufacturing process. Pusillo Rep. (Mot., Ex. 9) at 19. Plaintiff's expert mischaracterizes WellPet's testimony, which did not pertain to arsenic and lead. The WellPet employee had explained that fragments of metal "could find their way into the product by -- just by means of wear and tear of the equipment that they need to pass through." Deposition of Digvijay Gurung (Ex. S) at 149:4-150:6. Plaintiff's attorney later revisited this response, stating, "I think that's what you had testified before was that metal may enter some of the fish ingredients … through the manufacturing process? The employee responded, "It could, yes. And that's why you also have screens and magnets as part of the [hazard analysis and critical control point] program, to make sure that they are removed if they are present." *Id.* at 152:1-9. The employee was talking about removing metal fragments that can break off manufacturing equipment; he was *not* discussing arsenic and lead, which are present in microscopic amounts and could not be removed with screens and magnets.

FDA issued its follow-on regulations and industry guidance. *Id.* FDA issued regulations for animal food production in September 2015, followed by draft guidance on hazard analysis in 2018. *See* 21 C.F.R. Part 507; *Animal Food Draft Guidance* (Ex. K), *supra*. The draft manual eventually was superseded by a food safety plan in late 2018. Kean Decl. (Ex. A) ¶ 24. As discussed above, FDA regulations and guidance incorporate a risk-based approach to food safety and the trace amounts of arsenic, lead, and BPA found in pet foods do not pose a health risk to dogs, precluding the need for preventive controls.

As WellPet argues in its *Daubert* motion, neither Dr. Pusillo nor Dr. Callan is qualified to render opinions on WellPet's quality control procedures, as neither has expertise in food manufacturing or food safety. Moreover, their opinions are unsupported and therefore inadmissible.

- *The Class Representative*

Daniel Zeiger began purchasing Wellness dog food around 2010 after obtaining some free samples. Deposition of Daniel Zeiger (Ex. O) at 77:12-78:19, 134:15-135:6. Other than the name "Wellness" and the phrase "grain free," he did not recall seeing any words on the packaging.[12] *Id.* at 88:3-21, 99:3-22, 135:14-136:7. Zeiger considers himself a "very sophisticated" consumer and he understands that arsenic and lead are naturally occurring and that there are going to be trace levels of these elements in everything, including all pet food. *Id.* at 82:25-83:5, 120:18-121:7, 169:19-170:2, 241:21-25, 253:7-12. Zeiger likewise understands that BPA is in most foods and that it is "all around us." *Id.* at 142:4-9. He does not take issue with the use of "natural" on the Wellness packaging, and does not believe labels that claim a product is "natural." *Id.* at 279:12-15, 258:11-21. Although his interrogatory answers state that he purchased CORE Ocean or Sweet Potato approximately every one to three months for approximately $15.00 to $18.99 per bag, Zeiger didn't have a clear memory at his deposition as to which specific Wellness dog foods he bought and couldn't name the products he is suing about.[13] *Id.* at 17:19-25, 19:7-15, 276:2-12; Zeiger Interrog. Resp. No. 2 (Ex. T). He believes it is "reasonable" for manufacturers to rely on the levels of arsenic, lead, and BPA identified

---

[12] Through errata changes, Zeiger attempted to change his testimony to state that he relied on several of the challenged statements when he initially purchased Wellness dog food. WellPet moved to strike these changes as improper and the Court agreed. *See* Dkt. 138.

[13] Zeiger's deposition occurred just four months after his interrogatory answers were submitted.

9

as safe by governmental agencies, and he personally would rely on FDA. Zeiger Dep. (Ex. O) at 148:16-149:2, 162:25-163:8, 213:23-24, 214:5-9. Zeiger also admitted his claims are "hypothetical," and that to the best of his knowledge "[t]here's no proof [these levels of arsenic, lead, and BPA] are "going to have any long-term effects." *Id.* at 303:12-304:1. He does not allege that the Wellness dog foods harmed his dog.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation and internal quotation marks omitted). Before certifying a class, the court must conduct a "rigorous analysis" to determine whether a plaintiff has carried his burden to "affirmatively demonstrate" all certification requirements under Rule 23 have been met.[14] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Dukes*, 564 U.S. at 350. Rule 23 is not a mere pleading standard; it requires a party seeking certification to offer evidence. *Comcast*, 569 U.S. at 33. The district court's analysis will often overlap with the merits, but a court "must" consider the merits to the extent they do overlap. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Among other things, Plaintiff must offer a damages model to "establish that damages are susceptible of measurement across the entire class," or else "[q]uestions of individual damage calculations will inevitably overwhelm" common questions. *Comcast*, 569 U.S. at 34-35; *Khasin v. R.C. Bigelow, Inc.*, 2016 WL 1213767, at *3 (N.D. Cal. Mar. 29, 2016).

## ARGUMENT

Zeiger alleges misrepresentation and omission under the common law, CLRA, FAL, and UCL, and breach of express and implied warranty. He seeks certification of the following classes (*see* Mot. at i):

- *Wellness Class*: All persons in California who, from July 1, 2013, to the present, purchased Wellness Complete Health Adult Dry Whitefish and Sweet Potato dog food for household or business use, and not for resale;

---

[14] As a procedural device, Rule 23 cannot alter a defendant's substantive rights. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

- *Wellness Grain-Free Class*: All persons in California who, from July 1, 2013, to the present, purchased Wellness Complete Health Adult Grain Free Whitefish and Menhaden Fish Meal dog food for household or business use, and not for resale; and

- *Core Class*: All persons in California who, from July 1, 2013, to the present, purchased Wellness CORE Adult Dry Ocean Whitefish, Herring Meal and Salmon Meal dog food for household or business use, and not for resale.

Zeiger seeks to certify classes under Rule 23(b)(2) and Rule 23(b)(3), which requires him to satisfy the requirements of Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3).[15] For the reasons detailed below, Zeiger fails to carry his burden of proving he has met each of these requirements.

**I.  Zeiger has not proven that common issues predominate as to any claims.**

A court can certify a Rule 23(b)(3) class only if it finds that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). The "predominance" requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," and it is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 623-24. Zeiger has not satisfied predominance because he has not shown he can demonstrate deception and causation using class-wide proof, or that damages can be calculated on a class-wide basis.

**A.  Zeiger has not shown he can demonstrate deception and causation using class-wide proof.**

Zeiger's causes of action require him to prove that the packaging of the Wellness products is deceptive to reasonable consumers and that each proposed class member was injured as a result. Zeiger cannot prove deception and causation on a class-wide basis because (1) the challenged statements have not been uniform on the packages during the proposed class period; and (2) Zeiger hasn't shown that the challenged statements have a uniform meaning to consumers or are material across the proposed class.

**1.  The challenged statements have not appeared uniformly on the products during the proposed class period.**

"[W]here exposure to the alleged misleading advertising and labeling varied, courts have found that individual issues predominate because consumers' understanding of the alleged

---

[15] Plaintiff alternatively seeks certification of a class under Rule 23(c)(4).

misrepresentation would not be uniform." *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *7 (C.D. Cal. June 23, 2016); *see Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 229 (N.D. Cal. 2015) (denying class certification because challenged labels and packaging varied during class period); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("A presumption of reliance does not arise when class members were exposed to quite disparate information") (citation and internal quotation marks omitted). Here, the five challenged statements don't all appear on all of the packaging. Some of the statements were added to the packaging later in the class period, some were removed or moved to other locations on the packaging, and some are not prominently displayed and therefore do not warrant an inference of class-wide exposure. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099-1100 (N.D. Cal. 2018) (finding that certain packaging statements displayed less prominently, such as on the back panel, would lead to individualized inquiries to determine which proposed class members actually saw them). Moreover, the challenged statements are accompanied by other explanatory statements, thus providing "context that differs from bag to bag." *Reitman v. Champion Petfoods USA, Inc.*, 2019 WL 7169792, at *9 (C.D. Cal. Oct. 30, 2019) (denying class certification in substantially similar dog food case); *see* Ex. C through Ex. J (Wellness dog food packaging).

There have been several materially different versions of the CORE Ocean packaging during the class period. The phrase "uncompromising nutrition" appeared only on the back of the packaging from mid-to-late 2013 until the spring of 2016.[16] During this time, there were two different versions in the market. From mid-to-late 2013 until mid-to-late 2014, and from mid-to-late 2014 until the spring of 2016, the phrase appeared in differing print sizes and was accompanied by different statements that provided context. Exs. C, D, and E. Around the spring of 2016, the phrase was removed from the back of the packaging and placed in small print inside a small round "Wellness Way" seal on the bottom front of the packaging, adjacent to still other statements. Ex. F. Although consumers might have seen the seal itself, it's far less clear that they would have read the statements

---

[16] "Uncompromising nutrition" may also have appeared on the side of some packages for a few months in mid-2013. *See* Ex. C. Each version of the packaging takes about three to six months from the time the packaging change is approved until it begins arriving on store shelves. Marseglia Decl. (Ex. B) ¶ 10. The date of each packaging change is the revision date located adjacent to the bar code on the back of each package. *Id.* ¶ 6. Accordingly, these time frames are approximate.

in small print inside it on the perimeter of the circle. "With nothing in excess and everything in balance" was on the packaging only from mid-to-late 2013 until the spring of 2016. It appeared only on the back of the packaging, immediately below a large graphic containing explanatory statements. Exs. D, E. "Unrivaled quality standards" has been on the packaging only since the spring of 2016, in small print inside the circular "Wellness Way" seal. Ex. F. "Complete health" doesn't appear on any CORE Ocean packages.

The Sweet Potato product also has had three materially different versions in the market during the class period. From mid-to-late 2013 until the spring of 2016, "uncompromising nutrition" was on the back of the packaging, immediately followed by different statements that explain its meaning. Exs. G, H. Around the spring of 2016, the print size was reduced and the phrase was moved inside the "Wellness Way" seal on the front and back of the packaging, where it appears next to still other statements providing context. Ex. I; *see Reitman*, 2019 WL 7169792, at *10 ("each package's labeling provides additional context that will require individualized analysis across Class members that predominate over any common questions"). As with CORE Ocean, the phrase "unrivaled quality standards" did not appear on Sweet Potato until 2016, when it was placed inside the small "Wellness Way" seal. Ex. I. From mid-to-late 2014 until the spring of 2016, the packaging contained a different seal—the "All Ways Well" seal—that had virtually the same design as the "Wellness Way" seal but contained different language. Ex. H. The phrase "with nothing in excess and everything in balance" hasn't appeared on any of the Sweet Potato packaging.

On the Menhaden packaging, the phrases "uncompromising nutrition" and "unrivaled quality standards" also appear in smaller print inside the small round "Wellness Way" seal. Ex. J. The phrase "with nothing in excess and everything in balance" does not appear.

Because of the lack of uniformity in the labeling for the three products across the class period, Zeiger cannot show that class members were exposed to the same misrepresentations. *See Mazza*, 666 F.3d at 596; *Philips v. Ford Motor Co.*, 2016 WL 7428810, at *15-16 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 F. App'x 608 (9th Cir. 2018) (denying certification because "class members were not exposed to uniform representations" and therefore "reliance is a matter that would

vary from consumer to consumer").[17] Zeiger has not proposed subclasses for each product based on the different versions of the packaging (and his damages model doesn't take the packaging changes into account). But the creation of subclasses would not be workable anyway. As noted, it takes on average anywhere from three to six months from the time WellPet approves packaging changes until the new packages begin arriving in stores. Marseglia Decl. (Ex. B) ¶ 10. This means there would have been a period of up to several months for each packaging change when the old and new versions of the same product's packaging appeared on store shelves at the same time. *Id.* ¶ 11. As a result, there are significant portions of the class period for which it would be difficult to determine the particular packaging versions class members purchased. *See Kosta*, 308 F.R.D. at 229.

> ### 2. Zeiger has not proven that the challenged statements have a uniform meaning to consumers or are material across the proposed class.

Zeiger has not shown that the proposed class uniformly understands the challenged statements as (in his view) representing that the Wellness products are completely free of trace amounts of elements that exist everywhere in the environment and are found in nearly all pet food as well as in human food. As a result, Zeiger has not demonstrated that these alleged "misrepresentations" are material as to all class members and the issue of reliance will "vary from consumer to consumer." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011).

Zeiger has not shown that class members would reasonably read the phrases "uncompromising nutrition," "with nothing in excess and everything in balance," "complete health," "unrivaled quality standards," and "natural" as representing that the products are completely free of microscopic amounts of certain heavy metals and BPA, which are present in virtually everything. And he cannot make this showing. As another federal district court held in dismissing substantially similar claims against Champion Petfoods, "Champion did not claim that its products were free from *any* heavy metals and any inference to the contrary reads too much into Champion's representations." *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 972 (E.D. Ky.

---

[17] As Judge Koh explains, the Ninth Circuit has held that class exposure to disparate information can defeat a presumption of reliance in cases involving "both misleading statements and omissions." *Philips*, 2016 WL 7428810, at *15 (citing *Mazza*, 666 F.3d at 585 and *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)).

2019); *see Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) ("A representation does not become false and deceptive merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.") (citation and internal quotation marks omitted). Zeiger has not shown that even a majority of consumers would interpret the above phrases on the Wellness packages in this manner. This lack of a common understanding among the proposed class precludes certification. *See Pierce-Nunes*, 2016 WL 5920345, at *7 (no common understanding as to the meaning of "LED TV"); *In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *8-9 (C.D. Cal. June 7, 2017) (no common understanding of the meaning of "energy").

Moreover, the challenged statements often appear on the packaging next to other statements that provide context and alter meaning. For example, the phrase "uncompromising nutrition" has appeared next to a block of text on the CORE Ocean packaging explaining that the product is "based on the nutritional philosophy that dogs, given their primal ancestry, thrive on a diet mainly comprised of meat," the product is "nutrient-dense," and "packed with a high concentration of quality animal protein, without fillers or grains, along with a proprietary blend of botanicals and nutritional supplements." Ex. D. On other packaging the same phrase has appeared adjacent to "no meat by-products, fillers or artificial preservatives," "guaranteed levels of omega-3 fatty acids from whitefish & flaxseed," "easily digestible carbohydrates," and "fortified with vitamins and minerals." Ex. I.

"Complete Health"™ is the name of the line of Wellness dog foods that includes Sweet Potato and Menhaden. The packaging for both products contains numerous statements explaining the health benefits of those diets, including, among many others, "nutritious, balanced blends of high-quality proteins, select fats and carbohydrates will provide the energy your pet needs," "guaranteed levels of calcium, phosphorous and vitamin A help support healthy teeth and gums," "antioxidant-rich fruits and vegetables and nutritional supplements such as vitamin E help support a healthy immune system," and "a combination of healthy fiber, chicory root extract and probiotics help support healthy digestion." *E.g.*, Exs. I, J. In short, the entire package describes what is meant by "complete health." Similarly, the phrase "with nothing in excess and everything in balance"

WELLPET'S OPP. TO CLASS CERTIFICATION
CASE NO. 3:17-CV-4056-WHO

appeared immediately below and linked to a large graphic with text describing the benefits of CORE Ocean, including, among others, "optimum fat & calorie levels," "high protein, grain free," "green vegetables," and "fish & flax omega health." Ex. C. Zeiger has not shown that consumers would read any of the above statements as representations that the products are free of trace environmental elements. Without a common understanding of the challenged statements among consumers, materiality is not susceptible to common proof.

Although Zeiger's marketing expert surveyed nearly 500 individuals who purportedly bought Wellness dry dog food during the class period, he didn't ask any of them how they interpreted the five challenged statements. *See In re Conagra Foods, Inc.*, 302 F.R.D. 537, 577 (C.D. Cal. 2014) (faulting plaintiff for providing "no survey evidence concerning the actual reaction of consumers to the '100% Natural' label on Wesson Oils"). That's rather telling. Instead, Zeiger submits the report of an advertising expert who purports to know how consumers *would* perceive the statements. But the expert's opinions don't help Zeiger. He opines that consumers would interpret the challenged statements as representing that the Wellness products are "healthy," "natural," "safe," and "superior." Report of Bruce G. Silverman (Mot., Ex. 3) ¶ 59. We don't need an expert to tell us that. Rather, the question for purposes of class certification is whether Zeiger can establish through common proof that the mere presence of trace amounts of arsenic, lead, and BPA renders the challenged statements false or misleading to each class member. He cannot do so. Silverman opines that because of exposure to "media reports" on the "dangers" of arsenic, lead, and BPA, consumers would likely reject any dog food in which the elements were present—*in any amount*. *Id.* He provides no support for such a sweeping, categorical opinion. Silverman cites reports such as a *60 Minutes* story on the high levels of lead discovered in drinking water in Flint, Michigan; a *Consumer Reports* online report about levels of arsenic found in certain bottled water; internet articles about lead in dog toys; and similar internet articles about BPA. But he provides no evidence to suggest that all or even a majority of consumers of these Wellness products in California saw these reports, or that they would share his same view of the information if they had.

Moreover, Silverman ignores important information that is equally available to class members (and which Plaintiff's counsel apparently neglected to tell him). For example, he fails to

mention basic scientific, regulatory, and marketplace realities that consumers would undoubtedly consider important to their purchase decisions, including:

- FDA has stated that it is not possible to remove arsenic or lead entirely from the environment or food supply;

- the levels of arsenic and lead found in the Wellness products are commonly found in other premium dog foods and are well within the limits FDA (and the EU) has identified as safe for consumption by dogs;

- BPA exists everywhere in the environment, even human food, and FDA considers it safe; and

- there are no scientific studies showing that these trace levels of arsenic, lead, or BPA are harmful to dogs.

Because consumers are exposed to a variety of information, including the above facts ignored by Silverman, there is no basis for Silverman's assumption that all or nearly all Wellness consumers would be unwilling (or less willing) to buy the Wellness products due to the presence of *any* amount of arsenic, lead, or BPA. *See In re MyFord Touch Consumer Litig.*, 2016 WL 6873453, at \*2-3 (N.D. Cal. Nov. 22, 2016) (Because the "information individual plaintiffs were exposed to will vary considerably amongst class members," a "class-wide determination of reliance [is] impossible") (decertifying claims); *see also Weaver v. Champion Petfoods USA Inc.*, 2020 WL 3847248, at \*3 (E.D. Wis. July 8, 2020) ("[M]inute amounts of heavy metals are omnipresent in the environment and in all pet foods. If the mere presence of heavy metals in pet foods made a manufacturer's statements of quality misleading, then [Wisconsin's deceptive trade practices statute] would effectively bar the sale of any pet foods packaged or marketed in a manner that touts their quality. This is nonsensical, of course, as every pet food is advertised in this way.").

Zeiger also has not shown that most class members would view the presence of trace amounts of BPA as violating a "natural" representation, when BPA is present in air, dust, and water—even breast milk,[18] was not an ingredient added to the dog food during the manufacturing process, and the dog food complies with the definition of "natural" established by AAFCO, which publishes the model pet food regulations endorsed by FDA.[19] Kean Decl. (Ex. A) ¶¶ 11-14. Indeed,

---

[18] Poppenga Rep. (Ex. L) at 16.
[19] *See Memorandum of Understanding between the United States Food and Drug Administration and the Association of American Feed Control Officials* (Ex. P).

if the presence of trace amounts of BPA is sufficient to preclude a product from being labeled "natural," then no food product—even those intended for humans—could ever be labeled "natural."[20]

For all these reasons, Zeiger has not proven that all or even most members of the proposed class would be concerned about the presence of arsenic, lead, and BPA *in any amount*.[21] Zeiger provides no consumer survey or other evidence to suggest there is a common belief across the class in this regard. Individual inquiries would be required to determine each proposed class member's knowledge and understanding of relevant facts, such as those above, and their corresponding beliefs about the significance of these trace amounts in dog food. *See Mazza*, 666 F.3d at 596 ("A presumption of reliance does not arise when class members were exposed to quite disparate information") (citation and internal quotation marks omitted); *Philips*, 2016 WL 7428810, at *15-16. Accordingly, Zeiger has not shown that the alleged misrepresentations and omissions are material to the proposed class.[22]

**B.    Zeiger has not proven that damages can be measured on a class-wide basis.**[23]

Zeiger also fails to satisfy predominance under Rule 23(b)(3) because his damages model "falls far short of establishing that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. As a result, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id*. Zeiger contends that WellPet deceived him and the proposed class and, as a result, they paid too much for the Wellness products. He seeks money

---

[20] Zeiger has not shown that any class can be certified based on the alleged presence of BPA for the additional reason that he has not demonstrated that BPA is present in all or nearly all of the Wellness products purchased by class members. Zeiger's expert found quantifiable amounts of BPA in only 55% of the more than 100 WellPet products tested. Report of Sean P. Callan (Mot., Ex. 35) ¶ 3. Accordingly, common issues would not predominate regarding BPA. Nor can Plaintiff establish that BPA was present in any particular bag of dog food he purchased.

[21] Silverman's views aren't aligned with those of Zeiger, much less the entire proposed class. Zeiger believes there are trace levels of arsenic, lead, and BPA in everything. Zeiger Dep. (Ex. O) at 82:25-83:5, 120:18-121:7, 142:4-9, 253:7-12. He also thinks it's "reasonable" for pet food manufacturers to rely on the levels of arsenic, lead, and BPA regulatory agencies identify as safe. *Id*. at 148:16-149:2.

[22] The same analysis applies not just to Zeiger's misrepresentation claims, but also to his omission claims. Whether the absence of a warning about the presence of arsenic, lead, and BPA is deceptive requires the same individual inquiries into class members' perceptions.

[23] WellPet has moved to exclude Plaintiff's economic and survey experts in a separate *Daubert* motion for the reasons set forth in this section.

damages. The model offered to support Zeiger's damages case "must be consistent with [his] liability case[.]" *Id.* at 35. Zeiger puts forth two closely related theories of liability: (1) the five challenged statements have misled consumers and caused them to believe that the Wellness products are free of trace amounts of arsenic, lead, and BPA; and (2) the Wellness products' packaging fails to warn consumers that the products contain arsenic, lead, and/or BPA. To satisfy *Comcast*, Zeiger "must be able to isolate the price premium associated with misleading consumers in that particular fashion." *In re Conagra*, 302 F.R.D. at 579. Zeiger's proposed damages model fails this test.

The damages model is fatally flawed in numerous ways, beginning with the marketing survey on which it is based. Zeiger's survey expert claims to have designed and conducted a market research survey that identifies "the difference in market value of the Wellness Food with the omissions and misrepresentations compared to the value of the Wellness Food without the omissions and misrepresentations." Report of Steven P. Gaskin (Mot., Ex. 4) ¶ 12. But the survey suffers from numerous design flaws and therefore does not provide relevant or reliable information.

    1.   <u>The survey doesn't provide a relevant or reliable measure of the alleged harm.</u>

First and foremost, the survey fails to provide a relevant or reliable measure of the purported impact on consumers of information about the presence of arsenic, lead, and BPA. The labeling statements shown to survey respondents include two hypothetical warnings proposed by Plaintiff's counsel: "May contain measurable amounts of heavy metals such as arsenic or lead" and "May contain measurable amounts of bisphenol A (BPA)." These statements irreparably bias the survey because they are leading and also *mis*leading. Arsenic, lead, and BPA are commonly found in dog foods (and even human food). Poppenga Rep. (Ex. L) at 6-10, 16-18. But the survey presents information about the risk of presence of arsenic, lead, and BPA *only* for the Wellness products and not for other dog foods. If such disclosures were to be required, they would be made for *all* products in the market, not just Wellness. *See Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018) ("conjoint analysis [must] reflect market realities").

The survey is designed in a manner that results in bias. Plaintiff's "warnings" fail to include any context for the negative information they provide, such as the levels at which "measurable amounts" of arsenic, lead, and BPA would be harmful, the levels that occur naturally in the

environment, the levels present in other dog foods, the nutritional value of the ingredients in other dog foods, or information about the sourcing of ingredients by WellPet and other dog food manufacturers. As a result, the hypothetical warnings do not reflect the "real world" marketplace and cannot be used to estimate or predict actual purchasing behavior or consumer preferences. Because consumers know they haven't seen these warnings on other dog foods—or even on any human foods—they would naturally be alarmed and assume, incorrectly, that this is an issue unique to Wellness dog food. Before any survey could purport to measure the true value consumers place on the labeling statements, it would, at a minimum, have to provide context, including informing consumers that these elements are present in nearly all dog foods, that FDA has stated these elements cannot be removed entirely from food, and that FDA finds these levels safe.

2. The survey unreliably and impermissibly results in price premiums that exceed the purchase price.

The proof that omitting this context created bias is evident from the survey results. The price premiums Gaskin calculates for the challenged statements and omissions *exceed 100% of the purchase price*. Report of Colin B. Weir (Mot., Ex. 31) ¶ 54. In other words, because the hypothetical warnings provided no context for consumers, the responses across all the challenged statements and omissions unsurprisingly (and unreliably) resulted in a *negative* value, i.e., less than $0, for the Wellness products. But as the Ninth Circuit has held, "a plaintiff cannot be awarded a full refund unless the product she purchased was worthless." *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016). This Court and others in this district have rejected the "full refund" approach to restitution because it implausibly assumes the products provide no benefit. *See Khasin*, 2016 WL 1213767, at *3 ("Attributing a value of $0 to the Green Tea Products assumes that consumers gain no benefit in the form of enjoyment, nutrition, caffeine intake, or hydration from consuming the teas. This is too implausible to accept."); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014) (rejecting full refund model "because it is based on the assumption that consumers receive no benefit whatsoever from purchasing the accused products [when] [t]his cannot be the case, as consumers received benefits in the form of calories, nutrition, vitamins, and minerals"). As this Court held in *Khasin*, "the proper measure of restitution

in a product mislabeling case is not the full purchase price or all profits." 2016 WL 1213767, at *3 (internal quotation marks omitted). Zeiger *himself* testified that the Wellness products are fresher, provide more health benefits, and have better ingredients than other dog food. Zeiger Dep. (Ex. O) at 95:17-96:12. A flawed damages model that would give full refunds (and more) to class members must be rejected.

3.   The survey's presentation of the challenged statements and product prices does not reflect the "real-world" marketplace.

The survey is methodologically flawed in other ways. It presented the five challenged statements as stand-alone phrases in a list, without the surrounding text and graphics that appear on the packaging and provide meaning to the statements. Gaskin Rep. (Mot., Ex. 4) at 8 (Fig. 1). As a result, the respondents were left to subjectively interpret the statements without any context. By not using images of the actual packaging, the survey also improperly attributed equal weight to each statement, without regard to where and how the statement actually appears on the packaging (e.g., front or back, large or small print, etc.). This methodology cannot reliably assess the actual value of the statements to consumers.

Similarly, the questions in the survey each included only five to seven attributes of the products (with very short descriptions) even though Gaskin identified 15 attributes while omitting still others that are included on the actual packaging. *Id.* at 8 (Fig. 1), 22-23; Ex. C through Ex. J. By limiting each hypothetical product profile to less than half of the actual attributes on the packages, the survey "artificially focused [respondents] on … particular feature[s]." *Oracle America, Inc. v. Google, Inc.*, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012). As the court in *Oracle America* found, it is "highly likely" that respondents would place greater importance on an attribute if it were shown among only a few others as opposed to 15 or 20 other attributes. *Id.* (finding that artificially using a low number of features "warp[ed] what would have been [respondents'] real-world considerations").[24]

---

[24] As Judge Alsup held in *Oracle America*, telling respondents to hold all other features constant may "in theory" make it unnecessary to test every feature, but here, as in *Oracle America*, the survey's "irrational results shows that study participants did not hold all other, non-tested features constant." *Oracle America*, 2012 WL 850705, at *11.

In addition, the hypothetical warnings are the *only* two negative statements among all the label statements presented in the survey; the other statements all involve positive attributes of Wellness. By including two warnings among otherwise positive statements, Zeiger made no real attempt to disguise the purpose of the survey. This renders the survey susceptible to "demand artifacts," with respondents providing what they perceive to be "correct" answers, rather than answers that represent their actual opinions. Similarly, the questions in the survey mix the hypothetical warnings in among the statements that actually appear on the package. The survey cannot reliably measure the value of each challenged statement when the omitted statements also appear on the same hypothetical label. Indeed, what are respondents to think when they see "natural" right next to "may contain measurable amounts of bisphenol A (BPA)," with no explanation?

The inclusion of the two warnings undoubtedly influenced how respondents viewed the challenged statements, precluding the survey from measuring the true value of those attributes to the consumers. For example, as WellPet's economic expert found, the value respondents placed on the term "natural" ranged from negative 47 to positive 113, with a negative value assigned by 34 percent of the respondents. Report of Dr. Jesse David (Ex. Q) ¶ 49. Similarly, 17 percent of respondents placed a *positive* value on the warning regarding heavy metals. *Id.* ¶ 49 n.60. Dr. David notes that these "irrational" preferences suggest respondents were (a) confused by the apparently contradictory statements in the questions; (b) didn't care about the challenged statements and omissions; or (c) paid little attention to the questions; or, alternatively, it suggests the responses reflect random error. *Id.* ¶ 50. Regardless of the reason, this further undermines the survey's reliability. *MacDougall v. Am. Honda Motor Co.*, 2020 WL 5583534, at *8 (C.D. Cal. Sept. 11, 2020) (finding that "irrationality exhibited in individual survey responses evidence[d] a deeply flawed conjoint study that produced unreliable results").

The survey also used unrealistically low prices for the products and did not inform respondents as to the specific quantity of food in each bag. Gaskin selected $35.00, $45.00, $55.00, and $65.00 for the four price options. Respondents were informed that the prices all applied to the "largest" size of each of the Wellness products (the only size respondents were permitted to choose). Gaskin contends that this price range "reflects the actual market prices that prevailed during the

Class Period."[25] That's not true. The largest size of CORE Ocean generally has been priced at either $64.99 or $74.99, with Sweet Potato at $59.99 or $57.99, and Menhaden at $57.99.[26] Prices of $35.00 and $45.00 are well below actual market prices for the largest size. *Zakaria*, 755 F. App'x at 624 ("conjoint analysis [must] reflect market realities and prices for [the] products"). And because respondents all had purchased Wellness dry kibble products previously and would therefore have been familiar with the actual prices, this disparity from the real-world market likely caused additional confusion. By using unrealistically low prices, Gaskin also artificially increased the purported price premiums.[27] David Rep. (Ex. Q) at ¶ 74 n.102; *see MacDougall*, 2020 WL 5583534, at *6 ("By untethering his survey price choices from real-world prices, [the expert's] methodology sows doubt as to the reliability of his [willingness-to-pay] calculation.") (rejecting damages model).

A related design flaw is that respondents were told that the largest size "rang[ed] from 22-30 lbs,"[28] but they were not told for each set of options whether they were getting 22 lbs., 30 lbs., or some quantity in between. Consumers pay for a specific quantity of dog food, not a weight *range*. This additional ambiguity in the survey's design introduced the possibility that respondents were agreeing to pay particular prices based on differing quantity assumptions. By not identifying the specific quantity, the survey allowed that some respondents would consider the bags as containing 22 lbs. for purposes of their purchase decision, while others might assume they contained 30 lbs. or some other quantity. This is important because some consumers would be willing to pay a particular price for 22 lbs. of dog food, but would be willing to pay more if they thought they were receiving 30 lbs, which is 36% more.

    4.   <u>The damages model improperly reflects only consumers' purported willingness to pay without consideration of supply-side factors and other marketplace realities.</u>

Another glaring error in Zeiger's damages model is that it purports to calculate a price premium for the products based on willingness to pay without reflecting market realities. The Ninth

---

[25] Gaskin Rep. (Mot., Ex. 4) ¶ 24.

[26] Declaration of Clark Reinhard (Ex. R) at Ex. A. This reflects WellPet's suggested retail price. Some retailers may sell the large size at a slightly lower price, but certainly not in the $35.00 to $45.00 range.

[27] Of course, Gaskin could not determine the market price for a dog food that is free of arsenic, lead and BPA because Zeiger has not identified any such dog food.

[28] Gaskin Rep. (Mot., Ex. 4) ¶ 48.

Circuit has stated that such damages models "must, however, reflect supply-side considerations and marketplace realities that would affect product pricing." *Zakaria*, 755 F. App'x at 624 (affirming summary judgment for defendant and decertification of putative class). In *Zakaria*, the Court of Appeals found that the expert's conjoint analysis "showed only how much consumers subjectively valued" the label statement, "not what had occurred to the actual market price" of the product "with or without the label [statement]." *Id.* at 624-25. The plaintiff's expert failed to provide evidence that any consumers "actually paid" a higher price as a result of the label statement, and the defendant presented undisputed evidence that "it did not raise the price of [the product] because of [the label statement]." *Id.* at 625. The court held that "the subjective value consumers place on the [label statement] does not set the price for [the product]." *Id.*

Gaskin's conjoint analysis here fails for the same reason. Despite interviewing nearly 500 consumers who actually purchased Wellness products during the class period, Gaskin's analysis doesn't show that any consumers *actually paid* a higher price for the products because of the challenged statements/omissions. And WellPet has submitted undisputed evidence that the products' prices *did not change* as a result of the challenged statements being added to or removed from the packaging. Reinhard Decl. (Ex. R) ¶¶ 9-20 & Ex. A. Although Zeiger's economic expert purports to address supply-side considerations, Weir Rep. (Mot., Ex. 31) at 8, he's done nothing of the sort. Instead, he disregards basic economic theory and makes irrelevant points about the historical number of units sold while failing to provide any analysis of the "but-for" conduct of sellers in the real world. *See* David Rep. (Ex. Q) ¶¶ 54-57. All Weir did was multiply the price premiums from Gaskin's (faulty) survey by the total estimated retail sales in California; he performed no marketplace analysis. The Court should reject the damages model for this additional reason.

## II.  The named class representative's claims are not typical of the class members' claims.

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Stearns*, 655 F.3d at 1019. The court should deny certification "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Nguyen v. Nissan North Am., Inc.*, --- F. Supp. 3d ----, 2020 WL 5517261, at *9 (N.D. Cal.

Sept. 13, 2020). Zeiger's interests are not aligned with those of the proposed class and he is subject to unique defenses. Accordingly, typicality is not satisfied.

Zeiger's lack of reliance on the statements at issue and his knowledge that arsenic, lead, and BPA are ubiquitous in the environment, including food, raises serious questions regarding his ability to establish standing to pursue his claims. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("[I]f [the named plaintiff] has no … claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail."). Zeiger did not start buying the Wellness products in reliance on any of the five challenged statements. *See Sandoval v. PharmaCare US, Inc.*, 730 F. App'x 417, 419 (9th Cir. 2018) (affirming summary judgment when plaintiff failed to show that "he viewed and relied on the website before his first purchase of" the product). Zeiger first bought Wellness around 2010 after he obtained free product samples. Zeiger Dep. (Ex. O) at 77:12-78:19, 134:15-135:6. He remembered that the product was named "Wellness" and that the package said "grain free," but did not recall seeing any other words on the packaging. *Id.* at 88:3-21, 99:3-22, 135:14-136:7. He starting buying the dog food because when he opened the package it had a fresh smell and his dogs seemed to like it. *Id.* at 134:15-135:6. Before switching to Wellness, Zeiger fed his dogs Nutro. Zeiger said Nutro had good ingredients but that Wellness went "the extra mile" and the food was "moist looking" and more "stay-fresh" than Nutro." *Id*. at 87:1-8, 94:6-11, 95:17-25.

Zeiger considers himself a "very sophisticated" consumer. *Id*. at 241:21-25. He knows that arsenic and lead are naturally occurring and that there are going to be trace levels of these elements in everything, including all pet food. *Id.* at 82:25-83:5, 120:18-121:7, 169:19-170:2, 253:7-12. Similarly, Zeiger understands that BPA is in most foods and that it is "all around us." *Id*. at 142:4-9. He looks at the ingredients on dog food packaging "religiously," and does not have any issue with the use of "natural" on the Wellness packages. *Id*. at 145:1-6, 279:12-15. Nor does Zeiger believe it when products claim to be "natural." *Id*. at 258:11-21.

Zeiger doesn't have a clear memory of the specific Wellness products he bought (his interrogatory answers notwithstanding), nor does his recollection correspond to when some of the products were on the market. Asked which products he is complaining about, he responded, "The

dry dog food, the one that I purchased. … I purchased multiple ones. There's the plain one, there's the whitefish, and the other fish. *I think I've purchased all three at one time or another*[.]" *Id.* at 17:19-25. When asked again to name the products he was suing about, Zeiger stated, "I don't remember the exact names because it's, you know, multiple things. It's the ocean fish one … The other one was plain Wellness brand. I think it's chicken flavored or something like that. The basic one. And there's two different fish flavored ones." *Id.* at 19:7-15. Zeiger is wrong. All three dog foods at issue are fish-based, but he recalls at most buying two fish-based products. Even then, Zeiger couldn't name the specific products he is suing about, which is particularly problematic considering there are more than 50 Wellness dry dog food formulas, 10 of which are fish-based (Kean Decl. (Ex. A) ¶ 9), and only *three* are at issue in this case. There is no "chicken-flavored" or "plain" Wellness dog food at issue. Asked specifically about Complete Health Grain Free Whitefish and Menhaden, Zeiger claimed that he purchased it around 2009 and the word "CORE" appeared on the top of the package. But the Menhaden product wasn't marketed until 2016 and it doesn't say "CORE" on the package. *Id.* at 266:17-267:3, 269:20-24, 270:16-20; Ex. J. When pressed further, Zeiger conceded he may not have purchased the Menhaden product at all. *Id.* at 276:2-12.

Beyond these trouble signs, Zeiger states it is "reasonable" for pet food manufacturers to rely on the levels of arsenic, lead, and BPA identified as safe by governmental agencies. *Id.* at 148:16-149:2. He further states that he would rely on FDA for the appropriate levels of arsenic and lead in pet food. *Id.* at 162:25-163:8; 213:23-24, 214:5-9. This puts him at odds with his own expert, Dr. Pusillo, who disagrees with FDA and asserts (albeit without scientific support) that *no* level of arsenic, lead, and BPA is safe for dogs. These divergent views on the central issue in this case further render Zeiger unfit to serve as the class representative. Zeiger also concedes that his claims are "hypothetical," and that "[t]here's no proof [these levels of arsenic, lead, and BPA] are "going to have any long-term effects." *Id.* at 303:12-304:1.

Further, Zeiger runs a pet sitting business and bought Wellness dog food monthly for that business from October 2014 until July 2017. *Id.* at 283:1-14. He occasionally charged his customers for the Wellness dog food but has no idea how often he charged them because he didn't track it. *Id.* at 284:19-285:8. Because Zeiger cannot determine the degree to which he was reimbursed (he

WELLPET'S OPP. TO CLASS CERTIFICATION
CASE NO. 3:17-CV-4056-WHO

cannot recover reimbursed costs), it would be difficult to calculate Zeiger's damages for this additional reason. This further jeopardizes his individual claims.

For all these reasons, Zeiger is not typical of the putative class.

## III.   Zeiger lacks standing to represent a class challenging the "natural" representation.

Zeiger doesn't have standing to represent a class of consumers alleging that the "natural" representation on the Wellness packaging is false or misleading. Zeiger cannot represent the proposed class because he has no claim himself. *Lierboe*, 350 F.3d at 1022 ("[I]f [the named plaintiff] has no ... claim, she cannot represent others who may have such a claim[.]"); *Fenerjian v. Nongshim Co.*, 72 F. Supp. 3d 1058, 1082 (N.D. Cal. 2014) ("[A]t least one named plaintiff must have standing with respect to each claim the class representatives seek to bring"); *see Lee v. State of Oregon*, 107 F.3d 1382, 1390 (9th Cir. 1997) ("Standing is a jurisdictional element that must be satisfied prior to class certification."). Zeiger did not recall seeing the word "natural" on the Wellness packages, but does not take issue with the use of the word in any event. Zeiger Dep. (Ex. O) at 88:3-21, 99:3-22, 135:14-136:7, 279:12-15. But even if he did, he doesn't believe product claims of "natural." *Id.* at 258:11-21. If Zeiger doesn't believe the "natural" claims on products, then he cannot claim to have been deceived or misled by the phrase "natural food" on the Wellness packaging—particularly when he didn't see it before buying the dog food. Without a viable individual claim, he cannot represent the proposed class as to this alleged misrepresentation.

## IV.   Zeiger has not shown a Rule 23(b)(2) class should be certified.

The Court also should deny Zeiger's request to certify a class under Rule 23(b)(2). First, Zeiger has not satisfied all of the Rule 23(a) requirements. Second, a Rule 23(b)(2) class "is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (citation omitted). Although Zeiger half-heartedly argues otherwise, the primary relief he seeks on behalf of the proposed class is money—more than $13 million, in fact. And "although the monetary amount sought may be small per class member, in the aggregate [it] can hardly be said to be incidental to the injunctive relief sought."[29] *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523,

---

[29] Lest there be any doubt that the primary focus of this case is monetary, not injunctive or declaratory relief, Zeiger's request to certify a Rule 23(b)(2) class is just half a page long and appears on the last page of his brief.

541 (N.D. Cal. 2012). Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61.

Third, Zeiger lacks standing to seek injunctive relief. "Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999). To have standing, Zeiger must show that "he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citations and internal quotations omitted). He "must demonstrate 'a real and immediate threat of repeated injury' in the future." *Chapman v. Pier 1 Imports (U.S) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). The threat of future injury must be "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Zeiger doesn't face a real and immediate threat of repeated injury. He testified only that he would be "open to" the idea of buying the Wellness products again if WellPet "fixed" the dog food, but that he "would not" purchase the products if just the allegedly misleading labels were changed. Zeiger Dep. (Ex. O) at 113:9-114:17, 264:2-12. The mere possibility that Zeiger *might* buy Wellness dog food again someday is not enough. The "threatened injury must be *certainly impending* to constitute injury in fact, and … allegations of possible future injury are not sufficient." *Rahman v. Mott's LLP*, 2018 WL 4585024, at *2 (N.D. Cal. Sept. 25, 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (emphasis added); *see also Lanovaz v. Twinings North America, Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) (holding that plaintiff's statement that she would "consider buying" the products in the future did not support a finding of actual or imminent injury); *Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787, 803 (N.D. Cal. 2019) (dismissing injunctive relief claim because plaintiff "only alleges possible future injury, not an injury that is "certainly impending").

Zeiger also hasn't shown a "sufficient likelihood that he will again be wronged in a similar way." *Bates*, 511 F.3d at 985. The wrong Zeiger alleges is the sale of the Wellness products with misleading labels. Because he has testified that he will not purchase the products in the future (even if the labels are changed), "it is unlikely that [he] will "again be wronged in a similar way." *Lanovaz*,

726 F. App'x at 591. Moreover, Zeiger understands that trace levels of arsenic, lead, and BPA exist most everywhere, including in food. Zeiger Dep. (Ex. O) at 82:25-83:5, 120:18-121:7, 253:7-12, 142:4-9. Therefore, he would not be misled in the future.

Finally, Zeiger cannot pursue a claim for injunctive relief because he has an adequate remedy at law. *Philips,* 2016 WL 7428810, at *23-25 (denying certification of Rule 23(b)(2) class for this reason). Zeiger alleges that he and the proposed class have been damaged by paying a price premium for the Wellness products. As Judge Koh found in *Philips,* "not only do[es] Plaintiff[] *have* an adequate remedy at law, Plaintiff[] [is] seeking to certify a class *asserting* that adequate remedy at law." *Id.* at *24. In affirming the dismissal of the injunctive relief claims in *Philips,* the Ninth Circuit held that "the district court correctly determined that [Plaintiffs] were required to plead the inadequacy of their legal remedies to state a claim for injunctive relief." *Philips v. Ford Motor Co.*, 726 F. App'x 608, 609 (9th Cir. 2018); *see also Copelan v. Infinity Ins. Co.*, 359 F. Supp. 3d 926, 930 (C.D. Cal. 2019); *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011). Zeiger's claim for injunctive relief fails as a matter of law.

## V.   Zeiger has not shown a Rule 23(c)(4) class should be certified.

Anticipating the challenge he faces under Rule 23(b)(3) and Rule 23(b)(2), Zeiger alternatively seeks certification on liability issues pursuant to Rule 23(c)(4). The Court should deny this request. Zeiger has not satisfied all the requirements of Rule 23(a). *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015) ("[A] Rule 23(c)(4) issues class must still meet the requirements of Rule 23(a) ....."). Zeiger has failed to satisfy typicality. He hasn't satisfied the requirements for Rule 23(c)(4) either. Certification under Rule 23(c)(4) "is 'appropriate' only if it 'materially advances the disposition of the litigation as a whole.'" *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017) (quoting William B. Rubenstein, 2 *Newberg on Class Actions* § 4:90 (5th ed. 2012)). As set forth above, the issue of liability is not subject to common proof. The challenged statements have not appeared uniformly on the packaging, and Zeiger has not shown that class members would uniformly interpret the challenged statements as representing that the products are free of trace amounts of substances that exist everywhere in the environment, including other dog foods. *See Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 697 (N.D. Cal. 2019) (finding "issue

29

certification is not appropriate where the determination of liability itself requires an individualized inquiry").

Zeiger also has not shown "why a bifurcated proceeding would be more efficient or desirable." *Rahman v. Mott's LLP*, 2014 WL 6815779, at *9 (N.D. Cal. Dec. 3, 2014), *aff'd*, 693 F. App'x 578 (9th Cir. 2017). As in *Rahman*, Zeiger is "vague as to whether he intends to later certify a damages class, allow class members to individually pursue damages, or has some other undisclosed plan for resolving this case." *Id.* The *Rahman* court found none of these options "particularly desirable." *Id.* If the plaintiff prevailed on liability, "certifying a second class on the issue of damages would in essence amount to prosecuting two trials when one would have done just as well."[30] *Id.* And the court found that alternatively "allowing myriad individual damages claims to go forward hardly seems like a reasonable or efficient alternative, particularly in a case such as this where the average class member is likely to have suffered less than a hundred dollars in damages." *Id.*; *see D.C. by and through Garter v. County of San Diego*, 783 F. App'x 766, 767-68 (9th Cir. 2019) (district court correctly recognized plaintiff "failed to show that damages could be sufficiently calculated on a classwide basis following success in the liability phase"); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *26 (N.D. Cal. May 8, 2018) (denying certification of Rule 23(c)(4) class for similar reasons); 1 *McLaughlin on Class Actions* § 4.43 (15th ed. 2018) (bifurcating liability "does not materially advance the overall disposition of the case because" the court still must resolve "plaintiff-specific matters such as fact of injury, causation … and extent of damage"). The individualized issues here involving liability and damages calculations preclude certification under Rule 23(c)(4).

## CONCLUSION

For all the foregoing reasons, WellPet respectfully requests that the Court deny Plaintiff's motion for class certification.

---

[30] As shown above, Zeiger has not shown damages could be proven class-wide in any event. *See* section I.B, *supra*.

1

Dated:  September 30, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully  submitted,

SHOOK, HARDY & BACON L.L.P.

By:   _/s/ Amir M. Nassihi_____
        Amir M. Nassihi
        Joan R. Camagong
        James P. Muehlberger
        Elizabeth  P. Fessler

        Attorneys for Defendant WellPet LLC