Amir M. Nassihi (SBN: 235936)
anassihi@shb.com
Joan R. Camagong (SBN: 288217)
jcamagong@shb.com
SHOOK, HARDY & BACON L.L.P.
One Montgomery, Suite 2600
San Francisco, California 94104
Telephone: 415-544-1900
Facsimile: 415-391-0291

James P. Muehlberger (*admitted pro hac vice*)
jmuehlberger@shb.com
Elizabeth A. Fessler (*admitted pro hac vice*)
efessler@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
Telephone:    816-474-6550
Facsimile:    816-421-5547


Attorneys for Defendant
WELLPET LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL ZEIGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLPET LLC, a Delaware corporation,<br>Defendant. | Case No.  3:17-cv-04056-WHO<br><br>**WELLPET LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON THE INDIVIDUAL CLAIMS OF DANIEL ZEIGER**<br><br>Judge:  Hon. William H. Orrick<br>Hearing Date: December 23, 2020<br>Hearing Time: 2:00 p.m. |

1

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................. 1

UNDISPUTED FACTS ....................................................................................................... 2

SUMMARY OF PLAINTIFF'S CLAIMS ......................................................................... 9

LEGAL STANDARD ....................................................................................................... 10

ARGUMENT .................................................................................................................... 10

I.     WellPet is entitled to judgment as a matter of law because Zeiger cannot prove that the challenged statements and omissions are false or misleading. ................................... 10

       A.     Zeiger has not shown that the small amounts of arsenic, lead, and BPA in the Wellness products constitute a health risk for dogs. ............................................. 10

            1.     There is no evidence that the presence of arsenic and lead at low levels poses a health risk to dogs. .......................................................................... 11

            2.     There is no evidence that the presence of small amounts of BPA poses a health risk to dogs. .......................................................................... 13

       B.     The presence of minute amounts of arsenic, lead, and BPA does not render the challenged statements or the absence of warnings deceptive. ............................. 14

            1.     The products don't represent that the dog food is free of these substances and the meaning of the challenged statements is easily understood in context. ................................................................................ 11

            2.     Reasonable consumers would not interpret the challenged statements as Zeiger's advertising expert does, because he inexplicably fails to consider the factual context for the presence of these substances in dog food. ................................................................................................. 17

II.     Zeiger did not rely on any of the challenged statements or omissions. ........................... 19

III.     Zeiger cannot prove any damages or entitlement to restitution. ...................................... 21

IV.     Zeiger is not entitled to injunctive or other equitable relief. ............................................ 23

V.     The economic loss rule bars Zeiger's negligent misrepresentation claim. ...................... 21

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Anderson v. The Hain Celestial Grp., Inc.*,
   87 F. Supp. 3d 1226 (N.D. Cal. 2015) ...................................................................21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................................................10

*Azoulai v. BMW of North Am. LLC*,
   2017 WL 1354781 (N.D. Cal. Apr. 13, 2017) ...........................................................14

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) ................................................................................23, 24

*Brazil v. Dole Packaged Foods, LLC*,
   2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ...........................................................21

*Brazil v. Dole Packaged Foods, LLC*,
   660 F. App'x 531 (9th Cir. 2016) .......................................................................19, 20

*Brinson v. Linda Rose Joint Venture*,
   53 F.3d 1044 (9th Cir. 1995) .......................................................................................10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .......................................................................................................10

*Chapman v. Pier 1 Imports (U.S) Inc.*,
   631 F.3d 939 (9th Cir. 2011) .......................................................................................23

*Classick v. Diamond Pet Foods, Inc.*,
   No. 2:18-cv-02344 (E.D. Cal.)........................................................................................1

*Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) .....................................................................................15

*Day & Zimmermann, Inc. v. Challoner*,
   423 U.S. 3 (1975) ...........................................................................................................25

*Del Webb Communities Inc. v. Partington*,
   652 F.3d 1145 (9th Cir. 2011) .....................................................................................25

*Ebner v. Fresh, Inc.*,
   838 F.3d 958 (9th Cir. 2016) ................................................................................14, 15

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938)........................................................................................................25

*Forouzesh v. Starbucks Corp.*,
    2016 WL 4443203 (C.D. Cal. Aug. 19, 2016) ............................................................14

*Ham v. Hain Celestial Group, Inc.*,
    70 F. Supp. 3d 1188 (N.D. Cal. 2014) .....................................................................14

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) .................................................................................25

*In re Intel Laptop Battery Litig.*,
    2010 WL 5173930 (N.D. Cal. Dec. 15, 2010) .........................................................22

*In re: MacBook Keyboard Litig.*,
    2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) ..........................................................23

*In re Trader Joe's Tuna Litig.*,
    289 F. Supp. 3d 1074 (C.D. Cal. 2017) ...................................................................25

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .................................................................................19

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ...........................................................................................24

*Ladore v. Sony Computer Entm't Am., LLC*,
    75 F. Supp. 3d 1065 (N.D. Cal. 2014) .....................................................................24

*Lanovaz v. Twinings North America, Inc.*,
    726 F. App'x 590 (9th Cir. 2018) ............................................................................24

*Loeb v. Champion Petfoods USA Inc.*,
    359 F. Supp. 3d 597 (E.D. Wis. 2019) ....................................................1, 12, 13, 19

*Lucido v. Nestle Purina Petcare Co.*,
    217 F. Supp. 3d 1098 (N.D. Cal. 2016) ........................................................ *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................................10

*Minkler v. Apple, Inc.*,
    65 F. Supp. 3d 810 (N.D. Cal. 2014) .......................................................................25

*Philips v. Ford Motor Co.*,
    2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) .........................................................23

*Philips v. Ford Motor Co.*,
    726 F. App'x 608 (9th Cir. 2018) ............................................................................23

*Precision Safety Innovations, Inc. v. Branson Ultrasonic Corp.*,
    2005 WL 5801513 (C.D. Cal. Aug. 4, 2005) ..........................................................20

*Rahman v. Mott's LLP,*
   2014 WL 5282106 (N.D. Cal. Oct. 15, 2014), *aff'd on other grounds*, 693 F.
   App'x 578 (9th Cir. 2017) ........................................................................................................17

*Rahman v. Mott's LLP,*
   2018 WL 4585024 (N.D. Cal. Sept. 25, 2018) ........................................................................24

*Reitman v. Champion Petfoods USA, Inc.,*
   2019 WL 7169792 (C.D. Cal. Oct. 30, 2019), *appeal docketed*, No. 19-56467 (9th
   Cir. Dec. 19, 2019).....................................................................................................................1

*Renfro v. Champion Petfoods USA, Inc.,*
   2020 WL 4433027 (D. Colo. July 31, 2020) ..............................................................................1

*Robinson Helicopter Co. v. Dana Corp.,*
   34 Cal. 4th 979 (2004) ..............................................................................................................25

*Robinson v. J.M. Smucker Co.,*
   2019 WL 2029069 (N.D. Cal. May 8, 2019) ............................................................................25

*Rodriguez v. Airborne Express,*
   265 F.3d 890 (9th Cir. 2001) ....................................................................................................10

*Sandoval v. PharmaCare US, Inc.,*
   730 F. App'x 417 (9th Cir. 2018) .......................................................................................19, 20

*Schmitt v. Younique LLC,*
   2018 WL 7348850 (C.D. Cal. Dec. 21, 2018) .........................................................................19

*Sciacca v. Apple, Inc.,*
   362 F. Supp. 3d 787 (N.D. Cal. 2019) .....................................................................................24

*Simpson v. Champion Petfoods USA, Inc.,*
   397 F. Supp. 3d 952 (E.D. Ky. 2019) .................................................................................1, 15

*Sonner v. Premier Nutrition Corp.,*
   971 F.3d 834 (9th Cir. 2020) ....................................................................................................23

*Stephens v. Union Pac. R.R. Co.,*
   935 F.3d 852 (9th Cir. 2019) ....................................................................................................12

*Strumlauf v. Starbucks Corp.,*
   192 F. Supp. 3d 1025 (N.D. Cal. 2016) ...................................................................................25

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009).................................................................................................................23

*Tabler v. Panera LLC,*
   2020 WL 3544988 (N.D. Cal. June 30, 2020) .........................................................................19

*U.S. v. City of Tacoma,*
  332 F.3d 574 (9th Cir. 2003) .......................................................................................10

*Watson v. Solid Gold Pet, LLC,*
  No. 2:18-cv-06479 (C.D. Cal.) ........................................................................................1

*Weaver v. Champion Petfoods USA Inc.,*
  2020 WL 3847248 (E.D. Wis. July 8, 2020), *appeal docketed*, No. 20-2235 (7th
  Cir. July 9, 2020) .....................................................................................................1, 19

*Zakinov v. Blue Buffalo Pet Prods., Inc.,*
  2018 WL 1426932 (S.D. Cal. Mar. 22, 2018) ...............................................................1

*Zeiger v. WellPet LLC,*
  304 F. Supp. 3d 837 (N.D. Cal. 2018) .........................................................................11

**Regulations**

21 C.F.R. Part 507...............................................................................................................4

21 C.F.R. § 507.33...............................................................................................................4

21 C.F.R. § 507.34...............................................................................................................4

**Other Authorities**

AAFCO, *available at* https://www.aafco.org/ ....................................................................8

*Center for Veterinary Medicine CY15-17 Report on Heavy Metals in Animal Food*
  (F.D.A. Oct. 24, 2019), *available at*
  https://www.fda.gov/media/132046/download................................................................6

*Draft Guidance for Industry, Hazard Analysis and Risk-Based Preventative Controls
  for Food for Animals,* (F.D.A. Jan. 2018) ...............................................5-7, 12-14, 18

FDA, *Arsenic in Food and Dietary Supplements*, *available at*
  https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-
  supplements ............................................................................................................5, 18

FDA, *Bisphenol A (BPA)*, *available at* https://www.fda.gov/food/food-additives-
  petitions/bisphenol-bpa...................................................................................................8

FDA, *Lead in Food, Foodwares, and Dietary Supplements*, *available at*
  https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-
  dietary-supplements .................................................................................................5, 18

MOU 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, *Memorandum of Understanding between the United States Food
  and Drug Administration and the Association of American Feed Control Officials* ...............9, 16

National Research Council, *Mineral Tolerance of Animals* (2d ed. 2005).........................12

# NOTICE OF MOTION AND MOTION

TO THIS COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 23, 2020, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 2, 17th Floor of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant WellPet LLC ("WellPet") will, and hereby does, move this Court pursuant to Fed. R. Civ. P. 56 for an Order granting summary judgment in WellPet's favor on all the claims of Plaintiff Daniel Zeiger.

This motion is based on the following grounds: (1) there is no evidence that the small amounts of arsenic, lead, and BPA in the Wellness products pose a health risk to dogs; (2) the presence of small amounts of arsenic, lead, and BPA do not render the challenged statements or the absence of warnings deceptive; (3) Zeiger did not rely on any of the challenged statements; (4) Zeiger cannot prove any damages or entitlement to restitution; (5) Zeiger is not entitled to injunctive or other equitable relief; and (6) the economic loss rule bars Zeiger's negligent misrepresentation claim. As a result, WellPet respectfully requests that the Court enter an Order granting summary judgment in WellPet's favor on all the claims of Plaintiff Daniel Zeiger, and dismissing the claims with prejudice.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in Support thereof, the accompanying Declaration of Joan R. Camagong and exhibit thereto, the Declaration of Joan R. Camagong in Support of WellPet's Opposition to Plaintiff's Motion for Class Certification and exhibits thereto, and all other pleadings and papers on file in this action and such argument as may be presented to the Court at the time of the hearing.

## **INTRODUCTION**

Plaintiff Daniel Zeiger claims that WellPet misled him and other consumers by selling certain Wellness brand dog foods that were "contaminated" with arsenic, lead, and BPA, rendering false or misleading WellPet's labeling describing the products as healthy, nutritious, and of high quality. He further contends that WellPet should have included warnings on the packaging about the presence of these substances. He alleges that the labeling statements and failure to provide warnings caused him to pay more for the dog food than it was worth. Zeiger's claims rest entirely on the premise that the alleged levels of arsenic, lead, and BPA make the dog food unsafe. Although Zeiger pleaded that the Wellness products contain "significant" and "alarming" levels of these substances, he now takes the untenable position that **no** amount of these substances—no matter how small—is safe for consumption by dogs. That puts Zeiger at odds with the scientific community, the Food and Drug Administration, the European Commission, and other federal courts—all of whom have found these low levels do not pose a health risk for dogs. And Zeiger has no evidence to the contrary. This is just one of many lawsuits filed by the same plaintiff's counsel raising similar allegations against leading pet manufacturers in the United States, many of which have been dismissed or class certification denied.[1]

The undisputed evidence is that these low levels are routinely present in dog foods (and even human food) and are not harmful to dogs. They are routinely present because they are ubiquitous in the environment and therefore cannot be completely removed from the food supply. If successful here, Zeiger would impose on WellPet a "zero tolerance" standard for these substances that no pet food manufacturer—and no human food manufacturer—could meet, and that FDA doesn't expect them to meet. As Judge Chen found in granting summary judgment for a pet food manufacturer in a similar case, because substances like this are ubiquitous, Zeiger "would effectively be advocating for a warning on practically all food products." *Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098,

---

[1] *See, e.g.*, *Weaver v. Champion Petfoods USA Inc.*, --- F. Supp. 3d ----, 2020 WL 3847248 (E.D. Wis. July 8, 2020), *appeal docketed*, No. 20-2235 (7th Cir. July 9, 2020); *Renfro v. Champion Petfoods USA, Inc.*, 2020 WL 4433027 (D. Colo. July 31, 2020); *Reitman v. Champion Petfoods USA, Inc.*, 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019), *appeal docketed*, No. 19-56467 (9th Cir. Dec. 19, 2019); *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597 (E.D. Wis. 2019); *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952 (E.D. Ky. 2019); *Zakinov v. Blue Buffalo Pet Prods., Inc.*, 2018 WL 1426932 (S.D. Cal. Mar. 22, 2018); *Classick v. Diamond Pet Foods, Inc.*, No. 2:18-cv-02344 (E.D. Cal.); *Watson v. Solid Gold Pet, LLC*, No. 2:18-cv-06479 (C.D. Cal.).

1110 (N.D. Cal. 2016). Likewise, no manufacturer could ever make even generalized representations about the quality of its food. Zeiger's claims are unreasonable, unsupported by science, and the Court should reject them as a matter of law.

Zeiger's claims fail additionally because he did not rely on the challenged labeling statements (or the absence of warnings) before buying the Wellness products, and his "price premium" model is deeply flawed and therefore cannot support his damages claim. Finally, he is not entitled to injunctive or other equitable relief, and his negligent misrepresentation claim fails for the additional reason that it is barred by the economic loss rule.

For these and other reasons set forth below, Zeiger cannot establish a genuine issue of material fact exists with respect to any of his claims. Accordingly, WellPet requests the Court enter summary judgment in its favor and dismiss Zeiger's complaint.

## UNDISPUTED FACTS

- *The Parties*

WellPet manufactures and sells pet food products including Wellness® ("Wellness") brand dog food. Declaration of Gregory Kean (Ex. A)[2] ¶¶ 6-8. The Wellness brand includes among its product lines, Complete Health™ ("Complete Health") and CORE® ("CORE"). *Id.* ¶ 9. The Complete Health line includes more than 20 dry dog food varieties, while CORE is comprised of about 30 different dry kibble diets. *Id.* Complete Health and CORE together include 10 fish-based diets. *Id.* The three products at issue are Complete Health Adult Whitefish & Sweet Potato ("Sweet Potato"), Complete Health Grain Free Adult Whitefish & Menhaden Fish Meal ("Menhaden"), and CORE Ocean (Whitefish, Herring Meal & Salmon Meal) ("CORE Ocean") (collectively "the Wellness products"). 2d Am. Compl. ("SAC") (Dkt. 95) ¶ 2.

Daniel Zeiger began purchasing Wellness dog foods around 2010 after obtaining some free samples. Deposition of Daniel Zeiger (Ex. O) at 77:12-78:18, 134:15-135:6. Other than the name

---

[2] To avoid unnecessary duplication in the record, except where noted otherwise, citations to exhibits are to documents attached to the declaration of Joan R. Camagong in support of WellPet's opposition to Plaintiff's motion for class certification. Dkt. 162-1 through 162-21.

"Wellness" and the phrase "grain free," he did not recall seeing any words on the packaging.[3] *Id.* at 88:3-21, 99:3-22, 135:14-136:7. He starting buying Wellness dog food because when he opened the package it had a fresh smell and his dogs seemed to like it. *Id.* at 134:15-135:6. Zeiger said that the previous dog food he used had good ingredients but that Wellness went "the extra mile" and was "moist looking" and more "stay-fresh." *Id.* at 87:1-8, 94:6-11, 95:17-25. He purchased Wellness dog food until approximately July 2017. Zeiger Dep. (Summ. J. Mot., Ex. U) at 107:14-19; 18:16-25.

Zeiger runs a dog sitting business. SAC ¶ 26. From October 2014 until approximately July 2017, he purchased approximately one bag of Wellness dog food per month for his clients' dogs. Zeiger Dep. (Ex. U) at 282:11-283:5. He occasionally fed his own dog from the Wellness dog food he bought for his business. Zeiger Dep. (Ex. O) at 283:15-284:6. Zeiger sometimes charged his clients for the Wellness dog food but he did not keep a record of it and he has no receipts. Zeiger Dep. (Ex. O) at 284:19-285:8; (Ex. U) at 286:13-15.

Although his interrogatory answers state that he purchased CORE Ocean or Sweet Potato approximately every one to three months for approximately $15.00 to $18.99 per bag, Zeiger didn't have a clear memory at his deposition (just four months later) as to which specific Wellness dog foods he bought and he couldn't name the products he is suing about. *Id.* at 17:19-25, 19:7-15, 276:2-12; Zeiger Interrog. Resp. No. 2 (Ex. T). He has no receipts or documentation showing proof of purchase. Zeiger Dep. (Ex. U) at 32:12-21.

Zeiger considers himself a "very sophisticated" consumer and he understands that arsenic and lead are naturally occurring and that there are going to be small amounts of these elements in everything, including all pet food. Zeiger Dep. (Ex. O) at 82:25-83:5, 120:18-121:7, 169:19-170:2, 241:21-25, 253:7-12. Zeiger likewise understands that BPA is in most foods and is "all around us." *Id.* at 142:4-9. He believes it is "reasonable" for manufacturers to rely on the levels of arsenic, lead,

---

[3] Through errata changes, Zeiger attempted to change his testimony to state that he relied on several of the challenged statements when he initially purchased Wellness dog food. WellPet moved to strike these changes as improper and the Court agreed. *See* Dkt. 138. Notably, based on Zeiger's testimony, the complaint in this case was filed just a few days after his meeting with a lawyer friend (Peter Crane, who referred him to his counsel), but **before** Zeiger ever spoke with any of the firms representing him, and **before** he read the complaint. Zeiger Dep. (Ex. U) at 57:11-59:7, 309:24-312:14. This unusual (and highly questionable) sequence of events may explain why numerous facts pleaded in the complaint differ from Zeiger's deposition testimony.

and BPA identified as safe by governmental agencies, and he personally would rely on FDA. *Id.* at 148:16-149:2, 162:25-163:8, 213:23-24, 214:5-9. Zeiger also admitted that his claims are "hypothetical," and that to the best of his knowledge "[t]here's no proof [these levels of arsenic, lead, and BPA] are "going to have any long-term effects." *Id.* at 303:12-304:1. He does not allege that Wellness dog foods harmed his dogs.

Zeiger did not see the word "natural" on the packaging before buying the Wellness dog food. But he also doesn't take issue with the use of the word on the packaging, nor does he believe labels that claim a product is "natural." *Id.* at 279:12-15, 258:11-21. He also never visited the WellPet or Wellness websites (Zeiger Dep. (Ex. U) at 100:4-6, 101:3-9, 277:16-19), and therefore did not see the website representations referenced in paragraphs 17 through 19 of the complaint.[4]

- *Federal Regulation of Pet Food Safety*

In 2015, FDA issued regulations requiring animal food manufacturers to include hazard analysis and risk-based preventive controls in their food safety programs. *See generally* 21 C.F.R. Part 507. Among other things, these regulations require manufacturers to identify and evaluate known or reasonably foreseeable hazards for each type of animal food manufactured. 21 C.F.R. § 507.33. Only if a substance is determined to constitute a hazard—and a hazard that requires a preventive control— does the manufacturer need to develop and implement a preventive control for the substance. *Id.*; 21 C.F.R. § 507.34.

In January 2018, FDA issued draft guidance for industry to help manufacturers identify and address known and reasonably foreseeable hazards for various types of animal food, including pet food. *Draft Guidance for Industry*, *Hazard Analysis and Risk-Based Preventive Controls for Food for Animals* (F.D.A. Jan. 2018) (Ex. K). FDA explains in this guidance that chemical substances in animal food "are not always considered hazards and their occurrence may be unavoidable." *Id.* at 48. Whether a substance is a "hazard," depends on "[t]he particular chemical, and its level in the animal food[.]"

---

[4] These include the following product descriptions: "the healthiest natural products," "safe, pure, and balanced," "wholesome, natural pet food that is the best it can be," "exceeding even the strictest requirements from the FDA," and "unsurpassed food safety programs," among others.

*Id.* FDA further advises consumers on its website that because arsenic and lead are so prevalent, "it is not possible to remove [them] from the environment or food supply."[5]

According to FDA, "[h]eavy metals are naturally occurring" and whether an animal develops an injury or illness from exposure "depends upon the species, level of the mineral in the animal food, and frequency of exposure." *Id.* at 49-50. Because heavy metals are naturally occurring, nearly all dog foods contain some amount of arsenic and lead.[6] Report of Dr. Robert Poppenga (Ex. L) at 10. FDA expressly states that heavy metals are *not* hazards for kibble or the main ingredients in the Wellness products, including fish, grains, and fruit and vegetables. *Animal Food Draft Guidance* (Ex. K) at 142, 145, 153-54. This is consistent with the scientific literature and FDA's prior analysis of pet foods (and, as discussed below, with WellPet's own testing). *See generally* Poppenga Rep. (Ex. L) at 5-15.

In 2005, the National Research Council ("NRC") published *Mineral Tolerance of Animals* (2d ed.), which provides maximum tolerable limits ("MTLs") for arsenic and lead in animal food. Poppenga Rep. (Ex. L) at 10-11. The dietary MTLs are 12,500 μg/kg (ppb) or 12.5 mg/kg (ppm) for arsenic (this applies to rats, which are the most sensitive species, otherwise 30 mg/kg (ppm)), and 10,000 μg/kg or 10 mg/kg for lead.[7] *Id.* at 11, 14 n.13. The NRC determined that the MTLs are the appropriate limits for animal diets and physiology rather than relying on the human limits developed by the Environmental Protection Agency ("EPA") and the World Health Organization.[8] *Id.* at 11.

In 2011, FDA conducted its own review as to the levels of heavy metals in pet food, entitled the *Target Animal Safety Review*, following the MTLs identified by the NRC. *Id.* at 11-12. FDA

---

[5] FDA, *Arsenic in Food and Dietary Supplements*, *available at* https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements (last visited Oct. 29, 2020); FDA, *Lead in Food, Foodwares, and Dietary Supplements*, *available at* https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements (last visited Oct. 29, 2020).

[6] Zeiger has not identified any dog foods, especially fish-based, that do not contain small amounts of these elements.

[7] Micrograms per kilogram is the equivalent of parts per billion ("ppb") and milligrams per kilogram is equal to parts per million ("ppm"). A helpful illustration may be to think of one part per million as one second in a period of about two weeks, while one part per billion is one second out of roughly 32 years.

[8] Zeiger's complaint cites to allowable limits for arsenic in food and drinking water for humans set by FDA and the EPA, although his experts do not reference them. SAC ¶¶ 4-5. Notably, the action limit proposed by FDA for inorganic arsenic in infant rice cereal (and recently adopted), which Zeiger approvingly cites in the complaint, *id.* ¶ 5, wouldn't be acceptable for dog food according to his expert, who claims that *no* level of arsenic is safe is for pet food. Report of Gary Pusillo, Ph.D. (Class Cert. Mot., Ex. 9) at 14-15.

WELLPET'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-CV-04056-WHO

published another analysis of heavy metals in animal food last year, again relying on the MTLs. *Center for Veterinary Medicine CY15-17 Report on Heavy Metals in Animal Food* (F.D.A. Oct. 24, 2019), *available at* https://www.fda.gov/media/132046/download (last visited Oct. 29, 2020). As WellPet's expert says, these MTLs are "the best and most widely used scientific guidance available to veterinary toxicology and nutrition experts for determining what are safe levels of heavy metals in dog food." Poppenga Rep. (Ex. L) at 12. The European Union also has established regulatory limits: 10 mg/kg (ppm) for total arsenic, and 5 mg/kg for lead. *Id.* at 12-13. As discussed below, the amounts of arsenic and lead found in the Wellness products are well below these levels.

- *WellPet's Testing for Heavy Metals*

WellPet does not add arsenic or lead to its dog food products. Kean Decl. (Ex. A) ¶ 14. Because the company understood that it's possible for certain heavy metals, including arsenic and lead, to accumulate in fish, WellPet began conducting targeted tests of fish-based ingredients in 2013 to determine whether the amounts of heavy metals would be concerning. *Id.* ¶ 36. WellPet conducted approximately 35 tests of its fish-based ingredients over a two-year period using a well-respected third-party laboratory. *Id.* The testing used a detection limit of 10 ppm for arsenic and 5 ppm for lead and found no detectable amounts. *Id.* ¶ 37; Poppenga Rep. (Ex. L) at 5. Plaintiff's test results, which were the product of testing at the magnified detection level of parts per *billion*, were far below the FDA and EU limits, as the following chart shows:

| Diet and Heavy Metal Tested | Level Reported (ppm) | NRC/FDA MTL (ppm) | Percentage of MTL | EU Levels in Directive 2002/32/EC (ppm) | Percentage of EU Level |
|---|---|---|---|---|---|
| Arsenic<br><br>Complete Health Grain Free Adult Whitefish & Menhaden | 1.512 | 12.5 | 12.0% | 10 | 15.1% |
| Lead<br><br>Core Ocean Whitefish, Herring Meal & Salmon Meal | .310 | 10 | 3.1% | 5 | 6.2% |

Poppenga Rep. (Ex. L) at 13-14 (Table 9) (using the highest levels found in Plaintiff's test results); *see also id.* at 5-6 (Table 1). Moreover, as WellPet's expert explains, the amounts of arsenic and lead Plaintiff found in the Wellness products are comparable to those found in other premium dog foods. *Id.* at 9-10 & Table 7. The test results also align with FDA's 2018 draft guidance for animal food manufacturers, which indicates that the ingredients are not a health risk. *See Animal Food Draft Guidance* (Ex. K) at 142, 145, 153-54; *see also* Poppenga Rep. (Ex. L) at 2 ("The levels of naturally occurring arsenic and lead in WellPet dog food diets do not present a health risk to dogs.").

As discussed in a separate *Daubert* motion, the opinion of Plaintiff's expert, Dr. Pusillo, that *no* level of arsenic or lead in pet food is safe for dogs is unreliable and inadmissible. His unscientific report largely relies on his subjective belief, unsupported assumptions, and quotes from irrelevant news reports that don't involve animals. He also has not identified any known safety standard or guideline as to heavy metals applicable to dog food that WellPet is violating.

- *BPA*

Bisphenol-A (BPA) is a monomer, a chemical that is produced for use primarily in the production of polycarbonate plastics and epoxy resins. Poppenga Rep. (Ex. L) at 16. Polycarbonate plastics and epoxy resins frequently appear in water bottles, infant bottles, and lacquers to coat products such as food cans and bottle tops. *Id.* Humans and animals are most commonly exposed to BPA through their diet, as BPA tends to leach into food and liquid. *Id.* However, because of the extensive use of plastics, BPA is also prevalent in the environment, and studies have measured detectable levels of BPA in our air, dust, and water—even breast milk. *Id.* In fact, a study of residential and office dust samples reported an average concentration of BPA of more than twice the amount found in the Wellness dog food. *Id.*

Given BPA's ubiquitous presence in our environment, humans and animals are exposed to it daily through a variety of pathways. *Id.* Zeiger understands that BPA is in most foods, and concedes it is "all around us." Zeiger Dep. (Ex. O) at 142:4-9. As WellPet's expert explains, BPA is also commonly found in human foods, particularly canned foods, including in amounts much greater than those found in the Wellness dog foods. Poppenga Rep. (Ex. L) at 16. WellPet does not intentionally

7

add BPA to any products, nor is BPA used in the manufacture of WellPet's plastic storage containers and conveyor system buckets. Kean Decl. (Ex. A) ¶¶ 40-42.

FDA has reviewed numerous scientific studies in recent years and continues to find that BPA is safe for use in the packaging of human food.[9] FDA has not identified BPA as a potential hazard in pet food. Based on data from well-designed animal studies, the amount of BPA that would be consumed from eating the Wellness products—assuming the highest level of BPA found in Plaintiff's testing, and WellPet's recommended feeding portions—is far less than one-tenth of one percent of the lowest known animal-derived no observable adverse effect level (NOAEL), and therefore well below any level that might cause harm to a dog. Poppenga Rep. (Ex. L) at 17-18. Zeiger's experts point to no scientific evidence showing such small amounts are harmful to dogs.[10]

- *AAFCO and the Definition of "Natural" in Pet Food Labeling*

The Association of American Feed Control Officials ("AAFCO") is an association made up of individuals who are part of local, state, and federal agencies that regulate animal feeds and drugs, including pet food. Kean Decl. (Ex. A) ¶ 11; AAFCO, *available at* https://www.aafco.org/ (last visited Oct. 29, 2020). Through a Memorandum of Understanding with FDA, AAFCO "maintains definitions of various feed ingredients, which includes the common ingredient name, description, and any appropriate limitations for its use, and publishes the currently accepted feed ingredient definitions in

---

[9] FDA, *Bisphenol A (BPA)*, *available at* https://www.fda.gov/food/food-additives-petitions/bisphenol-bpa (last visited Oct. 29, 2020).

[10] Zeiger argues that WellPet's quality manual prohibited the presence of heavy metals and BPA in the pet food. But the manual states that heavy metals are not to be *introduced into WellPet's products*, not that the products will be *free of heavy metals entirely*—which even FDA says is not possible. Class Cert. Mot. at 4. Zeiger also misreads the "Foreign Body Control" section of the manual, which references having procedures in place to remove foreign bodies from ingredients and finished product. WLPT00008059 at 8087 (Class Cert. Mot., Ex. 5). As WellPet explains, this section of the manual is about removing solid objects from the food through magnets, sieves, and x-ray equipment; it has nothing to do with a chemical such as BPA that appears in microscopic amounts. Kean Decl. (Ex. A) ¶ 44. Zeiger's reliance on the quality manual is misplaced in any event. This was a draft document that a member of WellPet's quality team created in anticipation of what FDA might subsequently require of manufacturers after FSMA. *Id.* ¶ 24. It was not intended to be a final document until after FDA issued its post-FSMA regulations and industry guidance. *Id.* The draft manual eventually was superseded by a food safety plan in late 2018. *Id.*

the AAFCO Official Publication (OP)."[11] Pet food manufacturers rely on AAFCO's *Official*

*Publication* as the foundation for how to formulate and label pet food products for sale in the U.S. *Id.*

¶ 12. AAFCO defines "natural" as it applies to pet food as follows:

> [A] feed or feed ingredient derived solely from plant, animal, or mined sources, either in its unprocessed state or having been subject to physical processing, heat processing, rendering, purification, extraction, hydrolysis, enzymolysis or fermentation, but not having been produced by or subject to a chemically synthetic process and not containing any additives or processing aids that are chemically synthetic except in amounts as might occur in good manufacturing practices.

*Id.* ¶ 13; "Natural" Definition, AAFCO, *available at* https://talkspetfood.aafco.org/natural (last visited

Oct. 29, 2020). AAFCO's definition provides exceptions for trace amounts of chemicals. *Id.*

Specifically, it states that natural feed or feed ingredients should not contain "any additives or

processing aids that are chemically synthetic except in amounts as might occur unavoidably in good

manufacturing practices." *Id.* Thus, an ingredient can be "natural" under AAFCO's definition and still

contain small amounts of BPA or naturally-occurring heavy metals. *Id.*

## SUMMARY OF PLAINTIFF'S CLAIMS

Zeiger's claims are all premised on the same factual allegation – that WellPet advertised the

Wellness products as a healthy, safe, natural, and high-quality premium dog food, and that this was

false and misleading due to the undisclosed presence of arsenic, lead, and BPA.[12] Specifically, Zeiger

challenges the following five statements on WellPet's packaging: that the dog food offers "complete

health," "uncompromising nutrition" with "nothing in excess and everything in balance," and is

"natural" and made with "unrivaled quality standards."

Zeiger contends that WellPet charges a premium based on these representations and that he

was injured economically by paying for dog food that did not deliver what was promised and failed to

warn of the presence of arsenic, lead, and BPA. He seeks damages, restitution, disgorgement, and asks

the Court to order injunctive relief, including prohibiting the sale of the dog food until the "unsafe

levels" of arsenic, lead, and BPA are removed; preventing the sale of the dog food with the challenged

---

[11]  MOU 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, *Memorandum of Understanding between the United States Food and Drug Administration and the Association of American Feed Control Officials*, at 2 (Ex. P).
[12]  Zeiger alleges the presence of BPA only in the CORE Ocean and Sweet Potato dog foods.

1  representations; and requiring WellPet to recall existing products and implement corrective

2  advertising.

3  ## LEGAL STANDARD

4      Summary judgment is appropriate when there is no genuine dispute of material fact and the

5  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the moving party

6  has carried its burden to demonstrate the absence of a genuine dispute, the nonmoving party must go

7  beyond the pleadings and bears the burden of setting forth specific facts showing a genuine issue for

8  trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith*

9  *Radio Corp.*, 475 U.S. 574, 586-87 (1986). Although a court must view the evidence in the light most

10  favorable to the nonmoving party, *U.S. v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003), deference

11  to the nonmoving party has limits. A plaintiff cannot rest on the allegations in his pleadings. *Brinson*

12  *v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995). Nor can self-serving affidavits create

13  an issue of fact. *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001). If the nonmoving

14  party fails to produce enough evidence to show a genuine dispute of material fact, the moving party

15  prevails. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

16  ## ARGUMENT

17  ## I.    WellPet is entitled to judgment as a matter of law because Zeiger cannot prove
18  that the challenged statements and omissions are false or misleading.

19      Zeiger alleges that the five challenged statements are false or misleading because the three

20  Wellness dog foods contain "unsafe and alarming" levels of arsenic, lead, and/or BPA. The claims fail

21  because Zeiger has no evidence that the tiny amounts of arsenic, lead, and BPA identified pose any

22  health risk to dogs, and because reasonable consumers would not interpret the challenged statements

23  as promising the complete absence of substances that are ubiquitous in the environment and therefore

24  present in virtually all pet foods—and even human food.

25  ### A.    Zeiger has not shown that the small amounts of arsenic, lead, and BPA in the
Wellness products constitute a health risk for dogs.

26      Zeiger's claims are all premised on the theory that the packaging of the Wellness products is

27  false and misleading because it represents the dog foods as healthy and safe when they actually contain

28  harmful levels of arsenic, lead, and/or BPA. *E.g.*, SAC ¶¶ 12, 15, 16, 122, Prayer for Relief (alleging

10

that the products contain "unsafe levels of arsenic, lead, and BPA"). As the Court recognized in its order on WellPet's motion to dismiss, "the safety of the Products is a central issue in this litigation." *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 853 (N.D. Cal. 2018). At this stage of the case, however, Zeiger can no longer hide behind unsupported allegations: his claims fail because he has no evidence that the amounts of arsenic, lead, and BPA at issue are harmful to dogs.

Judge Chen granted summary judgment for a dog food manufacturer on similar claims because the plaintiffs lacked scientific evidence that the amounts of mycotoxins in the dog food were harmful. *Lucido*, 217 F. Supp. 3d 1098. In *Lucido*, the plaintiffs alleged that Purina failed to disclose the presence of mycotoxins and heavy metals in Beneful dog food. *Id.* at 1100-01. As here, the evidence was that mycotoxins are naturally occurring and omnipresent in the environment. *Id.* at 1110. The court excluded plaintiffs' expert because he didn't present any evidence as to the specific levels of mycotoxins that would present a safety concern. *Id.* at 1109-1112. Because all of the plaintiffs' claims "require[d] evidence of a health risk from Beneful," and plaintiffs had none, the court held that the claims were not sustainable. *Id.* at 1115. The same result is warranted here.

      1.   <u>There is no evidence that the presence of arsenic and lead at low levels poses a health risk to dogs.</u>

Zeiger has no evidence that the minute amounts of arsenic and lead found in the Wellness products are harmful to dogs. It is undisputed that WellPet does not add arsenic or lead as ingredients to its dog food products. Kean Decl. (Ex. A) ¶ 14. WellPet also does not advertise its products as free from naturally-occurring heavy metals. The small amounts of arsenic and lead in the Wellness products are naturally occurring in the ingredients used to make the food. Poppenga Rep. (Ex. L) at 3-10. Moreover, the products are fish-based and contain primarily organic arsenic that is essentially non-toxic, as compared with the inorganic arsenic that is the focus of Zeiger's complaint. *Id.* at 3-4, 8-9, 13; SAC ¶ 3. Zeiger concedes that arsenic and lead are naturally present in all or most foods. Zeiger Dep. (Ex. O) at 83:4-5, 142:4-9, 163:9-14, 169:19-170:2.

The evidence in this case is that the levels of arsenic and lead purportedly found in the Wellness products are well below the limits of what expert scientists at NRC, FDA, and the European Commission have found to be safe for consumption by dogs. Poppenga Rep. (Ex. L) at 2, 5-15. As set

11

forth in WellPet's *Daubert* motion, Plaintiff's expert, Dr. Pusillo, is not a toxicologist and he has no training or other experience that would qualify him to opine that the levels here are harmful to dogs. His opinions are based on his subjective belief and unsupported assumptions, not reliable scientific methodology. *See* Pusillo Rep. (Class Cert. Mot., Ex. 9). Dr. Pusillo performs no analysis of the amount of arsenic or lead and duration of exposure that would cause harm to dogs, which is the first step in any scientific analysis. Rather, he hypothesizes that ***no*** level of arsenic and lead is safe for dogs to consume based on his belief that these elements ***might*** build up in a dog's system over time and cause harm. But he has not conducted any studies and he cites no study showing this actually happens.[13] *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 858 (9th Cir. 2019) (finding that "the expert's opinion must rest on actual data, not unfounded assumptions"). The information Dr. Pusillo presents "indicate[s] at most that more research need[s] to be conducted." *Lucido*, 217 F. Supp. 3d at 1112. As WellPet's expert shows, Dr. Pusillo's opinions are contrary to the findings of the expert scientists at the NRC, FDA, and European Commission, yet he makes no effort to address this contrary evidence. *See* Poppenga Rep. (Ex. L) at 10-15. Based on Dr. Pusillo's "no safe level" standard, virtually every dog food on the market—and most human foods—would be deemed unsafe. That's not a reasonable position.

FDA has instructed pet food manufacturers in draft guidance for industry that "[h]eavy metals are naturally occurring" and whether an animal develops an injury or illness from exposure to them "depends upon the species, level of the mineral in the animal food, and frequency of exposure."[14] *Animal Food Draft Guidance* (Ex. K) at 49-50. Instead of providing analysis regarding exposure to specific levels of arsenic and lead for a given duration, Dr. Pusillo's report is full of unsupported statements and *ipse dixit*. And as in *Lucido*, Dr. Pusillo's opinion is not reliable because the scientific literature he cites "is either too speculative or too imprecise." 217 F. Supp. 3d at 1112. He "cites *no* epidemiological evidence that long-term exposure to [arsenic and lead] at levels below the limits set

---

[13] Unable to muster any scientific evidence that the Wellness products contain "unsafe and alarming levels of arsenic and lead," (SAC ¶ 12), as he pleaded, Zeiger has shifted his theory of the case to the even more untenable position that ***no*** level of arsenic or lead (or BPA)—all of which are ubiquitous in the environment—is safe for consumption by dogs. Another federal court has found that any such claim is "absurd." *Loeb*, 359 F. Supp. 3d at 604-05 & n.7.
[14] FDA's guidance cites to the NRC's *Mineral Tolerance of Animals* (2d ed. 2005).

WELLPET'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-CV-04056-WHO

by the FDA" is harmful to dogs. *Id.* In light of their ubiquitous nature, without evidence that small amounts of heavy metals are harmful, "every manufacturer would be required to disclose that their products contain heavy metals or be barred from making any assertion of quality about the products." *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597, 605 n.7 (E.D. Wis. 2019). Of course, that's not a reasonable position either.

Without any evidence, Zeiger is forced to rest his entire case on the hypothesis of his expert that the food ***may*** somehow be harmful to dogs if consumed for long enough periods. Such guesswork, however, does not create a genuine issue of triable fact sufficient to overcome a motion for summary judgment. *See Lucido*, 217 F. Supp. 3d at 1115-16 (granting Purina's motion for summary judgment on the issue of failing to disclose the presence of heavy metals or mycotoxins in its dog food, holding that the "levels of mycotoxins and heavy metals were within limits permitted by the FDA"); *Loeb*, 359 F. Supp. 3d at 604 (granting summary judgment when plaintiff "failed to create a genuine dispute as to whether the heavy metal concentrations … are excessive or dangerous"); *id.* at 602 ("Plaintiff's claim fails for lack of evidence … that the heavy metal levels in Orijen make the food harmful or otherwise of poor quality").

2.   There is no evidence that the presence of small amounts of BPA poses a health risk to dogs.

Zeiger's claims based on the presence of BPA fail for similar reasons. He alleges that CORE Ocean and Sweet Potato can cause harm to dogs because they contain BPA.[15] SAC ¶ 15. But Zeiger does not claim that his dogs or any other dogs have been harmed by BPA. WellPet does not add BPA to its dog food products (Kean Decl. (Ex. A) ¶¶ 40-42), nor does it advertise that its products are "BPA free." Zeiger admits that BPA is in most foods and is "all around us." Zeiger Dep. (Ex. O) at 142:4-9.

BPA is a chemical that is produced for use primarily in the production of polycarbonate plastics and epoxy resin. Poppenga (Ex. L) at 16. The primary source of exposure to BPA for humans is in the diet. *Id.* Because of the extensive use of plastics, BPA is ubiquitous in the environment, including the air, dust, and water. *Id.* There is no applicable law, regulation, or other guideline that establishes an acceptable upper limit of BPA for dog food. But the levels of BPA purportedly present in the two

---

[15] These claims were an afterthought added by Zeiger in an amended complaint. *See* Dkt. 33.

Wellness products are far below any known level that would be harmful to dogs. Poppenga (Ex. L) at 2-3. The small amounts of BPA identified do not present a health risk to dogs based on the no observable adverse effect levels (NOAEL) derived from dog and rodent studies, which are the appropriate benchmarks. *Id*. at 17-18.

Zeiger doesn't offer any evidence that the low levels of BPA identified in the samples of CORE Ocean and Sweet Potato are harmful to dogs. The study Dr. Pusillo primarily relies on found increased blood levels of BPA and changes in certain gut bacteria in 14 dogs that ate two selected (unknown) canned dog foods for a two-week period. Pusillo Rep. (Class Cert. Mot., Ex. 9) at 16. The researchers hypothesized about theoretical adverse effects of the changes in gut bacteria but noted that short-term diet changes (the dogs had switched to these two canned dog foods) can also lead to bacterial alterations in the gut. None of the study dogs was harmed. Again, Dr. Pusillo fails to identify the amount of BPA and duration of exposure that would be needed to pose an actual—as opposed to theoretical—risk to dogs. He conducted no studies regarding dogs' exposure to BPA, and he cites no study concluding that the levels of BPA at issue here are harmful to dogs. *See Lucido*, 217 F. Supp. 3d at 1111-12 (granting summary judgment for pet food manufacturer when expert "did not conduct any tests himself or rely on any epidemiological studies of animals" and the scientific literature the expert relied on "provide[d] no specifics about what low levels actually present a risk—or what levels constitute a risk when exposure is chronic"). Thus, Zeiger's claims regarding BPA also fail as a matter of law.

**B.     The presence of minute amounts of arsenic, lead, and BPA does not render the challenged statements or the absence of warnings deceptive.**

Zeiger's claims are all subject to the "reasonable consumer" standard. *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (FAL, CLRA, and UCL); *Ham v. Hain Celestial Group, Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014) (UCL, FAL, CLRA, negligent misrepresentation); *Azoulai v. BMW of North Am. LLC*, 2017 WL 1354781, at *7 (N.D. Cal. Apr. 13, 2017) (UCL, CLRA, express warranty); *Forouzesh v. Starbucks Corp.*, 2016 WL 4443203, at *4-5 (C.D. Cal. Aug. 19, 2016) (negligent misrepresentation, express and implied warranty). Under the reasonable consumer standard, a plaintiff must not only show his own actual reliance, but must also "show that members of the public

are likely to be deceived." *Ebner*, 838 F.3d at 965 (citation and internal quotation marks omitted). This requires more than the "mere possibility" that the statements on the Wellness packaging "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Id.* (citing *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) ("A representation does not become false and deceptive merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.") (citation and internal quotation marks omitted). Rather, it requires a "probability" that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Ebner*, 838 F.3d at 965 (citing *Lavie*, 105 Cal. App. 4th at 508). Accordingly, to prevail on his claims, Zeiger must show that he and a substantial portion of the public would interpret the five challenged statements on the packaging—"uncompromising nutrition," "nothing in excess and everything in balance," "complete health," "natural," and "unrivaled quality standards"—as representing that the Wellness dog foods are completely free of *any* amount of arsenic, lead, and BPA, despite the ubiquitous nature of these elements in the environment. Zeiger cannot make this showing.

1.    The products don't represent that the dog food is free of these substances and the meaning of the challenged statements is easily understood in context.

Zeiger does not challenge these statements on any basis other than the presence of minute amounts of arsenic, lead, and BPA in the dog food. But the products do not claim to be "free from *any* heavy metals [or BPA] and any inference to the contrary reads too much into [WellPet's] representations." *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 972 (E.D. Ky. 2019) (dismissing substantially similar claims against pet food manufacturer). The surrounding text on the packaging itself explains what the statements mean. For example, the phrase "uncompromising nutrition" has appeared next to a block of text on the CORE Ocean packaging explaining that the product is "based on the nutritional philosophy that dogs, given their primal ancestry, thrive on a diet mainly comprised of meat," the product is "nutrient-dense," and "packed with a high concentration of quality animal protein, without fillers or grains, along with a proprietary blend of botanicals and nutritional supplements." Ex. D. On other packaging "uncompromising nutrition" and "unrivaled

15

1  quality standards" appeared next to "no meat by-products, fillers or artificial preservatives,"

2  "guaranteed levels of omega-3 fatty acids from whitefish & flaxseed," "easily digestible

3  carbohydrates," "fortified with vitamins and minerals," and "high-quality proteins," among other

4  statements. Ex. I.

5  "Complete Health"[TM] is the name of the line of Wellness dog foods that includes Sweet Potato

6  and Menhaden. The packaging for both products contains numerous statements explaining the health

7  benefits of those diets, including, among many others, "nutritious, balanced blends of high-quality

8  proteins, select fats and carbohydrates will provide the energy your pet needs," "guaranteed levels of

9  calcium, phosphorous and vitamin A help support healthy teeth and gums," "antioxidant-rich fruits

10 and vegetables and nutritional supplements such as vitamin E help support a healthy immune system,"

11 and "a combination of healthy fiber, chicory root extract and probiotics help support healthy

12 digestion." *E.g.*, Exs. I, J. In short, the entire package describes what is meant by "complete health."

13 Similarly, the phrase "with nothing in excess and everything in balance" appeared immediately below

14 and linked to a large graphic with text describing the benefits of CORE Ocean, including, among other

15 phrases, "optimum fat & calorie levels," "high protein, grain free," "green vegetables," and "fish &

16 flax omega health." Ex. C.

17 As for "natural," there is no dispute that the minute amounts of arsenic, lead and BPA found

18 in the Wellness products are naturally occurring and are not added to the dog food by WellPet.

19 Poppenga Rep. (Ex. L) at 2, 3-4, 6-10; Kean Decl. (Ex. A) ¶¶ 14, 40-42. The presence of naturally-

20 occurring amounts of these substances in the environment has nothing to do with whether the Wellness

21 products or its ingredients are "natural." If that were true, then no food product, including human

22 foods, could ever be labeled "natural." FDA has never suggested such an extreme position, and

23 reasonable consumers would not take that position. Moreover, the Wellness products meet the

24 definition of "natural" published by AAFCO, which is the association FDA relies upon to establish

25 the identity of ingredients used in animal food. Kean Decl. (Ex. A) ¶¶ 12-14; MOU 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,

26 *Memorandum of Understanding between the United States Food and Drug Administration and the*

27 *Association of American Feed Control Officials* (Ex. P).

28

WELLPET'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-CV-04056-WHO

2.    <u>Reasonable consumers would not interpret the challenged statements as Zeiger's advertising expert does, because he inexplicably fails to consider the factual context for the presence of these substances in dog food.</u>

Zeiger has not shown that reasonable consumers would find the challenged statements false or misleading. He has submitted the report of an advertising expert who purports to know how reasonable consumers *would* perceive the statements. *See generally* Report of Bruce G. Silverman (Class Cert. Mot., Ex. 3). Silverman opines that reasonable consumers would find the presence of these elements in the dog food "inconsistent with WellPet's statements" that the products are healthy and nutritious and thus they "would likely reject" the dog foods. *Id.* ¶¶ 97-113. He reaches this conclusion based only on the existence of certain media reports over the years about the risks of arsenic, lead, and BPA (including some on obscure internet sites), and his observation twenty years ago that one or two individuals in a consumer focus group voiced some concerns about lead in paint. *Id.*

Silverman's opinion is unhelpful to Zeiger because it is nothing more than speculation. Silverman did not survey consumers to see what they actually think about minute amounts of these environmental elements in dog food. More importantly, he did not review relevant information providing context for the presence of these elements in dog food. As a result, his "conclusory, speculative testimony … is insufficient to raise genuine issues of fact and defeat summary judgment." *Rahman v. Mott's LLP*, 2014 WL 5282106, at *9-10 (N.D. Cal. Oct. 15, 2014), *aff'd on other grounds*, 693 F. App'x 578 (9th Cir. 2017) (quoting *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)) (finding that similar expert testimony on whether reasonable consumers would be deceived was insufficient to create a genuine issue of material fact).

Silverman cannot reliably opine on how reasonable consumers would interpret the challenged statements without considering the context for the presence of arsenic, lead, and BPA in pet food. Rather shockingly, he fails to consider that these substances are ubiquitous in the environment and commonly found in other dog foods (and human food). He likewise doesn't consider that the

WELLPET'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-CV-04056-WHO

substances cannot be removed entirely from the food supply,[16] or that the scientific community and regulatory agencies have deemed them safe at these low levels.[17] *See generally* Poppenga Rep. (Ex. L). Were the Court to accept Silverman's ill-informed conclusions, it would also have to accept that "reasonable" consumers would find nearly all food labeling deceptive because it fails to disclose the presence of these environmental elements. The Court would also have to accept that "reasonable" consumers would reject *any* dog food (and most human food) as "unsafe." Reasonable consumers obviously would not take this view. Silverman's opinions therefore cannot raise a genuine issue of fact as to whether the challenged statements would mislead reasonable consumers.

As Judge Chen found in *Lucido*, the idea that there is **no** acceptable level of these elements in dog food is not reasonable in the world in which we live.[18] *See* 217 F. Supp. 3d at 1110 ("Mycotoxins exist at some level naturally. Indeed, the impossibility of eliminating all mycotoxins underlies the FDA's tolerance for certain levels of mycotoxins in pet food and even human food."); *id.* (rejecting the notion that "*any* level of mycotoxin [in dog food] is a health risk" because "if that were Plaintiffs' position, then Plaintiffs would effectively be advocating for a warning on practically all food products because, as Plaintiffs do not dispute, mycotoxins are effectively ubiquitous").

Judge Chen is not alone. Another federal court granted summary judgment for a pet food manufacturer on similar claims because

> minute amounts of heavy metals are omnipresent in the environment and in all pet foods. If the mere presence of heavy metals in pet foods made a manufacturer's statements of quality misleading, then [consumer protection laws] would effectively bar the sale of any pet foods packaged or marketed in a manner that touts their quality. This is nonsensical, of course, as every pet food is advertised in this way.

---

[16] FDA advises consumers that "[a]s a naturally occurring element, *it is not possible to remove arsenic entirely from the environment or food supply*." FDA, *Arsenic in Food and Dietary Supplements*, *available at* https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements (last visited Oct. 29, 2020) (emphasis added). Similarly, FDA states that "*[i]t is not possible to remove or completely prevent lead from entering the food supply*." FDA, *Lead in Food, Foodwares, and Dietary Supplements*, *available at* https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements (last visited Oct. 29, 2020) (emphasis added).

[17] *See also Bisphenol A (BPA)*, *available at* https://www.fda.gov/food/food-additives-petitions/bisphenol-bpa (last visited Oct. 29, 2020) (explaining FDA's position that BPA is safe for use in human food packaging).

[18] A "zero tolerance" standard is one that manufacturers of *human* foods could not be expected to meet. *See, e.g.*, *Draft Guidance for Industry*, *Hazard Analysis and Risk-Based Preventive Controls for Human Food*, at 37 (F.D.A. Jan. 2018), *available at* https://www.fda.gov/media/100002/download (last visited Oct. 29, 2020) (discussing that human food manufacturers should keep heavy metal content "within permitted levels").

18

*Weaver v. Champion Petfoods USA Inc.,* 2020 WL 3847248, at *3 (E.D. Wis. July 8, 2020), *appeal docketed*, No. 20-2235 (7th Cir. July 9, 2020); *id.* at *4 ("The Court sees no reason to treat BPA differently than heavy metals. To hold Defendants liable for the risk that their products contain unintended and non-harmful concentrations of these substances, a fact common to many other pet food manufacturers, would be extraordinary."); *see also Loeb*, 359 F. Supp. 3d at 605 n.7 ("If a [consumer fraud] claim would lie whenever a product is marketed as healthful, but nevertheless contains naturally occurring heavy metals at levels not shown to be harmful, then in light of the data [showing that heavy metals exist in many consumer food products], consumers would have grounds to sue the manufacturer of nearly every product in a typical grocery store.").

Zeiger offers no evidence that the Wellness products he purchased were unhealthy or unsafe, or failed to provide the nutritional value and quality promised. Accordingly, reasonable consumers would not be misled and WellPet is entitled to summary judgment.

## II.   Zeiger did not rely on any of the challenged statements or omissions.

Zeiger's misrepresentation and omission claims fail for the additional reason that he did not rely on any of the challenged statements or the absence of warnings about the presence of arsenic, lead, and BPA when purchasing the Wellness products. *See Sandoval v. PharmaCare US, Inc.*, 730 F. App'x 417, 419 (9th Cir. 2018) (affirming summary judgment on false advertising and express warranty claims because the plaintiff "failed to submit sufficient evidence that he viewed and relied on the website before his first purchase of [the product]"); *Brazil v. Dole Packaged Foods, LLC,* 660 F. App'x 531, 534 (9th Cir. 2016) (affirming summary judgment on UCL claim because plaintiff "did not see the allegedly offending statements before he purchased" the product and the "statements therefore cannot be said to have influenced his purchase"); *see also Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125-27 (9th Cir. 2009) (dismissing CLRA and UCL claims when plaintiff failed to allege which specific advertisements he was exposed to and when, and failed to specify which sales materials he allegedly relied upon in deciding to purchase the subject product); *Schmitt v. Younique LLC*, 2018 WL 7348850, at *6-7 (C.D. Cal. Dec. 21, 2018) (granting summary judgment on express and implied warranty claims because plaintiff "did not view the label prior to purchasing such that she would rely on it"); *Tabler v. Panera LLC*, 2020 WL 3544988, at *7 (N.D. Cal. June 30, 2020) (dismissing

1  plaintiff's CLRA, FAL, and UCL claims when plaintiff failed to allege which advertisements she

2  relied upon and when); *Precision Safety Innovations, Inc. v. Branson Ultrasonic Corp.*, 2005 WL

3  5801513, at *10-11 (C.D. Cal. Aug. 4, 2005) (granting summary judgment on negligent

4  misrepresentation claim, in part, for lack of reliance on the defendant's statement).

5       Zeiger first bought Wellness around 2010 after he obtained free product samples. Zeiger Dep.

6  (Ex. O) at 77:12-78:19, 134:15-135:6. Although he remembered the brand name "Wellness," and that

7  it was "grain-free," he did not recall seeing the five challenged statements on the packaging. *Id.* at

8  88:3-21, 99:3-22, 135:14-136:7. He starting buying the dog food because when he opened the package

9  it had a fresh smell and his dogs seemed to like it. *Id.* at 134:15-135:6. He said that Wellness went

10  "the extra mile" and the food was "moist looking" and more "stay-fresh" than the dog food he was

11  using. *Id.* at 87:1-8, 94:6-11, 95:17-25.

12       Zeiger considers himself a "very sophisticated" consumer. *Id.* at 241:21-25. He knows that

13  arsenic and lead are naturally occurring and that there are going to be small amounts of these elements

14  in everything, including all pet food. *Id.* at 82:25-83:5, 120:18-121:7, 169:19-170:2, 253:7-12.

15  Similarly, Zeiger understands that BPA is in most foods and that it is "all around us." *Id.* at 142:4-9.

16  On these facts alone, it is obvious that Zeiger was not misled by the Wellness packaging.

17       He also admitted he does not remember seeing "natural" on the packaging. *Id.* at 279:12-15.

18  Even if he had seen the word "natural," he said he does not have any issue with the use of "natural"

19  on the Wellness packages. *Id.* at 145:1-6, 279:12-15. Nor does Zeiger believe it when products claim

20  to be "natural." *Id.* at 258:11-21. Thus, he has effectively disclaimed the challenge to the "natural"

21  claim in his complaint.

22       Zeiger has never visited the WellPet or Wellness websites. Zeiger Dep. (Ex. U) at 100:4-6,

23  101:3-9. As a result, any statements made on WellPet's website that are not otherwise on the products'

24  packaging could not have induced him to purchase the food. *Sandoval*, 730 F. App'x at 419; *Brazil*,

25  660 F. App'x at 534.

26       For all these reasons, Zeiger did not rely on any of the challenged statements, nor did he expect

27  the Wellness dog foods to be completely free of small amounts of arsenic, lead, and BPA. Accordingly,

28  WellPet is entitled to judgment as a matter of law.

### III.     Zeiger cannot prove any damages or entitlement to restitution.

Zeiger's claims also fail because he cannot prove that he was damaged by his purchases of the Wellness products. "To establish standing under the UCL, FAL, and CLRA a person must have suffered injury in fact and have *lost money or property as a result*." *Anderson v. The Hain Celestial Grp., Inc*., 87 F. Supp. 3d 1226, 1232-33 (N.D. Cal. 2015) (emphasis added). Zeiger alleges that he paid a "price premium" for dog food "that did not deliver what it promised." SAC ¶¶ 27, 76. He seeks restitutionary damages. "The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873, at *5 (N.D. Cal. Nov. 6, 2014). The only record evidence to support Zeiger's claim for damages is his deposition testimony and the "price premium" damages model his experts have proposed in support of class certification. Neither provides proof that Zeiger experienced any economic injury from purchasing the Wellness products.

Initially, as discussed in WellPet's class certification opposition, Zeiger doesn't have a clear memory of the specific Wellness products he bought (his interrogatory answers notwithstanding). When asked which products he is complaining about, he responded, "The dry dog food, the one that I purchased. … I purchased multiple ones. There's the plain one, there's the whitefish, and the other fish. *I think I've purchased all three at one time or another*[.]" Zeiger Dep. (Ex. O) at 17:19-25. Zeiger further stated, "I don't remember the exact names because it's, you know, multiple things. It's the ocean fish one … The other one was plain Wellness brand. I think it's chicken flavored or something like that. The basic one. And there's two different fish flavored ones." *Id.* at 19:7-15. Zeiger is mistaken. The products at issue are all fish-based; none is "plain" or "chicken flavored." Moreover, there are more than 50 Wellness dry dog food formulas, 10 of which are fish-based. Kean Decl. (Ex. A) ¶ 9. But only *three* are at issue. Zeiger also believed he purchased Menhaden around 2009 and that he saw the word "CORE" on the package. But the Menhaden product wasn't marketed until 2016 and it doesn't say "CORE" on the package. *Id.* at 266:17-267:3, 269:20-24, 270:16-20; Ex. J; Declaration of Clark D. Reinhard (Ex. R.) at Ex. A. In light of the dozens of Wellness dry kibble formulas on the market, Zeiger's inability to recall which ones he bought, and his belief that he purchased "plain" and chicken-flavored" products, which are not at issue, there is no basis for a jury to determine how many

times he purchased the three specific products at issue, or even if he bought all three.[19]

Even if he could overcome this problem, Zeiger has no evidence that he spent any money on the Wellness products. He doesn't have any receipts or any other documentation of his purchases. Zeiger Dep. (Ex. U) at 32:12-21. He also doesn't know how much he paid for each bag, estimating that he has paid anywhere from $15.00 to $20.00 per bag. *Id.* at 305:7-14.

Finally, Zeiger has not shown and cannot show that he paid a price premium for the Wellness products. For all the reasons set forth in section I.B of WellPet's class certification opposition, Zeiger's damages model—which is the only evidence available from which a jury could determine the alleged premiums he paid—is fatally flawed and therefore does not provide relevant or reliable information to calculate his alleged damages. In short, the consumer survey on which Zeiger's damages model is based omitted important contextual facts and presented information about the risk of presence of arsenic, lead, and BPA only for the Wellness products and not other dog foods, which are subject to the same risk; the methodological flaws in the survey impermissibly resulted in price premiums that exceed the purchase price (contrary to Ninth Circuit law); the survey's presentation of the challenged statements and product prices did not reflect the "real world" marketplace; and the damages model improperly reflects only consumers' purported willingness to pay without consideration of supply-side factors and other marketplace realities. *See* WellPet's Class Cert. Opp. (Dkt. 162) at 19-24.

Zeiger also has not provided any evidence to support his assertion that the Wellness products cost more than comparable dog foods available at his time of purchase. And that assertion is undercut by his admission that he does not know what comparable dog food he could have purchased at a lower price. Zeiger Dep. (Ex. U) at 304:6-305:6. Zeiger concedes that small amounts of arsenic and lead are

---

[19] Although Zeiger says he bought one small bag of Wellness per month from October 2014 to July 2017 for his dog daycare business, it is clear from his testimony that he doesn't recall *which formulas* he bought. Moreover, he occasionally charged his dog sitting business customers for the Wellness dog food but has no idea how often he charged them because he didn't track it. Zeiger Dep. (Ex. O) at 284:19-285:8. Because Zeiger cannot determine the degree to which he was reimbursed (he cannot recover reimbursed costs), a jury could only speculate in calculating his damages even if he had remembered which specific formulas he bought. *See In re Intel Laptop Battery Litig.*, 2010 WL 5173930, at *2-3 (N.D. Cal. Dec. 15, 2010) (granting summary judgment, in part, because plaintiff lacked standing to assert a claim under the UCL when plaintiff purchased the product at issue with company funds, and, thus, "did not personally lose any money in association with the transaction").

22

naturally occurring in all dog foods. Zeiger Dep. (Ex. O) at 169:19-170:2. Because these elements are found across all products, their presence cannot be the basis for any price difference.

## IV.    Zeiger is not entitled to injunctive or other equitable relief.

Zeiger cannot seek injunctive relief or any other equitable relief, including restitution, because he has an adequate remedy at law. The Ninth Circuit recently announced that "the traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under the UCL and CLRA in a diversity action … [r]egardless of whether California authorizes its courts to award equitable restitution … when a plain, adequate, and complete remedy exists at law." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844-45 (9th Cir. 2020). This applies to claims for injunctive relief as well. *In re: MacBook Keyboard Litig.*, 2020 WL 6047253, at *3-4 (N.D. Cal. Oct. 13, 2020) (citing cases applying *Sonner* to injunctive relief claims). Zeiger's request for injunctive and other equitable relief fails because his complaint does not allege an inadequate legal remedy. *Sonner*, 971 F.3d at 844. To the contrary, he seeks to certify a class asserting a legal remedy. *Philips v. Ford Motor Co.*, 2016 WL 7428810, at *24 (N.D. Cal. Dec. 22, 2016). In affirming the dismissal of the injunctive relief claims in *Philips*, the Ninth Circuit held that "the district court correctly determined that [Plaintiffs] were required to plead the inadequacy of their legal remedies to state a claim for injunctive relief." *Philips v. Ford Motor Co.*, 726 F. App'x 608, 609 (9th Cir. 2018).

Zeiger also lacks standing to seek injunctive relief because he has no evidence he will suffer a repeated injury. To have standing, Zeiger must show that "he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citations and internal quotations omitted). He "must demonstrate 'a real and immediate threat of repeated injury' in the future." *Chapman v. Pier 1 Imports (U.S) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). The threat of future injury must be "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Zeiger doesn't face a real and immediate threat of repeated injury. He testified only that he

would be "open to" the idea of buying the Wellness products again if WellPet "fixed" the dog food, but that he "would not" purchase the products if just the allegedly misleading labels were changed. Zeiger Dep. (Ex. O) at 113:9-114:17, 264:2-12. The mere possibility that Zeiger *might* buy Wellness dog food again someday is not enough. The "threatened injury must be *certainly impending* to constitute injury in fact, and … allegations of possible future injury are not sufficient." *Rahman v. Mott's LLP*, 2018 WL 4585024, at *2 (N.D. Cal. Sept. 25, 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (emphasis added); *see also Lanovaz v. Twinings North America, Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) (holding that plaintiff's statement that she would "consider buying" the products in the future did not support a finding of actual or imminent injury); *Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787, 803 (N.D. Cal. 2019) (dismissing injunctive relief claim because plaintiff "only alleges possible future injury," not an injury that is "certainly impending").

Zeiger also hasn't shown a "sufficient likelihood that he will again be wronged in a similar way." *Bates*, 511 F.3d at 985. The wrong Zeiger alleges is the sale of the Wellness products with misleading labels. Because he has testified that he will not purchase the products in the future (even if the labels are changed), "it is unlikely that [he] will "again be wronged in a similar way." *Lanovaz*, 726 F. App'x at 591. Moreover, Zeiger understands that small amounts of arsenic, lead, and BPA exist most everywhere, including in food. Zeiger Dep. (Ex. O) at 82:25-83:5, 120:18-121:7, 253:7-12, 142:4-9. Therefore, he would not be misled in the future.

For all these reasons, WellPet is entitled to judgment as a matter of law on Zeiger's request for injunctive and other equitable relief.[20]

## V.    The economic loss rule bars Zeiger's negligent misrepresentation claim.

Zeiger's negligent misrepresentation claim, which seeks relief only for alleged economic losses (SAC ¶¶ 25, 27, 76; Zeiger Dep. (Ex. O) at 304:6-13), is barred additionally by the economic loss rule. This rule "bar[s] a plaintiff's tort recovery of economic damages unless such damages are accompanied by some form *of physical harm* (i.e., personal injury or property damage)." *Ladore v. Sony Computer Entm't Am., LLC*, 75 F. Supp. 3d 1065, 1075-76 (N.D. Cal. 2014) (citation omitted)

---

[20] Zeiger's request for disgorgement fails additionally because, under the UCL, disgorgement must be restitutionary in nature. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003). As set forth above, Zeiger is not entitled to restitution.

(dismissing claim that Sony misrepresented video game features because plaintiff alleged no non-economic losses from product purchase); *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 820 (N.D. Cal. 2014) (dismissing claim when plaintiff failed to allege personal injury or property damage from misleading marketing of consumer product); *Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025, 1035-36 (N.D. Cal. 2016) (failed to allege physical harm); *In re Trader Joe's Tuna Litig.*, 289 F. Supp. 3d 1074, 1091-92 (C.D. Cal. 2017) (failed to allege non-economic damages); *Robinson v. J.M. Smucker Co.*, 2019 WL 2029069, at *5-6 (N.D. Cal. May 8, 2019) (failed to allege personal injury or non-economic loss).

Although the California Supreme Court has recognized an exception to the economic loss rule, this narrow exception applies only when a plaintiff relies on affirmative misrepresentations and those misrepresentations "expose [the] plaintiff to liability for personal damages independent of the plaintiff's economic loss." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 993 (2004). Zeiger did not rely on the challenged statements on the packaging. But even if he had, he doesn't claim that he has been exposed to personal liability for damages beyond his alleged economic loss.[21] *Id.*

Because Zeiger alleges only the loss of money, and not personal injury or injury to his dogs, his negligent misrepresentation claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, WellPet respectfully requests that the Court enter summary judgment in its favor and dismiss Plaintiff's claims.

---

[21] Federal decisions on California's economic-loss rule have been inconsistent. A consideration when construing the economic-loss rule is the principle derived from *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), that federal courts should avoid rulings that tend to expand state-law liability when the state law is unsettled. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975) ("A federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits.") (citing *Erie*); *Del Webb Communities Inc. v. Partington*, 652 F.3d 1145, 1154 (9th Cir. 2011) (a federal court "should hesitate prematurely to extend the law in the absence of an indication from the state courts or the state legislature that such an extension would be desirable") (citation omitted); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203-04 (9th Cir. 2002) (declining to expand liability under state statute when state courts had not extended law to situation before it).

1    Dated:  October 30, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By:  _/s/ Amir M. Nassihi_____
        Amir M. Nassihi
        Joan R. Camagong
        James P. Muehlberger
        Elizabeth P. Fessler

Attorneys for Defendant WellPet LLC