Amir M. Nassihi (SBN: 235936)
anassihi@shb.com
Joan R. Camagong (SBN: 288217)
jcamagong@shb.com
SHOOK, HARDY & BACON L.L.P.
One Montgomery, Suite 2600
San Francisco, California 94104
Telephone: 415-544-1900
Facsimile: 415-391-0291

James P. Muehlberger (*admitted pro hac vice*)
jmuehlberger@shb.com
Elizabeth A. Fessler (*admitted pro hac vice*)
efessler@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108
Telephone:    816-474-6550
Facsimile:    816-421-5547

Attorneys for Defendant
WELLPET LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL ZEIGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLPET LLC, a Delaware corporation,<br>          Defendant. | Case No.  3:17-cv-04056-WHO<br><br>**WELLPET LLC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE INDIVIDUAL CLAIMS OF DANIEL ZEIGER**<br><br>Judge:  Hon. William H. Orrick<br>Hearing Date: January 6, 2021<br>Hearing Time: 2:00 p.m. |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

    I.    Zeiger has no evidence that the Wellness products pose a health risk to dogs. ................... 1

    II.   FDA has determined that heavy metals are not hazards for kibble or the main ingredients in the Wellness products. ................................................................................. 3

    III.  WellPet has never identified arsenic, lead, or BPA as a health risk in the Wellness products. ............................................................................................................................. 5

    IV.  Zeiger has not proven that reasonable consumers would interpret the challenged statements as representing that the Wellness products are completely free of arsenic, lead, and BPA, which are ubiquitous. ................................................................................. 7

    V.   Zeiger did not rely on the challenged statements or omissions when he bought the Wellness products. ............................................................................................................. 9

    VI.  Zeiger is not entitled to restitution or damages. ................................................................ 11

    VII. Zeiger is not entitled to injunctive or other equitable relief. ............................................. 13

    VIII. Zeiger has abandoned his negligent misrepresentation claim, which is barred by the economic loss rule. ........................................................................................................ 15

CONCLUSION ............................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**                 **Page(s)**

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014) ............................................................................................11

*Anderson v. Apple Inc.*,
   2020 WL 6710101 (N.D. Cal. Nov. 16, 2020) .......................................................................15

*Continental Airlines, Inc. v. Intra Brokers, Inc.*,
   24 F.3d 1099 (9th Cir. 1994) .................................................................................................14

*Drake v. Toyota Motor Corp.*,
   2020 WL 7040125 (C.D. Cal. Nov. 23, 2020).......................................................................14

*Franklin v. Gwinnett Cty. Pub. Schs.*,
   503 U.S. 60 (1992).................................................................................................................13

*Idaho v. Coeur d'Alene Tribe of Idaho*,
   521 U.S. 261 (1997)...............................................................................................................13

*In re 5-Hour Energy Mktg. and Sales Practices Litig.*,
   2017 WL 2559615 (C.D. Cal. June 7, 2017) ........................................................................11

*In re Arris Cable Modem Consumer Litig.*,
   2018 WL 288085 (N.D. Cal. Jan. 4, 2018) ............................................................................10

*In re: Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*,
   2020 WL 5267567 (C.D. Cal. Sept. 2, 2020) ........................................................................15

*In re: MacBook Keyboard Litig.*,
   2020 WL 6047253 (N.D. Cal. Oct. 13, 2020)........................................................................14

*Lane v. Landmark Theatre Corp.*,
   2020 WL 1976420 (N.D. Cal. Apr. 24, 2020) .......................................................................15

*Lanovaz v. Twinings North America, Inc.*,
   726 F. App'x 590 (9th Cir. 2018) ..........................................................................................15

*Lucido v. Nestle Purina Petcare Co.*,
   217 F. Supp. 3d 1098 (N.D. Cal. 2016) .......................................................................... passim

*Nelson v. Pima Community College*,
   83 F.3d 1075 (9th Cir. 1996) ...................................................................................................3

*Ramirez v. City of Buena Park*,
   560 F.3d 1012 (9th Cir. 2009) ...............................................................................................15

*Reid v. Johnson & Johnson*,
   780 F.3d 952 (9th Cir. 2015) ..........................................................................................10

*Santos v. TWC Administration LLC*,
   2014 WL 12558274 (C.D. Cal. Nov. 3, 2014)..............................................................15

*Shakur v. Schriro*,
   514 F.3d 878 (9th Cir. 2008) ........................................................................................15

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ..................................................................................13, 14

**Regulations**

21 C.F.R. Part 507..................................................................................................................5

21 C.F.R. § 507.33 .................................................................................................................5

21 C.F.R. § 507.34 .................................................................................................................5

**Other Authorities**

*Center for Veterinary Medicine CY15-17 Report on Heavy Metals in Animal Food*
   (F.D.A. Oct. 24, 2019), *available at*
   https://www.fda.gov/media/132046/download..............................................................3

*Draft Guidance for Industry, Hazard Analysis and Risk-Based Preventive Controls*
   *for Food for Animals*, (F.D.A. Jan. 2018)..............................................................3, 4, 5

National Research Council, *Mineral Tolerance of Animals* (2d ed. 2005).......................4, 6

# INTRODUCTION

Zeiger's opposition fails to refute the arguments in WellPet's motion and therefore the Court should grant summary judgment for WellPet. As a threshold matter, Zeiger has ***no*** scientific evidence that exposure to the minute amounts of arsenic, lead, and BPA at issue poses a health risk to dogs. Neither can Zeiger prove any damages. Each of these facts alone warrants summary judgment. But Zeiger's claims also fail for numerous other reasons. Zeiger doesn't dispute that: (1) arsenic, lead, and BPA exist everywhere in the environment; (2) the minute amounts of arsenic and lead found in the Wellness products are well within the levels FDA considers safe for pet food and comparable to those found in other premium dog foods; (3) FDA has advised the public that arsenic and lead cannot be completely removed from food; (4) FDA has advised animal food manufacturers that heavy metals are not a hazard for kibble or the main ingredients in the Wellness products; and (5) WellPet has not violated any known safety standard or guideline for heavy metals or BPA applicable to dog food.

As a result of these undisputed facts, Zeiger has failed to establish that reasonable consumers would expect the Wellness dog foods to be completely free of trace amounts of these environmental elements based solely on WellPet's packaging statements about the nutritional and healthful qualities of the dog foods. Zeiger also doesn't dispute that the "zero tolerance" standard he advocates—which FDA says is not possible—would effectively require a warning on practically all food products (human and animal).

Zeiger's claims are conceptually flawed and utterly fail for a lack of evidence. Accordingly, WellPet is entitled to summary judgment.[1]

# ARGUMENT

**I.   Zeiger has no evidence that the Wellness products pose a health risk to dogs.**

Zeiger's contention that the Wellness products are unsafe for dogs to consume due to the presence of minute amounts of arsenic, lead, and BPA is based solely on the opinions of his animal

---

[1] In footnote 1 of its summary judgment motion and class certification opposition, WellPet listed numerous similar actions filed against other pet food manufacturers, most of which have been dismissed or class certification denied. Summ. J. Mot. at 1; Class Cert. Opp. at 1. WellPet mistakenly stated that all of the cases in footnote 1 were filed by this same plaintiff's counsel when two of the eight cases were filed by different lawyers.

nutrition expert, Dr. Pusillo. For all the reasons set forth in WellPet's separate *Daubert* motion (Dkt. 163, 179), Dr. Pusillo's opinions are unreliable and the Court should exclude them. Most notably, Dr. Pusillo opines that there is no safe level of arsenic, lead, or BPA in dog food without offering any evidence of the dose and duration of exposure to these substances that would be necessary to cause harm. Dr. Pusillo's litigation-driven opinions are based entirely on his subjective belief that if consumed for long enough periods these substances might accumulate in a dog's body to the point that they would negatively impact the dog's health. *See id.* But Dr. Pusillo has not conducted any study or identified any study showing that this occurs. Zeiger tries to paint this case as a "battle of the experts." Opp. (Dkt. 189) at 11. Nothing could be further from the truth.

This is not a situation where the experts on both sides are armed with epidemiological studies reaching different conclusions and the experts simply disagree as to the particular levels of arsenic, lead, and BPA that pose a health risk. Contrary to the basic tenets of toxicology, Dr. Pusillo contends that there is ***no*** threshold level of exposure necessary to create a health risk, i.e., ***any*** trace amount of these substances—no matter how small—is unsafe for dogs to consume. *See generally* Pusillo Rep. (Class Cert. Mot. (Dkt. 152), Ex. 9). ***There is no science to support that extreme position and Dr. Pusillo seems to be alone in holding it***. Dr. Pusillo offers nothing more than his own unsupported hypotheses. He has not presented ***any*** scientific evidence that the low levels of arsenic, lead, and BPA found in the Wellness products pose a health risk to dogs, and his opinions lack any scientific reliability. Just as Judge Chen found regarding the plaintiffs' expert in a similar dog food case, Dr. Pusillo's unfounded assumptions cannot create a genuine issue of fact as to the safety of the Wellness products. *Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1112 (N.D. Cal. 2016) (granting summary judgment for Purina because plaintiffs' expert relied on scientific literature that was "either too speculative or too imprecise" and he cited "*no* epidemiological evidence that long-term exposure to mycotoxins at levels below the limits set by the FDA leads to serious health risks for dogs").

Zeiger also misconstrues the testimony of WellPet's expert, Dr. Poppenga, and misstates WellPet's position. Dr. Poppenga stated that the "*concept*" of bioaccumulation is well-recognized in toxicology; he did ***not*** say there is scientific evidence supporting Dr. Pusillo's theory that the tiny amounts of heavy metals in dog food can accumulate over time in a dog's body sufficiently to cause

2

harm.[2] Dkt. 172-2 at 70:6-25 (cited in Opp. at 8). Similarly, WellPet did not say that more research is needed to determine the safety of heavy metals in pet food. Rather, it argued in its motion for summary judgment, citing Judge Chen's opinion in *Lucido*, 217 F. Supp. 3d at 1111-12, that *the most* that could be said about *Dr. Pusillo's unsupported hypotheses* is that more research should be done. Summ. J. Mot. (Dkt. 180) at 12. Accordingly, there is no contradiction between WellPet's arguments and Dr. Poppenga's opinions.[3]

## II.   FDA has determined that heavy metals are not hazards for kibble or the main ingredients in the Wellness products.

Zeiger disagrees with FDA's positions regarding the safety of heavy metals in animal food and BPA so he all but ignores FDA, despite FDA's role as the federal agency responsible for regulating pet food safety. WellPet's discussion of FDA's role is neither "misleading" nor "misplaced." Opp. at 5. As explained in WellPet's summary judgment motion, FDA instructs manufacturers that chemical substances in animal food "are not always considered hazards and their occurrence may be unavoidable." *Draft Guidance for Industry, Hazard Analysis and Risk-Based Preventive Controls for Food for Animals*, at 48 (F.D.A. Jan. 2018) (Class Cert. Opp. (Dkt. 162), Ex. K). Moreover, the determination of whether a substance is a "hazard" depends on "[t]he particular chemical, and its level in the animal food[.]" *Id.* FDA's Center for Veterinary Medicine conducts a surveillance program that monitors the heavy metal levels in pet food ingredients. *Center for Veterinary Medicine CY15-17 Report on Heavy Metals in Animal Food*, at 1 (F.D.A. Oct. 24, 2019), *available at* https://www.fda.gov/media/132046/download (last visited Dec. 11, 2020). Although FDA has not

---

[2] Zeiger quotes the Kim study as saying it is "conceivable" that chronic exposure to lead (not arsenic) could contribute to diseases in older dogs who eat the same product for many years. Opp. at 8. But saying that something is "conceivable" is nothing more than speculation that it theoretically could happen, which is insufficient to survive summary judgment. *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."). Moreover, Zeiger selectively quotes the Kim study, which concluded that "chronic toxic exposure levels [of heavy metals] are highly unlikely" and "commercial dog foods appear to be safe for chronic consumption[.]" Dkt. 172-4 at 1.

[3] Zeiger's reference to questioning of Dr. Poppenga regarding a debate over BPA (Opp. at 13) is with regard to *human* exposure and FDA regulation and therefore is irrelevant to dogs. In any event, FDA has not established exposure limits for BPA in human food (or pet food).

formally promulgated "action levels" for heavy metals in pet food, the agency uses the "maximum tolerable levels" or MTLs set forth in the National Research Council's *Mineral Tolerance of Animals* and information provided in AAFCO's *Official Publication* when determining safe levels of heavy metals in the food and taking regulatory actions against violators.[4] *Id.*

In FDA's most recent surveillance report from October 2019, it found that most domestic and imported animal food ingredient samples tested were below the MTLs. *Id.* at 4. And even as to those ingredients that were over the MTLs, FDA concluded that "based on typical inclusion rates of these ingredients, the expectation is that the heavy metal levels in the final feed would be within an acceptable range and not cause a safety issue for the specified animal[.]" *Id*. Here, the levels of arsenic and lead found in the Wellness products are well below the MTLs and therefore pose no health concerns whatsoever. Indeed, as explained in WellPet's motion, FDA has expressly stated that heavy metals are not hazards for kibble or the main ingredients in the Wellness dog foods, including fish, grains, and fruit and vegetables. Summ. J. Mot. at 5 (citing *Animal Food Draft Guidance* (Class Cert. Opp., Ex. K) at 142, 145, 153-54).

Zeiger points out that FDA sometimes tests dog food for heavy metals when investigating a reported pet illness. Opp. at 6. He argues that if FDA believed there was no risk of potential harm caused by ingesting dog food there would be no reason for FDA to test the food for heavy metals when conducting such investigations. *Id.* But that argument is misplaced. FDA's testing of pet food in response to a reported illness doesn't change the fact that heavy metals, like any substance, must be present in a certain amount before they can cause harm. FDA is merely testing the food to determine whether there are unusually high amounts of heavy metals that might explain the illness. That is of no

---

[4] Contrary to Zeiger's argument, Dr. Poppenga did not state that the MTLs are outdated. Opp. at 6. He stated that it would be prudent for NRC to revisit the MTLs "if there's new information available." Poppenga Dep. (Dkt. 189-2) at 95:8-13. But in response to the very next question (which Zeiger omits), Dr. Poppenga stated that "since 2005 there hasn't been any substantial new information." *Id.* at 95:15-22. This is consistent with the fact that when the European Commission updated its directive on safe upper limits of heavy metals and other substances in pet food in November 2019, it made no changes to the levels for arsenic and lead it established in 2002. *See* Poppenga Rep. (Class Cert. Opp., Ex. L) at 12-13 (stating that the EU continues to use the limits of 10 mg/kg (ppm) for arsenic and 5 mg/kg for lead for complete feed). The levels found in the Wellness products are "well below" these limits. *Id.* at 13.

1  help to Zeiger. He doesn't allege any harm to his dogs from eating the Wellness dog foods, and the
2  minute amounts of arsenic and lead found here are well below the MTLs.

3  Finally, Zeiger argues that FDA regulations and guidance and AAFCO guidelines are
4  irrelevant because this case is about alleged violations of California law. Opp. at 5. But Zeiger doesn't
5  identify any California law regarding dog food that WellPet violated or that imposes standards
6  different from those of FDA and AAFCO. Zeiger does not dispute that the Wellness products comply
7  with the requirements of FDA and AAFCO.

**III.  WellPet has never identified arsenic, lead, or BPA as a health risk in the Wellness products.**

Zeiger continues to mischaracterize WellPet's documents and testimony in an effort to suggest that WellPet considered arsenic, lead, and BPA to be a health risk. Contrary to Zeiger's opposition, WellPet's draft quality manual did not "prohibit[] the presence of heavy metals" in the ingredients. Opp. at 8. As the section of the manual Zeiger quotes reflects, it stated only that heavy metals were not to be "introduced into WellPet's products from direct or indirect contact." Opp. at 7. There is no evidence that WellPet's suppliers "introduced" heavy metals into the products. WellPet did not, and does not, require suppliers to certify that ingredients are completely free of heavy metals, which, as FDA says, is not even possible. This manual was a draft document[5] that was created pending FDA's publication of regulations and guidance for manufacturers following passage of the Food Safety Modernization Act ("FSMA"). Kean Decl. (Class Cert. Opp., Ex. A) ¶ 24. FDA issued regulations in 2015 and draft guidance for manufacturers in 2018. *See* 21 C.F.R. Part 507; *Animal Food Draft Guidance, supra.* FDA's regulations and guidance—which Zeiger ignores altogether—incorporate a risk-based approach to food safety. *See id.*; 21 C.F.R. §§ 507.33, 507.34. As explained above and in WellPet's motion, the trace amounts of arsenic and lead found in the Wellness products do not pose a health risk for dogs, precluding the need for preventive controls.

---

[5] Even if the quality manual were not a draft document, it does not state that WellPet intended or reasonably believed it could make dog food that was completely free of heavy metals. Moreover, WellPet never communicated to consumers any intention to provide food that was completely free of heavy metals, so there is no basis for a misrepresentation claim.

1    Zeiger similarly misreads the "Foreign Body Control" section of the draft manual. Opp. at 8-9. The manual discusses procedures for removing foreign objects from ingredients and finished products, such as wood and plastic and "metalized materials that are detectable by metal detectors and x-ray equipment." WLPT00008059 at 8087 (Class Cert. Mot., Ex. 5). This section pertains to removing solid objects from the food through magnets, sieves, and x-ray equipment, *not* the removal of microscopic amounts of a chemical like BPA, which is impossible.[6] Kean Decl. (Class Cert. Opp., Ex. A) ¶ 44.

Even if the quality manual were *not* a draft document superseded by FDA's subsequent regulations and guidance, and Zeiger did *not* misread the manual's provisions, that wouldn't help him. As Judge Chen found in *Lucido*, "even if [the manufacturer] failed to comply with its own policies and practices on testing, any such failure is not—*by itself*—enough to show that [the dog food] is unsafe." 217 F. Supp. 3d at 1115. And, as in *Lucido*, the amounts of heavy metals here are "within limits permitted by the FDA" and "[t]here is no evidence in this record that those levels of [heavy metals] pose a safety risk." *Id.* at 1115-16.

Zeiger also repeats the untruth that WellPet's corporate designee, Mr. Kean, admitted that WellPet would have considered arsenic and lead a risk if WellPet had tested at parts per billion ("ppb"), like Zeiger, instead of parts per million ("ppm"). Opp. at 7. It is clear from Kean's response that he misunderstood the question and, as a result, answered "yes" instead of "no." Kean expressly based his answer on the findings of the FDA veterinary medical officer's review of a study on heavy metals in pet food. Kean Dep. (Class Cert. Opp., Ex. N) at 131:18-132:3; *see Target Animal Safety Review Memorandum* (Class Cert. Opp., Ex. M). That FDA review found that the levels of arsenic and lead in the pet foods examined were safe and well under the MTLs set by the NRC in *Mineral Tolerance*

---

[6] FDA's *Animal Food Draft Guidance* doesn't even mention BPA, much less identify it as a hazard. And Zeiger doesn't identify a single pet food manufacturer that tests its pet food or ingredients for BPA. Zeiger argues that WellPet's use of plastic conveyor buckets during manufacturing and its receipt of ingredients from suppliers in plastic storage sacks creates an "unnecessary risk" of BPA contamination. Opp. at 9-10. But there is no evidence that BPA, which is ubiquitous, was introduced through the buckets, the sacks, or any ingredient. The manufacturers of the buckets and storage sacks have certified that they do not use BPA in manufacturing these items. Kean Decl. (Class Cert. Opp., Ex. A) ¶ 42. Moreover, the buckets and storage sacks WellPet uses are standard in the food manufacturing industry and the plastic material is FDA approved for use with human food. *Id.* ¶ 41.

*of Animals*. Class Cert. Opp., Ex. M at 9-10, 12. If Kean had intended to say that the levels of arsenic and lead Zeiger's testing identified were a health risk, his reference to the FDA veterinary medical officer's review would have made no sense.[7] Kean listened to the question and answer during a recess, realized he had misspoken, and immediately corrected his answer when the deposition resumed. Kean Dep. (Class Cert. Opp., Ex. N) at 141:18-144:2. Accordingly, Zeiger has mischaracterized Kean's testimony.

**IV.    Zeiger has not proven that reasonable consumers would interpret the challenged statements as representing that the Wellness products are completely free of arsenic, lead, and BPA, which are ubiquitous.**

Zeiger doesn't dispute that he must show that a substantial portion of the public would interpret the five challenged statements as representing that the Wellness dog foods are completely free of *any* amount of arsenic, lead, and BPA. He cannot carry that burden.

Silverman's opinion that the challenged statements represent to consumers that the Wellness dog foods are completely free of arsenic, lead, and BPA is nothing more than his personal view untethered to his expertise in advertising—or reality, for that matter. As Zeiger states in his opposition, Silverman opines that the statements convey that the dog foods are healthy, nutritious, safe, and of high quality. Opp. at 17-18. WellPet agrees that's generally what the packaging conveys. The problem is that Silverman goes far beyond that. He then opines that these statements lead reasonable consumers to believe that the products are completely free of trace amounts of arsenic, lead, and BPA. That conclusion simply does not follow absent subjective (and demonstrably incorrect) assumptions that Silverman makes and then improperly imputes to consumers. First and foremost, Silverman fails to

---

[7] Kean's confusion as to what Zeiger's counsel was asking is understandable given counsel's phrasing of the question. Kean had just said that WellPet stopped testing for arsenic and lead in 2015 because its test results showed that "arsenic and lead were not a risk that needed to be continued to be pursued." Kean Dep. (Class Cert. Opp., Ex. N) at 131:4-12. Zeiger's counsel then asked, "If WellPet had tested per parts per billion and the results showed as what is alleged in our complaint, would WellPet have continued to have considered heavy metals a risk?" *Id.* at 131:18-21. The question is confusing due to the use of the word "continued" because WellPet had never determined heavy metals to be a risk; it conducted the testing to find out *if* they were a risk and concluded they were not. Kean was responding that WellPet would have continued to hold the same view even if it tested at ppb, based on the FDA veterinary medical officer's findings (that those levels are safe).

consider the basic reality that arsenic, lead, and BPA are ubiquitous in the environment—a fact that is undisputed. He never explains how it could be "reasonable" to ignore this reality, or to ignore that these environmental elements are present in other dog foods and human food, which also is undisputed. Indeed, Zeiger has not identified any dog food that is completely free of these elements. On top of that, FDA has specifically advised the public that arsenic and lead cannot be removed completely from the food supply (Summ. J. Mot. at 5 & n.5), which Zeiger also does not dispute.[8] In short, Silverman's belief that reasonable consumers would expect the Wellness dog foods to be entirely free of substances that exist in trace amounts everywhere doesn't make sense.

Zeiger argues that whether arsenic, lead, and BPA are naturally occurring, are found in other dog foods, and are present at safe levels is irrelevant to determining whether reasonable consumers would be misled by the challenged statements. Opp. at 18 n.12. For all the reasons set forth here, that doesn't make sense either.[9]

Any expectations attributed to reasonable consumers must be reasonable. It would be patently *unreasonable* to expect that any food would be completely free of trace environmental elements that are ubiquitous and which FDA has said cannot be completely removed from food. Zeiger does not dispute that if the Court accepts Silverman's opinion that reasonable consumers would find the Wellness packaging deceptive because of the presence of minute amounts of arsenic, lead, and BPA, then that necessarily means reasonable consumers would also find nearly all food labeling deceptive— and they would reject nearly all food—animal and human—as "unsafe." Summ. J. Mot. at 18. Nothing in the record suggests that a substantial portion of the public would reach such extreme conclusions. As Judge Chen found in *Lucido*, Zeiger is "effectively [] advocating for a warning on practically all food products because, as [Zeiger] do[es] not dispute, [heavy metals and BPA] are effectively

---

[8] Although Dr. Pusillo relies on FDA draft guidance for *human* food manufacturers rather than the guidance for animal food manufacturers, even that guidance states that heavy metals should be kept "within permitted levels"; it makes no reference to eliminating them from food entirely. Pusillo Rep. (Class Cert. Mot., Ex. 9) at 19.

[9] The entire premise of Zeiger's lawsuit is that the challenged statements are misleading *because* these elements are present in amounts that are unsafe for dogs to consume. If there is no issue regarding the safety of the dog food then the presence of minute amounts of substances that naturally occur in the environment is of no consequence.

1  ubiquitous." 217 F. Supp. 3d at 1110. Accordingly, Silverman's opinions do not create a genuine issue
2  of fact sufficient to avoid summary judgment.

3  **V.  Zeiger did not rely on the challenged statements or omissions when he bought the**
4  **Wellness products.**

5  The testimony Zeiger cites in his opposition does not show that he relied on the challenged
6  statements and, accordingly, his claims fail as a matter of law for this independent reason. Zeiger cites
7  numerous excerpts from his deposition but they don't show reliance on the five challenged statements.
8  Zeiger's testimony on pages 234-35 doesn't refer to the five challenged statements. Zeiger Dep.
9  (Summ. J. Reply, Ex. V) at 233:19-235:14. The testimony pertains to 2010 (approximately), when
10 Zeiger first obtained samples of the products. *Id.* Zeiger concedes that, other than "Wellness," he does
11 not recall the words on the packaging during this time period. Zeiger Dep. (Class Cert. Opp., Ex. O)
12 at 88:3-21, 99:3-22, 135:14-136:7; Opp. at 19 n.13. Contrary to the opposition, Zeiger never stated
13 that he relied on "complete health." In the cited testimony he was merely being asked what the phrase
14 "complete health" means to him. Zeiger Dep. (Summ. J. Reply, Ex. V) at 250:9-22. Similarly, it is
15 clear from Zeiger's testimony on pages 271-72 that he was speculating as to what prompted his
16 purchase of Menhaden. *See id.* at 271:11-272:9. In the Q&A immediately following the excerpt Zeiger
17 cites from page 271 (omitted from Zeiger's opposition) he was asked if he remembered what was on
18 the packaging of Menhaden when he first bought it to which he replied, "Not specifically, but that's
19 obviously what would have led me to buy it." *Id.* at 271:25-272:4. In response to the next question,
20 Zeiger confirmed he had "no specific recollection" of buying Menhaden for the first time. As for
21 "uncompromising nutrition," Zeiger stated only that he thought the phrase appeared on the bag of
22 CORE Ocean he brought with him to the deposition; he did not say he saw the statement on the bag
23 of Menhaden (or any other variety) *before* buying it. *Id.* at 289:18-23, 290:8-13. Indeed, as set out
24 above, Zeiger did not recall what was on the Wellness packaging when he first bought the products.
25 Zeiger also is incorrect when he says he relied on the "natural" claim on the packaging at the
26 time of purchase. Initially, Zeiger does not dispute that he doesn't believe it when products claim to
27 be "natural." Zeiger Dep. (Class Cert. Opp., Ex. O) at 258:11-21. That admission alone defeats any
28 claim of reliance on "natural." But the testimony Zeiger cites also doesn't support his reliance claim.

1  Contrary to the opposition, Zeiger stated that he bought Wellness because "it looked like wholesome, you know, natural ingredients on it." Zeiger Dep. (Summ. J. Reply, Ex. V) at 235:10-14. This testimony refers to Zeiger's review of the list of ingredients on the packaging, not the "natural" statement. The testimony Zeiger cites at 271:11-23 does not support his position because that testimony pertains to the Menhaden product and, as stated above, he had no specific recollection of his initial purchase of Menhaden. Likewise, the testimony at 268:19-23 is unhelpful because Zeiger claims he first bought Menhaden a decade ago (around 2009 or 2010) (Zeiger Dep. (Class Cert. Opp., Ex. O) at 266:17-267:3, 269:20-24), but Menhaden was not marketed until 2016 (*see* Class Cert. Opp., Ex. R at Ex. A), so he is clearly mistaken. When pressed further, Zeiger conceded he may not have purchased the Menhaden product at all. Zeiger Dep. (Class Cert. Opp., Ex. O) at 276:2-9. Accordingly, it is unknown which Wellness formula(s) Zeiger actually bought a decade ago or whether it was one of the three formulas at issue. Zeiger stated that he initially purchased Wellness because he received samples, it "stood out to [him] in the store," it had a "better smell" and "look[ed] more quality" than other dog foods, and his dogs liked it. Zeiger Dep. (Summ. J. Reply, Ex. V) at 235:10-238:24. The only words Zeiger remembered seeing on the packaging were the brand name "Wellness" and "grain-free." *Id.* at 238:17-24; Zeiger Dep. (Class Cert. Opp., Ex. O) at 99:3-22. In sum, Zeiger has not provided any evidence that he relied on the five challenged statements when he bought the dog food, whether initially (in 2009/2010) or the time period at issue (2014 to 2017).

Zeiger tries to overcome this by arguing that he does not need to prove individual reliance to succeed on his claims under the UCL, FAL, and CLRA, and that it is enough to show that a significant portion of the public would be misled (which he also hasn't shown). Opp. at 20-21. That is incorrect. To have standing under all three statutes, Zeiger must prove that he personally relied on the alleged misrepresentations. *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015); *In re Arris Cable Modem Consumer Litig.*, 2018 WL 288085, at *6-7 (N.D. Cal. Jan. 4, 2018); Summ. J. Mot. at 19-20 (citing cases). He has not done so and therefore his claims should be dismissed.

Critically, Zeiger does not dispute that he is aware that small amounts of arsenic, lead, and BPA are present everywhere, including in food. Summ. J. Mot. at 3. Zeiger's argument that he is not an expert on heavy metals or BPA doesn't change this fact. Opp. at 20. As a result, he cannot claim

10
WELLPET'S MOTION FOR SUMMARY JUDGMENT REPLY
Case No. 3:17-CV-04056-WHO

that the Wellness packaging led him to believe the products are completely free of these elements.

## VI. Zeiger is not entitled to restitution or damages.

Zeiger argues that the flaws WellPet identified in his experts' consumer survey and damages model go to weight, not admissibility. Opp. at 21-22. But Zeiger cannot so easily dismiss these fatal shortcomings. As discussed in detail in section I.B of WellPet's class certification opposition and its separate *Daubert* motion and reply, the methodological flaws in Gaskin's consumer survey are so fundamental and pervasive as to render any damages model based on it unreliable. *See* WellPet's Class Cert. Opp. at 19-24; Mot. to Exclude (Dkt. 163) at 14; Mot. to Exclude Reply (Dkt. 179) at 7-12. The Court should grant summary judgment for WellPet on this ground alone.

Recognizing that his proposed damages model is deeply flawed, Zeiger tries to salvage his damages claim by contending—for the first time—that, apart from the damages model, WellPet marketing documents also reflect a price premium associated with the challenged statements and omissions. Opp. at 22. They do not. Zeiger argues that a WellPet marketing document shows that the Wellness CORE and Complete Health product lines cost significantly more than Purina One and other premium grocery brands. Dkt. 189-11 at WLPT00001879. But, as the company e-mail this document was attached to shows, the document reflects pricing differences in *foreign* markets, not for products sold in the U.S. Summ. J. Reply, Ex. W at 1 (e-mail was sent from marketing manager in Singapore and discusses marketing strategy for Asia). Thus, Zeiger cannot rely on that document here.

Even if the record did show that Wellness products cost more than certain other brands in the U.S., that fact alone doesn't support Zeiger's damages claim. "To establish that any difference in price is attributed solely to the alleged misrepresentation [or omission], the Court must use a product, exactly the same but without the [misrepresentation or omission]." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 460 (S.D. Cal. 2014). The marketing documents Zeiger cites provide no information about other brands on which to make this comparison. Zeiger hasn't established that Purina or any other purportedly lower-priced brands are the same as the Wellness products in terms of nutrition, quality of ingredients, or health benefits. *See id.* (finding that price difference could be attributable to "higher quality of ingredients"); *In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *10 (C.D. Cal. June 7, 2017) ("5HE's caffeine content alone may be sufficient to justify much of the

1  price of 5HE … Yet, Plaintiffs do not account for the value of the caffeine, vitamins, and minerals[.]"). Nor has Zeiger shown that these other brands either (a) include warnings about the presence of trace amounts of heavy metals and BPA, or (b) are free of trace amounts of heavy metals and BPA. Zeiger therefore cannot prove a price premium claim based on the cost of other brands. Indeed, because arsenic, lead, and BPA are ubiquitous and found in virtually all dog foods, their presence or absence would not be the basis for any price difference between the Wellness products and other brands.

As for Zeiger's point that he could have bought dog food "at half the price," he hasn't identified any dog food he could have bought for half the price, much less a *comparable* dog food that also is completely free of arsenic, lead, and BPA.[10] When asked which food he could have bought at half the price Zeiger responded, "I don't know, because it's a crap shoot what ingredients are in it." Zeiger Dep. (Summ. J. Mot., Ex. U) at 304:20-23. Zeiger further testified that if other dog foods "turn out to be just as toxic" he would "hopefully shop around, may pay more" in search of a "better product." *Id.* at 304:24-305:6. Thus, Zeiger's testimony does not support his damages claim.

In addition to the above problems, as stated in WellPet's motion, Zeiger sometimes charged his dog sitting business customers for Wellness dog food he fed to his customers' dogs but has no idea how often he charged them because he didn't track it. Summ. J. Mot. at 22 n.19; Zeiger Dep. (Class Cert. Opp., Ex. O) at 284:19-285:8. He doesn't dispute that he cannot recover these reimbursed costs. To get around this problem, Zeiger now says he seeks recovery only of the money he paid for the dog food he bought for personal use, not the food he bought for his pet sitting business. Opp. at 22 n.18. But that doesn't cure the problem because the dog food Zeiger purchased from October 2014 until July 2017—the period at issue—was used for business *and* personal use. *Compare* Zeiger Interrog. Resp. No. 2 (Class Cert. Opp., Ex. T) *with* Danz Doggie Daytrips' Interrog. Resp. No. 2 (Summ. J. Reply, Ex. X) (providing the same answer to separate interrogatories asking Zeiger to identify the formulas and dates and locations for purchases he made personally and for his business). Zeiger didn't

---

[10] Zeiger testified that he reads ingredient labels "religiously" and that he looks for dog foods that contain "healthier ingredients," without "grains" and "processed meat." Zeiger Dep. (Summ. J. Reply, Ex. V) at 145:2-146:7. Moreover, Zeiger stated that WellPet's products are "made of better ingredients" and "more wholesome" than "Gravy Train or Purina." *Id.* at 237:3-24.

keep any receipts from his purchases and hasn't provided any other documentation or evidence from which a jury could segregate the amount he spent for food he fed his own dogs from that he fed to his customers' dogs.

Zeiger also is incorrect when he says "he recalled buying at least the three products at issue." Opp. at 23. The testimony he cites in support indicates he bought a "plain" Wellness product or one that was "chicken-flavored," and "two different fish-flavored ones." Dkt. 172-8 at 19:7-18. Although he *thought* he purchased Menhaden around 2009, Menhaden wasn't marketed until 2016. *See* Class Cert. Opp., Ex. R at Ex. A. He later conceded it's possible his dogs "may have had another product similar but not that exact one." Zeiger Dep. (Class Cert. Opp., Ex. O) at 276:2-12. The Wellness Complete Health and CORE product lines include ten fish-based diets. Kean Decl. (Class Cert. Opp., Ex. A) ¶ 9. Because Zeiger does not recall the names of the specific formulas he purchased, a jury would have no way to determine whether he bought the three formulas at issue or how often he may have bought them. As a result, any damages award would impermissibly be based on speculation.

Finally, Zeiger did not respond to WellPet's argument that the Ninth Circuit's recent decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844-45 (9th Cir. 2020) expressly precludes his request for restitution for failure to plead the lack of an adequate legal remedy.[11] *See* Summ. J. Mot. at 23. Accordingly, summary judgment is appropriate for this additional reason.

**VII. Zeiger is not entitled to injunctive or other equitable relief.**

Zeiger argues that he doesn't have to show lack of an adequate legal remedy to obtain injunctive relief. That is incorrect. As the Supreme Court has made clear, "it is axiomatic that a court should determine the adequacy of a remedy in law before resorting to equitable relief." *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75-76 (1992); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 292 (1997) ("the inadequacy of a legal remedy is a prerequisite for equitable relief in any case"). In *Sonner*, the Ninth Circuit held that a plaintiff suing under the California consumer protection statutes "must establish that she lacks an adequate remedy at law" before pursuing equitable

---

[11] Although Zeiger argues in support of his *injunctive relief* claim that his legal remedies "do not adequately address WellPet's continued unlawful conduct" that "harm[s] consumers" (Opp. at 24), that argument does not apply to his individual claim for restitution.

13
WELLPET'S MOTION FOR SUMMARY JUDGMENT REPLY
Case No. 3:17-CV-04056-WHO

claims. *Sonner*, 971 F.3d at 844 (affirming dismissal of equitable claims under UCL and CLRA). Zeiger's reliance on California state cases is misplaced because, as *Sonner* explains, federal courts require the lack of an adequate legal remedy regardless of whether California state courts are permitted to award equitable relief when an adequate legal remedy exists. *Id.* at 845.

Zeiger's argument that *Sonner* doesn't apply to injunctive relief likewise misses the mark. Although *Sonner* dealt specifically with restitution, "nothing about the Ninth Circuit's reasoning indicates that the decision is limited to claims for restitution" and "numerous courts in this circuit have applied *Sonner* to injunctive relief claims." *In re: MacBook Keyboard Litig.*, 2020 WL 6047253, at *3-4 (N.D. Cal. Oct. 13, 2020) (citing cases); *Drake v. Toyota Motor Corp.*, 2020 WL 7040125, at *13-14 (C.D. Cal. Nov. 23, 2020).

Zeiger's next argument that he *has* pleaded and shown that his legal remedies are inadequate also fails. Zeiger argues that WellPet's alleged unlawful conduct continues to harm other consumers. Opp. at 24. Initially, that argument is misplaced because this motion pertains to Zeiger's *individual* claims, not his purported class claims on behalf of others. He hasn't shown why damages would not be a sufficient remedy for his individual claims. But even if the class claims were relevant to this motion, he hasn't shown that his legal remedies are inadequate as to others. He doesn't explain why other consumers "could not sufficiently be 'made whole' by monetary damages." *In re: MacBook*, 2020 WL 6047253, at *3 (dismissing injunctive relief claim under UCL in class action complaint). As Judge Koh found in *Philips v. Ford Motor Co.*, "not only do[es] [Zeiger] *have* an adequate remedy at law, [he is] seeking to certify a class *asserting* that adequate remedy at law." 2016 WL 7428810, at *24 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 F. App'x 608 (9th Cir. 2018).[12]

Zeiger also has not shown that he will suffer a repeat injury absent injunctive relief. He concedes that he must show a threat of "imminent" harm. Opp. at 24-25. But he hasn't made that showing. Zeiger testified that he has no plans to buy these Wellness products in the future. Zeiger Dep. (Summ. J. Reply, Ex. V) at 305:24-306:8. He said only that he would be "open to" the idea of buying

---

[12] Zeiger's reliance on *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099 (9th Cir. 1994), in which the damages were potentially unascertainable and there also was a risk of multiplicity of lawsuits, is therefore misplaced. *Id.* at 1104-05.

the Wellness products again if WellPet "fixed" the dog food, but that he "would not" purchase the products if just the allegedly misleading labels were changed. Zeiger Dep. (Class Cert. Opp., Ex. O) at 113:9-114:17, 264:2-12. As this Court recently held, a "'*possible* future injury' is insufficient; the plaintiff must show an injury that is '*certainly* impending.'" *Anderson v. Apple Inc.*, 2020 WL 6710101, at *6 (N.D. Cal. Nov. 16, 2020) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original)); *see also Lanovaz v. Twinings North America, Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) (holding that plaintiff's statement that she would "consider buying" the products in the future did not support a finding of actual or imminent injury). Zeiger has not shown that he faces a certain and imminent threat of future injury. His injunctive relief claim therefore fails.

### VIII. Zeiger has abandoned his negligent misrepresentation claim, which is barred by the economic loss rule.

Zeiger did not respond to WellPet's argument that the economic loss rule bars his negligent misrepresentation claim.[13] Summ. J. Mot. at 24-25. As a result, Zeiger has waived or otherwise abandoned this claim and summary judgment for WellPet is appropriate. *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that "a plaintiff has abandoned … claims by not raising them in opposition to [the defendant's] motion for summary judgment"); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) (same); *Lane v. Landmark Theatre Corp.*, 2020 WL 1976420, at *38 (N.D. Cal. Apr. 24, 2020) (granting summary judgment because plaintiffs' briefing failed to respond to defendant's argument); *Santos v. TWC Administration LLC*, 2014 WL 12558274, at *9-10 (C.D. Cal. Nov. 3, 2014) (same).

### CONCLUSION

For the foregoing reasons and those in the motion, WellPet respectfully requests that the Court enter summary judgment in its favor and dismiss Plaintiff's claims.

---

[13] This is not surprising since even courts that have created additional liability by expanding exceptions to the economic loss rule have later reversed course after a deeper analysis. *See In re: Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, 2020 WL 5267567, at *7 (C.D. Cal. Sept. 2, 2020) (after consideration of substantial submissions by both sides, changing view from prior order to now hold that economic loss rule barred omission-based claims, and noting that "to the extent lower court cases arguably reflect some uncertainty ... 'federal courts are bound by the pronouncements of the state's highest court on applicable state law.'") (internal citations omitted).

1  Dated:  December 11, 2020

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: _/s/ Amir M. Nassihi_____
    Amir M. Nassihi
    Joan R. Camagong
    James P. Muehlberger
    Elizabeth P. Fessler

Attorneys for Defendant WellPet LLC