UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ZEIGER, | Case No. 3:17-cv-04056-WHO |
| Plaintiff, | |
| v. | **ORDER ON MOTIONS FOR CLASS CERTIFICATION, SUMMARY JUDGMENT, AND TO EXCLUDE AND STRIKE** |
| WELLPET LLC, | Re: Dkt. Nos. 152, 160, 163, 171, 173, 180, 188 |
| Defendant. | |

**INTRODUCTION**

Defendant WellPet LLC ("WellPet") makes premium-priced dog food that it holds out to be healthy, nutritious, natural, and high quality. According to plaintiff Daniel Zeiger, three WellPet dog foods actually contain small amounts of arsenic, lead, and bisphenol A ("BPA"). He alleges, on behalf of himself and several proposed classes, that WellPet misled consumers by failing to disclose the presence of these substances and by making claims on the products' packaging that would lead reasonable consumers to believe the substances were not present. WellPet has numerous responses, including that arsenic and lead are naturally occurring and ubiquitous in the environment and that small amounts of the substances are likely present in many pet foods, that all three substances are impossible to fully remove from the food supply, and that they do not present a health risk in these small quantities.

Before me are WellPet's motion for summary judgment on Zeiger's individual claims, Zeiger's motion to certify classes, and both parties' motions to strike and exclude. WellPet's motion for summary judgment is largely denied. Zeiger has shown genuine disputes of material fact about the safety of these levels of arsenic and lead in dog food. But he has not shown that these levels of BPA present any risk. He has also shown genuine disputes of material fact about

1   most remaining issues, including whether reasonable consumers would be misled by the

2   representations and omissions.

3          Zeiger has also met many of the requirements for certification under Federal Rule of Civil

4   Procedure 23(b)(3).  He has not, however, put forward an admissible damages model or shown

5   that he can.  As a result, his motion to certify under Rule 23(b)(3) is denied.  Because the lack of

6   an admissible damages model is the only barrier to certification and it appears possible that such a

7   model could be advanced, Zeiger has leave to renew his motion with a new damages model.  His

8   motion to certify classes under Rule 23(b)(2) is granted; the classes he proposes shall be certified

9   for purposes of injunctive relief.

10                                   **BACKGROUND**

11  **I.      THE WELLNESS PRODUCTS**

12         This case concerns three dog food products manufactured and marketed by WellPet as part

13  of its "Wellness" line: Complete Health Adult Whitefish & Sweet Potato (the "Sweet Potato

14  Product"), Complete Health Grain Free Adult Whitefish & Menhaden Fish Meal (the "Menhaden

15  Product"), and CORE Ocean (with Whitefish, Herring Meal and Salmon Meal) (the "CORE

16  Ocean Product") (collectively, the "Wellness Products").  Zeiger's broad theory is one of

17  misrepresentation.  He alleges that WellPet marketed the Wellness Products as "premium dog

18  food" at a "premium price" that held itself out as "natural and nutritious."  *See, e.g.*, Plaintiff's

19  Motion for Class Certification ("Cert. Mot.") [Dkt. No. 163] 2–3.  In reality, Zeiger claims, the

20  Wellness products contain lead, arsenic, and BPA, the presence of which WellPet did not disclose

21  to consumers.  *Id.*

22         The Wellness Products are sold in bags ranging from 4 lb. to 30 lb.  Declaration of Laura

23  Marseglia [Dkt. No. 162-3] ¶ 4.  Their packaging includes, among other things, the ingredients

24  included in the dog food and percentages of nutrients.  Declaration of Gregory G. Kean ("Kean

25  Decl.") [Dkt. No. 162-2] ¶ 15.  They also contain, Zeiger alleges, a group of misleading

26  "marketing claims."  Those statements are: (1) "Uncompromising Nutrition," (2) "Unrivaled

27  Quality Standards," (3) "Natural," (4) "Nothing in excess and everything in balance," and (5)

28  "Complete health" (collectively, the "Wellness Statements").  *See* Second Amended Complaint

United States District Court
Northern District of California

2

("SAC") [Dkt. No. 95] ¶¶ 10, 11, 16, 46. Because the Wellness Statements are a focus of the parties' class certification dispute, they are discussed further below. As a general matter, the statements on the Wellness Products' packaging have changed over time in content, location, and size. Kean Decl. ¶ 16. They also change from product to product. *Id.*

Both parties agree that the Wellness Products are geared toward nutrition-conscious consumers. The record also shows that pet foods that are viewed as high in nutritional value, use high-quality ingredients, and use only "natural" ingredients can be sold at higher prices than other pet foods. *See, e.g.*, Cert. Mot. 2 (collecting statements by WellPet to that effect). Zeiger argues that WellPet has designed its brand and the Wellness Products' brands around an image that conforms to these ideals. According to Zeiger, everything from the name "WellPet" to the brand name "Wellness" to the Wellness Statements are intended to evoke this natural, healthy, high-quality image. Of particular importance to this suit, Zeiger argues that the brand is designed to convey that there are no "chemicals or contaminants" in the Wellness Products.

## II.   ARSENIC, LEAD, AND BPA

Zeiger contends that the Wellness Products either contained or had a risk of containing "detectable amounts" of arsenic, lead, and BPA. Cert. Mot. 3; SAC ¶¶ 2, 12, 13, 21, 45.

Arsenic and lead are heavy metals. *See, e.g.*, Report of Dr. Gary Pusillo ("Pusillo Rep.") [Dkt. No. 163-2] at 16–17.[1] There is no evidence that WellPet intentionally adds arsenic or lead to its products, and Zeiger does not contend otherwise. Prior to "approximately 2015," WellPet tested at least some of its products for heavy metals. *See, e.g.*, Dkt. No. 151-11, Ex. 7 at 57. Zeiger and his expert contend that this testing was ineffective because (1) only a small number of ingredients were tested and (2) WellPet used a detection limit of 10 or 5 parts per million ("ppm") when it could have used lower limits measured in parts per billion ("ppb"). *See* Pusillo Rep. at 21–22. WellPet points out that arsenic and lead can occur naturally in fish-based ingredients, so it conducted 35 tests of those ingredients over two years. Kean Decl. ¶ 36–37. It represents that all of those tests "yielded non-detectable levels of arsenic and lead." *Id.* ¶ 37.

---

[1] Citations to exhibits attached to the parties' briefs are to the ECF-generated page number.

United States District Court
Northern District of California

1   There is also evidence that WellPet created guidelines for its suppliers that, among other

2   things, barred products with arsenic and lead and required accrediting testing for those substances.

3   *See* Dkt. No. 151-8 (supplier manual).  But, according to Zeiger, these standards were never

4   enforced or communicated to raw material vendors.  *See, e.g.*, Dkt. No. 151-11 at 5:11–21 ("This

5   would have been sent to our co-manufacturing suppliers—companies that make finished products

6   for us . . . I have never sent it to a raw material vendor.").  WellPet says that the guidelines were

7   only ever a draft that was later superseded.  Kean Decl. ¶ 24.  WellPet allegedly later removed any

8   requirement for lab tests to show an absence of heavy metals.  Dkt. No. 151-8, Ex. 6 (Certificate

9   of Analysis for WellPet ingredients does not include testing for arsenic or lead).

10   BPA is a synthetic chemical found in some plastics, among other places.  *See, e.g.*, Pusillo

11   Rep. at 16.  Zeiger contends that WellPet's internal quality control standards prohibit BPA in its

12   products because they seek to prevent contamination by "foreign bodies," defined as "[a]ny

13   material which is not natural to the raw material, ingredient, packaging material, or finished

14   product[]."  *See* Dkt. No. 151-8, Ex. 5  WellPet admits that it did not and does not test for BPA.

15   *Id.*, Ex. 7.  There also appears to be no requirement that WellPet suppliers test for BPA.  *Id.*, Ex. 6

16   (Certificate of Analysis for WellPet ingredients requires that "this ingredient is preserved with a

17   natural antioxidant" but does not include testing for BPA).

18   Zeiger claims that BPA can be introduced into the Wellness Products through its

19   manufacturing and storage processes.  Specifically, Wellness Products are placed into plastic

20   buckets at high temperatures, which creates a risk that BPA from the plastic will contaminate the

21   products.  *See* Dkt. No. 151-11 at 59:12–16.  Ingredients are also at one point placed into large

22   plastic bags, which Zeiger argues may lead to contamination.  *Id.* at 3:24–4:11.  According to a

23   laboratory analysis by one of Zeiger's experts, "quantifiable levels of BPA" were found in 59 of

24   the 105 tested WellPet products.  See Report of Sean P. Callan ("Callan Rep.") [Dkt. No. 163-8] ¶

25   3.

26   The parties dispute the risk from arsenic, lead, and BPA in the Wellness Products.  There is

27   evidence on this record that many pet foods contain some small amount of arsenic and lead.  *See,*

28   *e.g.*, Poppenga Rep. at 10.  The Food and Drug Administration ("FDA") has remarked (albeit in

4

1    explanatory posts online, not in any regulatory or adjudicatory proceeding) that "[a]s a naturally

2    occurring element, it is not possible to remove arsenic entirely from the environment or food

3    supply" and "[i]t is not possible to remove or completely prevent lead from entering the food

4    supply."  *See* FDA, *Arsenic in Food and Dietary Supplements* (August 5, 2020),

5    https://www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements; FDA,

6    Lead in Food, Foodwares, and Dietary Supplements (February 27, 2020),

7    https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements.

8    But even in these posts, which WellPet relies on, the FDA goes on to say that, because of these

9    facts, the FDA "seeks to limit consumer exposure to arsenic to the greatest extent feasible" and

10   "seeks to limit consumer exposure to lead in foods to the greatest extent feasible."

**III.    ZEIGER'S EXPERIENCES**

12          Zeiger purchased at least a $15 bag of Wellness Product every one to three months from

13   "approximately October 2014 until July 2017."  SAC ¶ 25; Dkt. No. 152-8 at 4:1–5.  (He also

14   made purchases of it before the class period.  *See, e.g.*, Dkt. No. 162-16 at 14:3–11.)  At that point,

15   he learned that the Wellness Products contained arsenic, lead, and/or BPA and he stopped

16   purchasing them.  SAC ¶ 25.  He claims that he relied on the Wellness Statements and, as a result,

17   reasonably believed the Wellness Products did not contain arsenic, lead, or BPA.  *Id.*.  He also

18   alleges that he would not have purchased the products if he had known about the presence of these

19   substances.  *Id.*  WellPet interprets Zeiger to have testified that he could not recall most specifics

20   about the products he purchased; that he understands arsenic and lead are naturally occurring; that

21   he understands BPA exists in many places; and that he personally would rely on the FDA to

22   determine reasonable levels of arsenic, lead, and BPA in food.

**IV.    PROCEDURAL HISTORY**

24          Zeiger filed this suit in September 2017 on behalf of himself and a proposed class.[2]  Dkt.

25   Nos. 1, 33.  In January 2018, I granted in part and denied in part a motion to dismiss.  Dkt. No. 59.

26   Discovery began, discovery disputes ensued, and the time for discovery was repeatedly extended

27

28   _____
     [2] There were previously other named plaintiffs but they have since been dismissed.

United States District Court
Northern District of California

at the parties' requests.  *See* Dkt. Nos. 72, 87, 104, 111, 119, 126, 140.  In June 2018, I granted a

motion to amend the complaint in line with my order on the motion to dismiss.  Dkt. No. 94.  In

December 2019, Zeiger moved to file a third amended complaint, which I denied for failure to

show diligence and for the prejudice to WellPet.  Dkt. No. 135.

The operative complaint alleges six causes of action: (1) negligent misrepresentation, (2)

violation of the California Consumers Legal Remedies Act ("CLRA"), (3) violation of

California's False Advertising Law ("FAL"), (4) violation of California's Unfair Competition Law

("UCL"), (5) breach of express warranty under California law, and (6) breach of implied warranty

under California law.

On June 29, 2020, Zeiger moved for class certification on all claims.  Dkt. No. 152.  On

September 30, 2020, WellPet filed a *Daubert* motion about Zeiger's class certification experts.

Dkt. No. 163.  On October 14, 2020, Zeiger moved to strike portions of a declaration filed by

WellPet.  Dkt. No. 171.  And on October 30, 2020, WellPet moved for summary judgment on

Zeiger's individual claims.  Dkt. No. 180.  Because the class certification motion turned in large

part on the summary judgment and *Daubert* motions, I granted WellPet's motion to consolidate

the hearing on all pending motions, Dkt. No. 186, which was held on January 27, 2021.

## LEGAL STANDARD

### I.     EXPERT TESTIMONY

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion

or otherwise" where: (a) the expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and

reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "[R]elevance

means that the evidence will assist the trier of fact to understand or determine a fact in issue."

*Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558,

564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes

primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note.

## II.     SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the

United States District Court
Northern District of California

1   non-movant. *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

2   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

3   facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony

4   does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

5   *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

6   **III.     CLASS CERTIFICATION**

7         "Before certifying a class, the trial court must conduct a rigorous analysis to determine

8   whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda*

9   *Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  The party

10  seeking certification has the burden to show, by a preponderance of the evidence, that certain

11  prerequisites have been met.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–50 (2011);

12  *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

13        Certification under Rule 23 is a two-step process.  The party seeking certification must first

14  satisfy the four threshold requirements of Rule 23(a).  Specifically, Rule 23(a) requires a showing

15  that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are

16  questions of law or fact common to the class; (3) the claims or defenses of the representative

17  parties are typical of the claims or defenses of the class; and (4) the representative parties will

18  fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

19        Next, the party seeking certification must establish that one of the three grounds for

20  certification applies.  *See* Fed. R. Civ. P. 23(b).  Zeiger seeks certification under Rule 23(b)(3),

21  which requires him to establish that "the questions of law or fact common to class members

22  predominate over any questions affecting only individual members, and that a class action is

23  superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

24  R. Civ. P. 23(b)(3).  He also seeks certification under Rule 23(b)(2) for an injunctive relief class.

25  And, in the alternative to the (b)(3) class, he seeks certification under Rule 12(c)(4) for any issues

26  that I determine are fit for class treatment.

27        In the process of class-certification analysis, there "may entail some overlap with the

28  merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,

8

1    568 U.S. 455, 465–66 (2013) (internal quotation marks omitted).  However, "Rule 23 grants courts

2    no license to engage in free-ranging merits inquiries at the certification stage."  *Id.* at 466.  "Merits

3    questions may be considered to the extent—but only to the extent—that they are relevant to

4    determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.*

5                                                    **DISCUSSION**

6    **I.      MOTIONS TO STRIKE AND EXCLUDE**

7                     **A.  WellPet's *Daubert* Motion**

8           WellPet moves to exclude the opinions of two of Zeiger's technical experts and of his

9    damages experts.

10                            **i.  Dr. Pusillo**

11          WellPet moves to exclude several opinions of Dr. Gary Pusillo, who opines, among other

12   things, that (1) there is no safe amount of arsenic, lead, or BPA in dog food for consumption by

13   dogs and (2) WellPet could have but did not prevent inclusion of arsenic, lead, and BPA in its dog

14   food.  *See* WellPet's Motion to Exclude Certain of Plaintiff's Expert Testimony ("WellPet Strike

15   Mot.") [Dkt. No. 163].

16          WellPet first attacks Pusillo's qualifications to opine on these subjects at all.  It argues that

17   Pusillo is an animal nutritionist, but that the above opinions he renders are about toxicology and

18   pet food manufacturing respectively.  *See* WellPet Strike Mot. 3, 10–11.  Zeiger agrees that Pusillo

19   is a nutritionist, but argues that he is nonetheless qualified to render his opinions due to his general

20   experience in animal food safety and testing.  *See* Opposition to the WellPet Strike Mot. ("WellPet

21   Strike Oppo.") [Dkt. No. 174] 5–8.  WellPet then challenges the reliability of each opinion.

22          Pusillo's master's degree is in "animal production" and his Ph.D. is in "animal nutrition."

23   Pusillo Rep. at 7.  He is currently the president and owner of a company that, by Pusillo's

24   description, "develop[s] and formulate[s] specialty animal feeds, supplements, and health care

25   products for domestic and exotic animals[;] . . . provides nutritional consulting advice to animal

26   owners, and manufacturers involved in the animal industry[; and] . . . provides investigative

27   forensic and expert witness services for claims and litigated cases involving animal deaths,

28   production abnormalities, and injuries."  *Id.*  He also works and has previously worked at several

United States District Court
Northern District of California

9

1    other companies in nutrition-related roles. *See id.* He has testified or been deposed in five cases.

2    *Id.* at 13.

3                    1.   Opinion that there is no safe level of arsenic, lead, and BPA

4           WellPet's first argument is that it is for a toxicologist, not a nutritionist, to opine on what

5    levels of certain chemicals are safe in pet food. WellPet Strike Mot. 3–4. Here, the evidence is

6    that Pusillo has long experience (in addition to a Ph.D.) in animal nutrition, which includes

7    understanding the effects of substances in animal food on those animals' health. His CV shows

8    that he has published papers analyzing the effects of substances in food on animals. *See* Pusillo

9    Rep. at 9–12. In his deposition in a previous case that both parties rely on, Pusillo testified that he

10   has, within the scope of his work, analyzed lab testing results, including for heavy metals. *See*

11   Dkt. No. 174-2 at 114:21–24. While the opinions might or might not be most appropriate for a

12   toxicologist or chemist, *Daubert* does not require that the expert with the best possible

13   qualifications testify, it requires that the expert be sufficiently qualified and his or her testimony be

14   reliable. As an experienced animal nutritionist, Pusillo is qualified to opine about the effects of

15   substances that animals ingest on their health.

16          WellPet relies on *Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098 (N.D. Cal.

17   2016). *See* WellPet's Reply in Support of the WellPet Strike Mot. ("WellPet Strike Reply") [Dkt.

18   No. 179] 2. WellPet argues that, in that case, a veterinarian with a specialty in toxicology offered

19   opinions on the adequacy of a company's testing procedures but the court excluded them as

20   unreliable because they "were not within 'his specialized knowledge as a veterinarian.'" *Id.*

21   (quoting *Lucido*, 217 F. Supp. at 1107). As an initial matter, *Lucido* went on to hold that the

22   veterinarian *was* qualified to testify about the potential *health risks* of the dog food. 217 F. Supp.

23   3d at 1107. While he may not have been "calling upon his specialized knowledge as a veterinarian

24   to express his opinions about the adequacy of Purina's *testing procedures*," *id.* (emphasis added),

25   he did have "knowledge about [the toxins at issue]," *id.* at 1108. (The court then excluded those

26   opinions on reliability grounds.) More to the point, Pusillo is an animal nutritionist, not a

27   veterinarian, and is opining about animal nutrition and its effects on animal health.

28          WellPet next contends that this opinion is not reliable under *Daubert*. WellPet Strike Mot.

10

4–10.  I separate out the opinion into lead and arsenic on the one hand and BPA on the other.

Pusillo bases his opinion that there is no safe level of lead and arsenic in the dog food on the established fact of "bioaccumulation."  Pusillo Rep. at 15–18.  Bioaccumulation is essentially the build-up of a substance as it is ingested over time.  *Id.* at 17–18.  WellPet does not dispute that, as a general matter, bioaccumulation of substances is recognized to occur.  *See* WellPet Strike Reply 2–3.  And both parties' experts agree that lead and arsenic *in certain concentrations* are dangerous.  *See* Report of Dr. Robert Poppenga ("Poppenga Rep.") [Dkt. No. 162-13] at 5 (discussing arsenic and lead poisoning).

Pusillo cites several published studies to support various aspects of his opinion.  He characterizes a 2013 study as finding that "non-absorbed heavy metals have a direct impact on the gut microbiota.  In turn, this may impact the alimentary tract and overall gut homeostasis."  Pusillo Rep. at 16 (citing Breton, J., at al. *Ecotoxicology inside the gut: impact of heavy metals on the mouse microbiome*, 14 BMC Pharmacology and Toxicology 62 (2013)).  Though that study concerned rodents, Pusillo opines that the principle applies to dogs too.  *Id.*  Additionally, he cites evidence that "trace amounts" of arsenic ingested by humans can, over extended periods, have deleterious health consequences.  *Id.*

WellPet musters a number of counterarguments, but all go to weight, not admissibility.  The role of a court at the *Daubert* stage is reliability gatekeeper, not factfinder.  WellPet first attacks the studies Pusillo relies on as being inconclusive.  WellPet Strike Reply 2–4.  Pusillo has cited no studies in which bioaccumulation of heavy metals was conclusively shown to be a health risk in dogs.  And WellPet is right that none of the studies establish all aspects of his opinions, which is why his report is necessary to connect them.  The 2013 study, for instance, concerned lead and cadmium, not arsenic.  *Id.*  But Pusillo opines that it is a feature of *heavy metals* that they bioaccumulate, as his other evidence arguably shows.  Similarly, WellPet attacks the study as only finding possible impacts on health, as opposed to certain ones; and it cites that paper's call for further study.  WellPet Strike Mot. 4–5.  The strength of the evidence of health effects and need for more study go to weight because Pusillo has illustrated how his theory works.

WellPet also faults Pusillo for his purported "failure to consider the dose and duration of

11

United States District Court
Northern District of California

1  possible exposure . . . instead reaching the conclusion that there is no safe level without first doing

2  any analysis of dose or duration."  WellPet Strike Mot. 5–6; WellPet Strike Reply 3–4.  That

3  misunderstands Pusillo's opinion.  The issue is not that any single dose is harmful, it is that

4  ingesting these substances would not be safe for dogs because they bioaccumulate to unsafe levels.

5         With respect to lead in particular, WellPet contends that Pusillo's opinion runs afoul of the

6  Supreme Court's instruction that there cannot be "too great an analytical gap between the data and

7  the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The leap it identifies

8  is to the conclusion "that *any* measurable amount of lead in pet food—even less than 1 ppm—is

9  unsafe for dogs."  WellPet Strike Mot. 9.  No such leap was made.  Pusillo's opinion is that lead,

10  which is established to be dangerous at sufficiently high concentrations, bioaccumulates.

11  Therefore, even small doses add up to a health hazard over time.  WellPet's arguments are, again,

12  for the jury.

13         WellPet points to guidance from the FDA and European Union regulatory guidelines that

14  purport to address safe levels of lead and arsenic in pet food.  *Id.* 6–7.  As an initial matter, many

15  of the documents that WellPet relies on are in the nature of guidance memoranda, not the

16  agencies' authoritative positions.  One of WellPet's primary exhibits, for instance, explicitly states

17  it is "draft guidance" that is "for comment purposes only" and is "not for implementation."  Dkt.

18  No. 162-12.  Additionally, much of the evidence WellPet relies on shows, at most, that the

19  substances have not been named hazards, not that they have been declared safe at the levels the

20  Wellness Products are alleged to have.  *See id.* at 139–155 (table of hazards WellPet relies on that

21  does not include the substances).  In any event, this dispute is here on a *Daubert* motion.  So long

22  as *Pusillo*'s methodology is sound and his opinions reliable, it does not matter what countervailing

23  evidence there is, even if it is strong.  The only way countervailing evidence would negate

24  Pusillo's opinion is if it showed it was unreliable, not just that it was disputed.

25         WellPet points again to *Lucido*.  There, however, there was no bioaccumulation theory

26  presented and the expert's opinion was excluded as being unsupported.  *See Lucido*, 217 F. Supp.

27  3d at 1107.  Pusillo's opinion on the safety of lead and arsenic is admissible.

28         I agree with WellPet, however, that Pusillo's opinion that no amount of BPA is safe is

12

1    unsupported and has not been shown to be reliable.  Pusillo's theory on BPA is not that it

2    bioaccumulates.  Instead, Zeiger identifies two sources for Pusillo's conclusion that *no* amount of

3    BPA is safe in dog food: Pusillo's experience and background and a 2016 study.  *See* WellPet

4    Strike Oppo. 12–13.

5        The 2016 study is not sufficient support for Pusillo's broad assertion about BPA.  In that

6    study, 14 dogs were fed a BPA-laced diet or a control diet over 14 days.  *See* Zoe L. Koestel, et al,

7    *Bisphenol A (BPA) in the serum of pet dogs following short-term consumption of canned dog food*

8    *and potential health consequences of exposure to BPA*, 579 Science of The Total Environment

9    1804 (2017).  While BPA concentrations were greater for dogs on the BPA diet, "there was no

10   difference in circulating concentrations of BPA between dogs on either of these two diets."  *Id.* at

11   1808.  That study did not reach any causal connections and recognized the changes may have

12   resulted from changes in diet and Pusillo does not suggest that bioaccumulation occurs with

13   respect to BPA.  That does not support the idea that *trace* amounts of BPA will have deleterious

14   health consequences, especially because of the lack of a bioaccumulation opinion.  Indeed, the

15   study explained that "[i]t remains to be determined whether these diet-induced bacterial changes

16   result in significant health consequences." *Id.* at 1813.  It is far from a conclusion that BPA *at any*

17   *level* is a health risk.  Given the weak materiality of that study, Pusillo's nebulous assertions of

18   "experience" are insufficient to show reliability of a theory that appears to have no other scholarly

19   support.  Accordingly, this opinion will be excluded.

20              2.   Opinion that WellPet could have prevented inclusion of arsenic, lead,
                     and BPA

21       WellPet also moves to exclude Pusillo's opinion that it could have prevented inclusion of

22   arsenic and lead.  WellPet again attacks Pusillo's qualifications to opine on this topic at all.

23   WellPet Strike Mot. 10.  As discussed, Pusillo has a long history in animal nutrition, including in

24   formulating diets and laboratory testing.  He is qualified to offer opinions about WellPet's food

25   formulation and testing procedures.  The core of his opinion on this topic is that WellPet could

26   have identified the substances through testing its ingredients and then excluded those that tested

27   positive. *See* Pusillo Rep. 21–24. That opinion is in his wheelhouse as someone who analyzes how

28

United States District Court
Northern District of California

best to provide nutrients in food to animals.  WellPet responds that someone would need expertise in animal food manufacturing to render these opinions.  WellPet Strike Reply 4.  Again, however, Pusillo does not need to be the most specialized possible expert to opine on a subject, he must have expertise from his experience, as he does.

However, I find that Pusillo is not qualified to opine about how WellPet could reduce the risk of BPA (as opposed to lead and arsenic).  To form *that* opinion, Pusillo relies on the assertion that BPA contamination can occur with exposure to plastic at high heat that can happen during the storage process of the food.  Pusillo Rep. at 24.  Pusillo is a nutritionist, not a food safety expert, a chemist, or a toxicologist.  Lead and arsenic exist in food and he is qualified to opine about their nutritional effects.  But BPA is a synthetic compound that, Zeiger alleges, enters due to how the Wellness Products are moved and stored.  It is beyond the ken of a nutritionist to describe the mechanisms for that synthetic chemical infiltrating the products.

WellPet also argues that the opinions are unreliable.  It argues that Pusillo does not opine that it is a common practice to perform this testing and quality control in the *pet food* industry (presumably as opposed to human food) or for the ingredients to which the practice would apply.  WellPet Strike Mot. 11.  That objection goes to the weight of his opinion and would not alter his central opinion about the possibility avoiding these substances through testing.  Additionally, WellPet points to science that it argues is contrary to Pusillo's conclusion; the materials it relies on have largely been discussed already because they relate to the safety and ubiquity of these substances.  *Id.* 11–12.  Again, the existence of contrary evidence is not itself sufficient to exclude an otherwise reliable opinion under *Daubert*.

Relatedly, WellPet argues that because the levels of arsenic and lead are so low, there is no need to exclude them.  *Id.*  That is the very merits issue to be determined, not a reason to exclude Pusillo's opinion that removal is *possible*.

WellPet challenges Pusillo's discrete opinion that "WellPet products contained arsenic and lead for years."  WellPet Strike Mot. 13.  That opinion is not based on any substantive analysis in his report and Zeiger makes no attempt to defend it in his Opposition.  It will be excluded.

In sum, Pusillo's opinion on lead and arsenic is admissible (except for his opinion that the

14

1    products contained lead and arsenic "for years"); his opinion on BPA will be excluded.

2                                    **ii.  Dr. Callan**

3          WellPet moves to exclude several opinions of Dr. Sean Callan, another of Zeiger's experts

4    who analyzed WellPet's products in a laboratory for traces of BPA.  *See* WellPet Strike Mot. 13–

5    14.  To form his opinions, Callan tested 105 of WellPet's products for BPA and found that 59

6    contain "quantifiable levels of BPA."  *Id.* Ex. G ("Callan Rep.") [Dkt. No. 163-8] at 2.  Callan

7    offers several opinions about these results that WellPet does not challenge.

8          WellPet objects, though, to Callan's opinions about WellPet's quality control procedures

9    and possible sources of BPA in pet food.  *Id.* at 5–6.  The portion of the report that contains these

10   opinions reads in its entirety:

11          Upon review of the disclosure on the Wellpet website around their purported transition to
12          BPA-free packaging, I find no mention of the methodology used to screen for BPA.  As
             such, I am unable to review the suitability of their methodology in this regard.  However, it
13          should be noted that BPA in pet food is not confined to packaging, and may result from
             many other components of the supply chain processing, raw ingredient packaging, etc.
14          Furthermore, the variability in the levels of BPA observed in the 105 products tested,
             coupled with the proportion of products with quantifiable levels of BPA suggests a
15          systemic quality control issue beyond wet food packaging.

16   *Id.*

17          WellPet argues that Callan is not qualified to render these opinions and that he fails to

18   employ reliable principles or methods to reach them.  I agree that Callan has no expertise that

19   would permit him to opine on this to the jury and that he has not offered any reliable foundation

20   for these opinions.

21          Callan's master's degree and Ph.D. are in psychology and his post-doctoral training is in

22   molecular neuroscience and molecular biochemistry.  *Id.*  Currently, he is a senior vice president at

23   Ellipse Analytics, a lab that is accredited to test for BPA.  *Id.* at 2, 4.  He represents that he

24   "specialize[s] in data analytics, statistics, toxicology and neuropharmacology" and has "taught

25   statistics and research design courses."  *Id.* at 2–3.  He has served for four years in various roles at

26   Ellipse, including in research and as a lab technician.  *Id.* at 13.

27          Zeiger argues that Callan is qualified to render the above opinions about WellPet's quality

28   control and the other possible sources of BPA aside from packaging because he "is a laboratory

technician" and is "qualified to review and attest to the suitability of testing methodologies to properly test and screen for BPA." WellPet Strike Oppo. 15. While that experience renders him an expert in the laboratory testing he performed and analyzed, that is not the focus of WellPet's motion. Zeiger has not shown that Callan is qualified to testify about possible sources of BPA in WellPet's food. He is a psychologist, and any other relevant experience that he has comes from his role analyzing lab results. Expert testimony about potential *other* sources of BPA comes neither from psychology nor from the results.

Zeiger also relies on one talk Callan gave to the Association of Official Analytical Collaboration that it characterizes as being about "ensuring reliability and reproducibility of analytical chemistry analyses of, among other things, pet food." *Id.* This single talk—the description of which is quite vague—does not reveal any level of expertise in the areas that would permit Callan to form the opinions above. It simply points back to him being qualified to perform the analysis of the composition of pet food, but not more.

This opinion will also be excluded on reliability grounds because Callan never indicates what it is based on. The methodology in Callan's report is entirely related to how his laboratory analysis of the products was performed. *See* Callan Rep. at 3. The results of that lab work are not challenged and appear admissible. Yet the opinion quoted above—which is Callan's entire opinion on this topic—is couched as an "interpretation" of these results. *Id.* at 5. He never explains how he knows that "BPA in pet food is not confined to packaging," how it "may result from many other components of the supply chain," or how "variability" in the levels of BPA and "proportion" with BPA "suggest[] a systemic quality control issue" aside from packaging. *Id.* at 5–6. Zeiger argues that the opinion "is based on his experience in evaluating and assessing test results," WellPet Strike Oppo. 15, but it goes beyond analyzing the lab results to analyzing the sources of and mechanisms that lead to BPA contamination. These opinions may be true, but there is no way to test their reliability and Callan is not qualified to opine as an expert on them.

The motion to strike Callan's opinions about quality control and alternate sources of BPA is GRANTED. His other opinions, including the lab results, are not struck. He is also permitted to testify that he was unable to review the suitability of WellPet's BPA testing methodology, a

16

subject he is properly qualified to opine about.  He is not permitted to offer the remaining opinions in the paragraph quoted above.

### iii.  Damages Experts

Finally, WellPet moves to exclude the opinions of Zeiger's damages experts, Colin Weir and Steven Gaskin.  *See* WellPet Strike Mot. 14.  WellPet's half-page argument on this point is entirely derivative of its argument in opposition to class certification.  *See id.* ("For the reasons set forth in section I.B of WellPet's opposition to Plaintiff's motion for class certification…").  Accordingly, I analyze the parties' briefing on both motions.

Zeiger's economic experts conducted a conjoint analysis.  *See* Declaration of Colin B. Weir ("Weir Rep.") [Dkt. No. 163-9]; Expert Report of Steven P. Gaskin ("Gaskin Rep.") [Dkt. No. 163-10].  In that analysis, they surveyed a representative sample that measured respondents' preferences for WellPet Products with and without each Wellness statement and with and without the omission that heavy metals and BPA were in the products.  Gaskin Rep. at 7–13.  They then determine the "price premium" that results to consumers.  In other words, they determine how much more a consumer is paying for a WellPet product with the presence of the Wellness Statements and/or the absence of the omissions.  Similar analyses are often examined in the caselaw.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 3:17-CV-4372-CRB, 2020 WL 6688912, at *7–*8 (N.D. Cal. Nov. 12, 2020); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 573–77 (N.D. Cal. 2020); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103–07 (N.D. Cal. 2018).

"[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to" the plaintiff's theory of liability.  *Leyva*, 716 F.3d at 514 (quoting *Comcast*, 133 S. Ct. at 1435).  And price premiums attributable to alleged misrepresentations have been accepted, as a general matter, as valid measures for damages in these cases.  *See, e.g.*, *Krommenhock*, 334 F.R.D. at 575; *Hadley*, 324 F. Supp. 3d at 1204 (collecting cases).  As a result, a "full refund" (that is, a price premium worth the same or more than the actual price of the product) can only be given if the product is actually worthless to the consumer.  *See Krommenhock*, 334 F.R.D. at 578.  In other words, "[a] full refund *may* be available in a UCL

United States District Court
Northern District of California

17

1    case when the plaintiffs prove the product had *no* value to them." *In re Tobacco Cases II*, 240

2    Cal. App. 4th 779, 795 (2015).

3          Zeiger's damages model attempts to calculate the price premium associated with each

4    Wellness Statement and with the omissions.  That price premium can be expressed as a percentage

5    of total price.  Gaskin calculates the following price premiums for the Wellness Statements:

6    "natural" is 3.0 percent, uncompromising nutrition is 1.9 percent, "unrivaled quality standards" is

7    2.6 percent, "with nothing in excess and everything in balance" is 3.0 percent, and "complete

8    health" is 4.3 percent.  Gaskin Rep. at 30–31.  Gaskin also measures the price premiums of the

9    omission of lead and arsenic and the omission of BPA at 46.2 percent each.  *Id.* at 31.  He derives

10   these omission figures from the inclusion of the hypothetical disclosure "may contain measurable

11   amounts of heavy metals such as arsenic or lead" or "Bisphenol A (BPA)."  *Id.*

12         All three Wellness Products always lack both omissions.  Just the omissions, therefore, are

13   calculated at 92.4 percent of the value of the product.  Each of the Wellness Products also always

14   contained some combination of Wellness Statements.  Based on their percentages, the net result is

15   that two of the three products have price premiums that are more than 100 percent, and the third is

16   a few percentage points away.  In other words, Gaskin values two of the three products as

17   worthless (in fact, worse than worthless) and the third as worth close to it.

18         Gaskin has produced a full refund model.  Although Zeiger resists this characterization,

19   WellPet Strike Oppo. 18, the *end-result* of the analysis would be a full refund for two of the three

20   products and very close to it for the third if Zeiger's theories were accepted at trial.[3]  The law is

21   clear that a full refund model is only justified when the plaintiffs prove the products have no value.

22   *See, e.g.*, *Krommenhock*, 334 F.R.D. at 577–78 ("That model has been rejected by numerous

23   courts when proffered in consumer product cases where the product provided some value.");

24   *Chowning*, 735 Fed. App'x at 925.

25         Zeiger attempts to justify this model by showing that the Wellness Products had no value

26   because they are allegedly unsafe.  WellPet Strike Mot. 19–20.  That is unpersuasive for two

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [3] It is irrelevant that I have excluded the BPA opinions and, accordingly, that omission appears no
     longer at issue.  The *result* of Gaskin's analysis was still a full refund.

*(left margin)* United States District Court   Northern District of California

1   reasons. These consumers inarguably *did* get value from the Wellness Products. Their pets

2   consumed them and received nutrients from them. And even on Zeiger's theory, there is no

3   evidence that any individual Wellness Product was a health risk. Instead, Zeiger's argument is

4   that they cumulatively can be a health risk, and so need warnings. As a result, not every bag a

5   consumer ever purchased had zero value due to being dangerous in a way that, for instance, a

6   device that dangerously explodes might.

7        It is conceivable that the problems may have resulted from not revealing a sufficient

8   amount of information about arsenic, lead, and BPA to the survey participants. Perhaps survey

9   participants would give more accurate answers with more information about the substances and

10   about the extent to which other dog foods contain them. Maybe not. But it seems more than

11   possible for an analysis to sufficiently capture the price premium consumers paid due to the

12   Wellness Statements and omissions; there appears to be no barrier to some price being applied that

13   is sufficiently reliable and tied to the injury. This is a fairly standard case in terms of how one

14   might measure damages. As I explain below, I will deny the motion to certify a 23(b)(3) class

15   with leave to bring a renewed motion with a renewed damages model. Because it is unclear what

16   this model may look like, I do not rule on WellPet's other arguments about the reliability of the

17   current model.

18        The motion is GRANTED IN PART and DENIED IN PART as described above.

19        **B. Zeiger's Motion to Strike**

20        Zeiger moves to strike portions of the Declaration of Gregory G. Kean, WellPet's Vice

21   President of Innovation and Product Development, that WellPet submitted in support of its

22   Opposition to class certification. *See* Plaintiff's Motion to Strike Portions of Declaration of

23   Gregory G. Kean ("Zeiger Strike Mot.") [Dkt. No. 171]. Zeiger argues that Kean was not

24   disclosed as an expert yet renders expert opinions; he also argues that Kean offers inadmissible

25   legal opinions.

26        **i. Preliminary Issues**

27        As an initial matter, WellPet argues that the motion should be rejected because it was not

28   made earlier. On September 29, 2020, the parties brought a discovery dispute to me. Dkt. No.

161.  Zeiger argued that declarations of three new witnesses served by WellPet after the close of fact discovery were untimely.  *Id.* at 1–3.  One of those was Kean.  *Id.*  Zeiger requested that the declarations should be struck or he should be permitted to depose those witnesses again.  *Id.*  I granted the request to depose the other two witnesses but denied the request to depose Kean, finding that "Kean was adequately disclosed and plaintiffs had the opportunity during his Rule 30(b)(6) deposition to cover relevant topics."  Dkt. No. 164.

WellPet argues that this issue should have been addressed during that dispute.  WellPet's Opposition to Zeiger Strike Mot. ("Zeiger Strike Oppo.") [Dkt. No. 171] 1.  I disagree.  At the time of that dispute, WellPet had not identified Kean as an expert.  I made clear that I was denying the request to depose him "as a fact witness."  Dkt. No. 164.  Now that class certification briefing has occurred, Zeiger has seen how Kean's opinions are being used and argues that they are being used as improper expert opinion.

Relatedly, WellPet argues that it would be unfairly prejudiced by striking these opinions now because it is after WellPet has submitted its brief and expert declarations, and after I denied it an extension to file its class certification Opposition in light of the discovery dispute discussed above.  *Id.* 2.[4]  WellPet is no more prejudiced than any other party facing a motion to strike resolved at the same time as a substantive underlying motion.  WellPet itself filed a *Daubert* motion about four of Zeiger's experts.  If WellPet *had* disclosed Kean as an expert, he would be subject to such a motion today.  Because WellPet did not, it is fair for Zeiger to move to strike and for WellPet to oppose that motion.

### ii.  Expert Opinions

Federal Rule of Civil Procedure 26(a)(2) governs disclosure of expert testimony.  It provides that each party "must disclose to the other parties the identity of any witness it may use at

---

[4] On September 28, 2020, WellPet requested (prior to filing the discovery dispute) an extension for class certification deadlines until after any new depositions were taken pursuant to the discovery order discussed above.  Dkt. No. 157.  I denied that motion, explaining that I would "address the joint letter regarding the disputed depositions when it is filed, but defendant has not explained why the depositions sought from its witnesses (and not yet granted) would cause it cognizable prejudice."  Dkt. No. 159.  I then ruled on the discovery dispute the day after it was filed.

trial to present evidence under Federal Rule of Evidence 702, 703, or 705," the rules governing expert testimony. Fed. R. Civ. P. 26(a)(2)(A). This disclosure must conform to Rule 26(a)(2)(B), which imposes a series of requirements, including "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness," and "the witness's qualifications." These disclosures ensure that each party is able to adequately assess and challenge the expert's opinions. Under Rule 26(a)(2)(D), "[a] party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made: (i) at least 90 days before the date set for trial or for the case to be ready for trial; or (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure." Rule 37(c)(1) provides an enforcement mechanism: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

The determination of whether testimony is lay or expert is governed by the Federal Rules of Evidence. The definitions of lay and expert opinions are mutually exclusive. Lay opinions are, among other things, "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Expert opinions must be based on "the expert's scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a).

The mere fact that knowledge is particularized does not necessarily make it an improper subject for lay opinion. The notes of the advisory committee to Rule 701 discuss the admissibility of opinions based on "particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 advisory committee's notes to the 2000 amendment. The typical example is "the owner or officer of a business [being permitted] to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." *Id.* Many courts have therefore permitted particularized business knowledge under Rule 701. *See In re Google AdWords Litig.*, No. 5:08-CV-3369 EJD, 2012 WL 28068, at *4 (N.D. Cal. Jan. 5, 2012) (surveying cases), *rev'd and remanded on other*

1   *grounds sub nom. Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015).

2       Kean was not adequately disclosed as an expert. There was no timely expert disclosure

3   about him that met the standard set out in Rule 26(a)(2)(B) despite WellPet's disclosures of

4   several other experts. In 2018, Kean was deposed as a Rule 30(b)(6) witness for WellPet. His

5   current duties "involve development of new products, maintaining the nutritional integrity of

6   WellPet's products, regulatory compliance, quality assurance, technical services, and

7   commercialization." Kean Decl. ¶ 1.

8       Zeiger objects to two types of testimony from Kean. First, Kean discusses the Association

9   of American Feed Control Officials ("AAFCO"), a voluntary association of animal food and drug

10  regulators. *Id.* ¶¶ 11–14. Applying the framework discussed above, some of Kean's statements

11  about AAFCO are proper lay witness testimony and some that could only be properly made by an

12  expert. Kean may describe AAFCO and its role, *see* Zeiger Strike Mot. 4 (objecting to this),

13  because that requires no specialized knowledge. Kean Decl. ¶ 11. His testimony on this may, like

14  any others, be attacked on other proper grounds. Kean may also report the AAFCO's definition of

15  "natural," *id.* ¶ 13, and his understanding of how AAFCO guidance is promulgated, *id.* ¶ 12.

16      Kean may not opine that WellPet's products "satisfy the AAFCO definition of 'natural.'"

17  *Id.* ¶ 14. To reach that conclusion, Kean must opine about how WellPet's ingredients are

18  "derived" and "mined"; about their chemical composition, including "trace amounts" of heavy

19  metals and chemicals he labels as naturally occurring; and about the prevalence of those

20  substances in the environment. *Id.* All of that is plainly specialized knowledge that requires

21  expertise. Indeed, these types of issues are the subject of other expert evidence in this case.

22      WellPet responds that these opinions are the result of Kean's "particularized knowledge"

23  taken from his job responsibilities. That doctrine does not transform expert evidence into lay

24  evidence. The Advisory Committee has explained that "[s]uch opinion testimony is admitted *not*

25  because of experience, training or specialized knowledge within the realm of an expert, but

26  because of the particularized knowledge that the witness has by virtue of his or her position in the

27  business." Fed. R. Evid. 701 advisory committee notes to the 2000 amendment. This

28  particularized knowledge rule recognizes that some particularized knowledge is within the ken of

United States District Court
Northern District of California

22

laypeople simply from performing their jobs.  The rule does not stand for the proposition that *merely* because knowledge is acquired on the job it is always admissible as lay opinion.  Here, although Kean may have acquired this knowledge during the course of his job, the opinions themselves cross the line into "scientific, technical, or other specialized knowledge."  They—but not the other evidence discussed above—will be struck.

Second, Zeiger objects to testimony about heavy metals and BPA in five paragraphs of the declaration.  Kean is permitted to testify to "factual information about WellPet's position on the safety of BPA."  Zeiger Strike Oppo. 6.  Kean may also, again, report on various AAFCO requirements that he believes WellPet adheres to.  *See* Kean Decl. ¶ 26.  So long as he is merely *reporting* regulatory guidance, he may state that the FDA has not identified heavy metals as a "risk for kibble generally" or "identified BPA as a risk for pet food."  *Id.* ¶¶ 27, 40.  Zeiger may attempt to impeach him about these conclusions but they do not require specialized knowledge within the meaning of FRE 702.

Kean may not, however, opine that "[i]t is not technically possible to eliminate all trace amounts of arsenic and lead from the Products," *id.* ¶ 39, or that "eliminating all trace amounts from the Products is not technically possible," *id.* ¶ 43.  For substantially the reasons set out above, those are expert opinions thinly veiled as a lay witness's knowledge acquired from business.  Whether it is "technically" possible to eliminate certain chemicals from products is a technical and specialized opinion.  Indeed, in its co-pending *Daubert* motion, WellPet argues that the inverse opinion cannot be made by Zeiger's *expert* because that expert is a nutritionist and not a toxicologist, and therefore insufficiently specialized.  Even if this evidence were acquired during the course of Kean's job duties, it is still expert knowledge.

WellPet also argues that, if I determine any of these opinions are expert in nature, they should not be struck.  Zeiger Strike Oppo. 7–8.  It first relies on the Ninth Circuit's decision in *Sali v. Corona Regional Medical Center* for the principle that "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification."  909 F.3d 996, 1004 (9th Cir. 2018); Zeiger Strike Oppo. 7.  That principle comes from a line of cases holding that class certification motions need not be decided by "the formal strictures of trial."  *Id.*  WellPet's

23

reliance on this line of cases is misplaced.  The issue here is not that evidence will ultimately be *admissible* at the merits stage, it is that Kean was not *disclosed* as an expert.  That determination happens to turn on an issue governed by the Rules of Evidence, but the ultimate conclusion is that WellPet failed to disclose Kean as an expert and so cannot use him as one going forward.

Finally, WellPet argues that there is no prejudice in permitting Kean to testify as an expert because he "was identified as a potential witness in interrogatory responses, documents were produced from his custodial files, and a full-day deposition was conducted."  Zeiger Strike Oppo. 7.  The prejudice to Zeiger is clear.  If Kean had been properly disclosed as an expert, Zeiger would have been given a full Rule 26 disclosure; could have questioned Kean as an expert, rather than as a corporate representative as occurred in reality; could have determined whether its own experts needed to rebut any of Kean's expert opinions; and could have filed a *Daubert* motion to do so.  Allowing Kean's improper opinions and denying this motion to strike, in contrast, would mean that Kean could testify to expert opinions without having gone through any of the hurdles that other experts do.[5]

### iii.  Legal Opinions

Zeiger moves to strike the opinions in four paragraphs of Kean's Declaration as "improper legal opinions."  *See* Zeiger Strike Mot. 6–7.

"[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.  Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court."  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).  Even when this type of testimony is offered as lay opinion, "the district court could exclude it because the testimony [i]s not helpful to a clear understanding of the testimony or a fact in issue."  *Id.* at 1059 (internal quotation marks omitted).  This is because

---

[5] Nor is it sufficient that Kean "provided his education and experience in his declaration, which was served on Plaintiff at the same time as WellPet's expert reports . . . [and] included citations to any materials he consulted for his declaration."  Zeiger Strike Oppo. 8.  That is far from the robust expert disclosure—not to mention time and opportunity to prepare and rebut—that the Rules require.  Similarly, that Kean was deposed as a fact witness, *id.*, is of no moment because this new declaration includes expert opinions that could not reasonably have been anticipated from a non-expert corporate representative.

1    applying law (in that case, the Uniform Commercial Code) to facts is to "instruct the jury

2    regarding how it should decide" the legal question and such testimony is not "helpful" as it must

3    be under FRE 701. *Id.* at 1059–60. District courts may, accordingly, preclude witnesses from

4    relating legal conclusions, but not the facts underpinning those conclusions (so long as they are

5    otherwise admissible). *Id.* at 1060.

6            In paragraph 11, Kean opines that "[t]he packaging for the Products complies with the

7    model pet food regulations established by the Association of American Feed Control Officials

8    ("AAFCO") and endorsed by FDA." Kean Decl. ¶ 11. In paragraph 19, Kean states that "WellPet

9    is fully compliant with the FDA Food Safety Modernization Act ("FSMA") across our products."

10   *Id.* ¶ 19. These are legal conclusions; that is, they require an application of the standard set out in

11   regulatory guidance or government-endorsed model regulations to particular facts. WellPet

12   characterizes Kean as merely having "read the relevant documents and stated WellPet's position

13   that it has complied." Zeiger Strike Oppo. 6. While Kean may state the *facts* underlying his view

14   on compliance—so long as they are otherwise admissible—he may not do what he has done here,

15   which is reach legal conclusions. This conclusion is not altered by the fact that Kean's "job

16   responsibilities" include regulatory compliance. He is not testifying as a regulatory expert but as a

17   lay witness. And it is unhelpful to the jury to hear a lay witness apply legal standards to particular

18   facts.

19           In paragraph 25, Kean states, "[u]nder [the FDA's] risk-based approach to food safety, pet

20   food manufacturers only need to apply preventive controls if, after conducting a hazard analysis of

21   each type of animal food manufactured, they determine that there are known or reasonably

22   forseeable [sic] biological, chemical, or physical hazards, and those hazards require a preventive

23   control. *See* 21 C.F.R. §§ 507.33, 507.34." *Id.* ¶ 25. This too is a legal opinion. Indeed, it goes

24   beyond the conclusory opinions discussed above because it purports to interpret and boil down the

25   FDA's regulatory scheme. That is not the province of a lay corporate witness.

26           In paragraph 38, Kean states,

27           WellPet determined from these test results that the fish ingredients do not pose a risk in the
             company's products, and, as a result, further testing of fish-based ingredients, either by
28           suppliers or by WellPet, was not necessary. This is consistent with the regulations FDA

subsequently issued in 2015, which state that only when a substance is determined to be a hazard, and a hazard that requires a preventive control, does the manufacturer need to identify and implement preventive controls for that substance. *See* 21 C.F.R. §§ 507.33, 507.34.

*Id.* ¶ 38. I agree that the portion of this opinion purporting to show consistency with FDA regulations—and interpreting them—is not admissible for the reasons already discussed. The first sentence, however, is admissible on this ground to the extent it simply relates what WellPet did or determined.

The motion is GRANTED IN PART and DENIED IN PART as described above.

## II.    MOTION FOR SUMMARY JUDGMENT

WellPet moves for summary judgment on all of Zeiger's (individual) claims. *See* WellPet's Motion for Judgment on the Individual Claims of Daniel Zeiger ("SJ Mot.") [Dkt. No. 180].

### A.  Safety of Arsenic, Lead, and BPA in the Wellness Products

#### i.  Arsenic and Lead

WellPet first contends that Zeiger cannot show that the amounts of arsenic, lead, and BPA in the Wellness Products are a health risk to dogs. I disagree.

Zeiger has demonstrated a genuine dispute of material fact about the dangerousness of the amounts of arsenic and lead that can occur in the Wellness Products. As explained above, Pusillo (Zeiger's expert) opines that lead and arsenic can "bioaccumulate" in dogs. Consequently, even the small amounts alleged to be in the Wellness Products would be unsafe if the Products were consumed over a sufficient time by a dog. At summary judgment, the admissible opinion of an expert on this issue is sufficient to create a genuine dispute of material fact.

WellPet's argument to the contrary primarily rested on its *Daubert* motion. Aside from that, it first points to *Lucido*. SJ Mot. 10–11. There, as previously explained, the court excluded the proffered expert's opinion. *Lucido*, 217 F. Supp. 3d at 1107–08. Here, in contrast, Pusillo's opinion survives *Daubert*. There, too, there was no bioaccumulation theory. *Lucido*'s conclusion that there was no evidence that small amounts of mycotoxins were harmful made sense: on that record there was no longer any such evidence. Here, because of the bioaccumulation theory, there

is.

Nor is the dispute avoided because lead and arsenic are "naturally occurring" or "ubiquitous" in the environment.  SJ Mot. 10–11.  Pusillo's bioaccumulation theory introduces a genuine dispute of material fact about their dangerousness; the debate about ubiquity is beside the point.  Merely because a substance is "naturally occurring" or impossible to *entirely* remove from the food supply as a whole does not necessarily mean that it is safe in any quantity, nor does it necessarily mean there is not a duty to disclose it under California law.  As the FDA posts that WellPet cites make clear, arsenic and lead are to be limited to the extent feasible.  Moreover, this is not a case about regulatory compliance; as a matter of California consumer protection law, the extent to which the substances are pervasive is only relevant in that the jury will take it into account when determining what a reasonable consumer would believe.

Relatedly, WellPet puts forward evidence—such as guidance from the FDA, European Union regulators, and scientific groups—that Pusillo is wrong and that the relevant amounts of lead and arsenic have not been shown to be harmful for dogs.  But this case is at summary judgment.  Zeiger has submitted competent, admissible evidence to support his theory; it would be improper for me to weigh that evidence against WellPet's evidence.  Much of WellPet's argument on this point is not for summary judgment, it is for trial or a *Daubert* motion.  *See, e.g.*, SJ Mot. 12 ("Dr. Pusillo's opinions are contrary to the findings of the expert scientists at the NRC, FDA, and European Commission, yet he makes no effort to address this contrary evidence.").

Although that settles the issue on this motion, I note that WellPet's evidence is not quite as conclusive as it asserts.  Among other things, it presents no definitive evidence showing that the bioaccumulation theory is not physically possible.  Additionally, as alluded to, many of the FDA materials that WellPet relies on are either nonbinding guidance, posts online, or are less conclusive than WellPet contends.

### ii.  BPA

WellPet is entitled to summary judgment that the presence of the alleged amounts of BPA in its Wellness Products does not pose a health risk to dogs.  SJ Mot. 13–14.  As explained earlier, Pusillo's opinion on BPA is excluded under *Daubert*.  He did not opine that BPA bioaccumulates.

27

WellPet has submitted an expert report (that has not been challenged under *Daubert*) that opines that there is no risk to dogs of the levels of BPA purported to be present in the Wellness Products. Poppenga Rep. at 17–18. Zeiger's reply is only that it is a "battle of the experts as WellPet simply disagrees with Dr. Pusillo's findings." Plaintiff's Opposition to WellPet's SJ Mot. ("SJ Oppo.") [Dkt. No. 189] 13. Without Pusillo's findings, Zeiger cannot introduce a genuine dispute of material fact about the safety of BPA at these levels in dog food.

### B. Whether the Statements and Omissions are Misleading

The core of WellPet's motion for summary judgment is that there is not, as a matter of law, anything misleading about its packaging. SJ Mot. 14–17. Although Zeiger brings both misrepresentation- and warranty-based claims, they all revolve around the same alleged misrepresentations and omissions.

Claims under the UCL, FAL, and CLRA are, at this stage, generally governed by the same reasonable consumer test. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016); *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Under that test, Zeiger will ultimately have to show that "members of the public are likely to be deceived." *Id.*; *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002), *as modified* (May 22, 2002). "Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides." *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) (internal quotation marks omitted). Materiality is for the jury "unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

Zeiger brings claims based both on the Wellness Statements (allegedly misleading affirmative statements) and based on WellPet's omission of the inclusion of lead, arsenic, and BPA. WellPet focuses exclusively on the Wellness Statements. Because WellPet does not move for summary judgment on the pure omissions claims, they survive.

As an initial matter, WellPet argues that the Wellness Products "do not claim to be free from *any* heavy metals or BPA." SJ Mot. 15 (internal quotation marks and alterations omitted).

28

United States District Court
Northern District of California

1    That is true; Wellness Products have no explicit claim that they lack these substances.  But that is

2    not Zeiger's theory nor what a claim like this requires.  Zeiger contends that the Wellness

3    Statements are *misleading*, not that there is an *explicit* guarantee.  Again, those statements are (1)

4    "uncompromising nutrition," (2) nothing in excess and everything in balance," (3) "complete

5    health," (4) "natural," and (5) "unrivaled quality standards."  WellPet relies on *Simpson v.*

6    *Champion Petfoods USA, Inc.*, for this point, but the portion it cites concerned whether certain

7    statements on the packaging were partial representations that triggered a failure to disclose which,

8    at least in California, requires that a statement be *contrary* to the omitted information.  *Simpson*,

9    397 F. Supp. 3d 952, 972–73 (E.D. Ky. 2019); *see Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th

10   Cir. 2018) (discussing partial representations).  Here, the issue is whether the statements are

11   misleading, not explicitly contrary.[6]

12        Summary judgment on these statements would be improper.  How a reasonable consumer

13   would understand them is a quintessential matter for a jury.  *Linear Tech.*, 152 Cal. App. 4th at

14   134–35.  A statement like "uncompromising nutrition" might simply be understood to mean that

15   the Wellness Products were highly nutritious compared to other possible dog food formulations.

16   But, viewed in the light most favorable to Zeiger, it might also be reasonably understood to mean

17   that non-nutritious substances will not exist in the dog food—that is, it is "uncompromising."

18   Similarly, "unrivaled quality standards" might be understood as a marketing platitude, or it might

19   be understood to communicate that steps are taken to ensure quality control in ingredients that

20   could, among other things, include elimination of heavy metals or synthetic chemicals.

21        The argument is even stronger for "natural," which is likely to have a more concrete

22   meaning to reasonable consumers.  I note, however, that the natural representation may not be

23

24   [6] *Song v. Champion Petfoods USA, Inc.*, No. 18-CV-3205 (PJS/KMM), 2020 WL 7624861 (D.
     Minn. Dec. 22, 2020), was decided since briefing closed here.  In that case, the court held that a
25   number of statements on dog food bags (though not statements identical to those here) would not
     mislead reasonable consumers.  There, however, the court was explicit that "plaintiffs do not
26   allege that Champion's dog food contains heavy metals in amounts that may harm dogs" and so
     held one of the statements could not be misleading on that basis.  *Id.* at *5.  The second statement
27   did not concern arsenic, lead, or BPA.  *Id.*, at *8–*9.  And the third set of statements were held to
     be non-actionable puffery, an argument not before me.  *Id.*, at *9–*10.  Accordingly, the only
28   determination on lead and arsenic failed for the same reason as in *Lucido*: unlike here, there was
     no evidence of a health risk.

sustainable on the basis of lead and arsenic alone, because they are alleged (unlike BPA) to be naturally occurring. The parties have had no chance to address this issue in light of my ruling on the admissibility of the BPA opinions today, so it may be dealt with by motion in limine.

Additionally, Zeiger has retained an advertising expert whose opinions have not been the subject of a *Daubert* motion. *See* Report of Bruce G. Silverman ("Silverman Rep.") [Dkt. No. 151-6]. That expert examined each of the Wellness Statements and determined, based on his expertise in consumer understanding and brand development, that each would be understood by consumers to communicate that the products were healthy and safe. WellPet attacks his opinions but has not moved to exclude them under *Daubert*, so its attacks go to their weight. SJ Mot. 17–18. And although it seeks to cast the opinions as speculative, their methodology has not been challenged under the Federal Rules of Evidence and they are proffered as the product of extensive experience in advertising. A jury may agree or disagree about what a reasonable consumer would believe, but the advertising expert's opinions are relevant and helpful.

WellPet has several responses. It contends that the context in which the Wellness Statements appear entitles it to summary judgment. SJ Mot. 15–16. It argues that:

> The surrounding text on the packaging itself explains what the statements mean. For example, the phrase "uncompromising nutrition" has appeared next to a block of text on the CORE Ocean packaging explaining that the product is "based on the nutritional philosophy that dogs, given their primal ancestry, thrive on a diet mainly comprised of meat," the product is "nutrient-dense," and "packed with a high concentration of quality animal protein, without fillers or grains, along with a proprietary blend of botanicals and nutritional supplements."

SJ Mot. 15.

WellPet may be correct that a reasonable consumer would understand the surrounding packaging to clarify these statements, but I cannot so hold on summary judgment. A reasonable consumer might also understand the more prominently placed Wellness Statements to be broader, not narrowed by other specific phrases on the packing. Agreeing with WellPet would require me to transform summary judgment into a highly contextual analysis that made assumptions about how consumers experience packaging. At this point, WellPet's views on how a consumer would understand these phrases are unsupported speculation; it has offered no evidence that any

30

consumer would actually understand them this way, in contrast to Zeiger's expert evidence.

This argument of WellPet's, additionally, is to some extent undermined by its position in class certification that the packaging of its products varies so much that common questions do not predominate. While WellPet argues in class certification that all of its packaging cannot possibly be determined to be misleading as a whole, it argues here that the packaging is sufficiently uniform that I can determine that it is not misleading as a matter of law.

WellPet also falls back to its argument that arsenic, lead, and BPA are ubiquitous and cannot be removed entirely from the food supply. First, that does not mean that they cannot be removed from this particular dog food, as Zeiger's expert opines. Second, it would be improper to determine at summary judgment whether a reasonable consumer would be misled by the Wellness Statements despite the alleged prevalence of these substances.

WellPet contends that not granting summary judgment would open the floodgates to require labelling of virtually all pet food and much of the human food supply. It cites *Lucido* and several other cases for the proposition such as, "every manufacturer would be required to disclose that their products contain heavy metals or be barred from making any assertion of quality about the products." *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597, 605 n.7 (E.D. Wis. 2019); *see also Weaver v. Champion Petfoods USA Inc.*, 2020 WL 3847248, at *3 (E.D. Wis. July 8, 2020). But WellPet does not have evidence fit for summary judgment that this broad claim is categorically true. A substance's existence in the food supply *as a whole* is quite different from it being in all food. The removability of these substance is currently a matter of expert debate, as discussed above. Moreover, this case concerns viable *health and safety* claims, not just nutritional ones as in *Lucido*. Further, WellPet's parade of horribles seems exaggerated. If a jury found WellPet liable, that could presumably be remedied by a simple disclosure about lead and arsenic. Most fundamentally, there is no authority from California courts or the Ninth Circuit holding that there is an exception to the UCL, FAL, and CLRA just because the resulting disclosure would be widespread or that the potentially dangerous substance is pervasive.

The parties also engage in a subsidiary dispute over whether WellPet previously concluded that arsenic, lead, or BPA were a health risk. That debate is immaterial for present purposes

31

because no summary judgment determination turns on it.

### C. Reliance

WellPet argues that there is no evidence that Zeiger relied on the Wellness Statements or omissions. SJ Mot. 19–20. Zeiger does not dispute that he must show reliance on the misrepresentations. *See Sandoval v. PharmaCare US, Inc.*, 730 F. App'x 417 (9th Cir. 2018) (requiring actual reliance for UCL, CLRA, FAL, and warranty claims). *But see Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 254 (9th Cir. 2018) ("Under California law, class members in CLRA and UCL actions are not required to prove their individual reliance on the allegedly misleading statements. Instead, the standard in actions under both the CLRA and UCL is whether members of the public are likely to be deceived."). He presented enough evidence to create at least a genuine dispute of material fact.

First, to adequately show reliance in a pure omission case, Zeiger need not point to any particular past *statement* on which he relied. "To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision. A plaintiff may do so by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

Zeiger has done so. The mechanism for disclosure is WellPet's packaging, which Zeiger would have seen when buying products. The presence of lead and arsenic are, on Zeiger's theory, material because of the safety threat they pose. WellPet counters that Zeiger made a series of statements in his deposition to the effect that lead and arsenic are naturally occurring and that trace amounts will exist in all substances, including pet food. SJ Mot. 20 (collecting examples). It is not clear that Zeiger was testifying to what he knew at the time of the purchases, as opposed to what he learned during the course of this suit. Because this case is on summary judgment, I must draw the reasonable inference in Zeiger's favor that he was unaware (as most consumers presumably are) of these issues at the time. It will be up to a jury to determine whether Zeiger was aware of information that would have meant that he did not rely on the omissions.

United States District Court
Northern District of California

1    Turning to the Wellness Statements, Zeiger testified that the "natural" mattered to him

2    when buying it. *See, e.g.*, Dkt. No. 172-8 at 38:10–14 ("Q. Were those both reasons for why you

3    started buying WellPet product, that they had a nice package and the word "Wellness®"?  A. And

4    it looked like wholesome, you know, natural ingredients on it."); 52:11–23 ("Q. What -- what

5    leads you to conclude that -- that it seemed like a superior product when you first bought it?  A.

6    All their claims on -- you know, on the packaging and from the people that this is all natural, from

7    the earth, you know, better quality than you can get from regular dog food."); 51:14–23 ("And it --

8    it touted everything. It's -- on the bag it says only the finest ingredients.  You know, it's all

9    natural, highest quality.").

10    WellPet says that Zeiger testified that he does not believe products that claim to be natural.

11    WellPet's Reply in Support of SJ Mot. ("SJ Reply") [Dkt. No. 193] 9.  But the portion of his

12    deposition it relies on is ambiguous.  Zeiger was asked, "Have you ever sought out the definition

13    of natural, as used by industry or regulators?"  He answered, "No.  I think it's gotten clouded in

14    the past years from what it probably was back in the '70s.  So I don't know -- yeah, I don't put my

15    faith when something says it's natural.  I look -- try to look a little further, but there's only so far

16    you can look."  Dkt. No. 162-16 at 35:11–21.  "[T]ry[ing] to look a little further" than the face

17    value of a claim because of a belief that such claims may be overhyped is distinct from not relying

18    on that claim at all.  Given Zeiger's representations that he did see and rely on the natural claim

19    and imagery, summary judgment cannot be granted on this point.

20    The evidence of reliance on the other Wellness Statements is more mixed.  I conclude that

21    Zeiger has adequately shown genuine disputes of material fact about his reliance on them.  As

22    noted above, he testified that what mattered to him about WellPet revolved around it being high-

23    quality, nutritious, and healthy.  Those understandings would likely come from, among other

24    things, the Wellness Statements, which are all to that effect.  WellPet's position is apparently that

25    Zeiger is required to remember each particular misleading statement and have individually relied

26    on it.  But the question is whether a reasonable consumer would be misled and whether that

27    misleading impression was a substantial factor in the choice to purchase.  Because these

28    statements were all geared toward the same message and would potentially be (as explained

33

1    above) material to reasonable consumers, Zeiger had, at most, to show genuine disputes of

2    material fact about exposure and materiality, which he has.

3                    **D.  Damages and Restitution**

4          WellPet next argues that Zeiger cannot prove damages or establish that he is entitled to

5    restitution under California law.  SJ Mot. 21–23.  WellPet makes two related arguments.  First, it

6    contends that because the Weir/Gaskin damages model is inadmissible, damages cannot be

7    measured.  Second, it argues that Zeiger cannot adequately show damages because he cannot

8    remember what WellPet products he purchased or when and because he also purchased those

9    products for his business, which is excluded from his claims.

10         Because the damages model is inadmissible, I agree that Zeiger cannot show what level of

11   damages or restitution he is entitled to.

12         Apparently as a fallback position, Zeiger argues that he can show what he is owed

13   regardless of the admissibility of the Weir/Gaskin analysis.  SJ Oppo. 22–23.  He relies on (1) his

14   testimony that he could have bought other food for "half" the price of WellPet and (2) WellPet's

15   own documents illustrating the price premium over lower quality dog foods.  Neither of these,

16   however, is a measure of what Zeiger would have paid *for the products absent the alleged*

17   *misrepresentations or omissions*, which is the standard.  *Hadley*, 324 F. Supp. 3d at 1103.  That

18   Zeiger could have bought some other dog food for half the price does not mean that dog food is

19   comparable.  (That dog food may also have included arsenic, lead, or BPA in comparable levels,

20   meaning he would not have bought it either had it contained appropriate disclosures.)  The

21   WellPet documents that Zeiger relies on do not show the price premiums *associated with the*

22   *alleged misrepresentations and omissions*, they merely show the price (in foreign, not U.S.,

23   markets) of high-quality, natural dog food over the lower quality alternatives.[7]

24

25

26   _____

     [7] I am granting leave for class certification to be renewed on the issue of damages.  If a new

27   damages model is accepted, Zeiger has leave to file a motion for reconsideration on this part of the
     order.  *See* Civ. L.R. 7-9(a).  The motion and opposition shall be limited to 10 pages; the reply

28   limited to 6.

United States District Court
Northern District of California

United States District Court
Northern District of California

**E.  Equitable Relief**

WellPet asserts that Zeiger has an adequate remedy at law and so cannot seek equitable relief, including an injunction.  SJ Mot. 23.  It also argues he lacks standing to pursue an injunction.  *Id.* 24.

**i.  Adequate Remedy at Law**

In *Sonner v. Premier Nutrition Corporation*, the Ninth Circuit held that "federal courts must apply equitable principles derived from federal common law to claims for equitable restitution under" the UCL and CLRA.  971 F.3d 834, 837 (9th Cir. 2020).  That holding, the Ninth Circuit explained, flowed from the general principle that "a federal court must apply traditional equitable principles before awarding restitution," an equitable remedy.  *Id.* at 841.  One well-established equitable principle is that equitable remedies will not be awarded when there is an "adequate remedy at law."  *Id.* at 842.

*Sonner* concerned equitable restitution.  WellPet argues that *Sonner* applies equally well to injunctive relief because it too is equitable and that Zeiger has not shown that he lacks adequate remedies at law.  Zeiger responds that *Sonner* does not apply to injunctive relief and that, in any event, Zeiger has shown a lack of adequate legal remedies.  One court in this District and several courts in California have held that it applies to injunctive relief.  *See In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020) (collecting cases).

Assuming that *Sonner* applies to injunctive relief, Zeiger has shown that monetary damages for past harm are an inadequate remedy for the future harm that an injunction under California consumer protection law is aimed at.  Zeiger's remedy at law, damages, is retrospective.  An injunction is prospective.  Damages would compensate Zeiger for his past purchases.  An injunction would ensure that he (and other consumers) can rely on WellPet's representations in the future.  *See, e.g.*, *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017) (explaining that UCL, CLRA, and FAL injunctive relief is designed to prevent "future harm").  Accordingly, retrospective damages are not an adequate remedy for that prospective harm.

*Sonner's* holding was based on application of traditional federal equitable principles.  *See,*

*e.g.*, *Sonner*, 971 F.3d at 841. The core equitable rule is that simply having *any* remedy at law is not sufficient to foreclose equitable relief; instead, the remedy must be *adequate*. The Supreme Court has often affirmed that retrospective money damages play a markedly different role than prospective injunctive relief. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 288–90 (1977) (explaining that retrospective damages are generally not permitted under *Ex Parte Young* but prospective remedies, including injunctions, generally are).

As a result, it makes sense that *Sonner* may sometimes bar equitable *restitution* when damages are available because, as in *Sonner* itself, equitable restitution may seek to compensate a plaintiff for the same past harm as monetary damages. *Sonner*, 971 F.3d at 841. Similarly, it has long been true that the availability of monetary damages forecloses injunctive relief of certain types. The classic example is that specific performance (via injunction) of a contract will not be ordered unless damages are insufficient. *See* Restatement (Second) of Contracts § 359(1). But, at least on the facts of a case like this, California's consumer protection laws permit courts to issue injunctions that serve different purposes and remedy different harms than retrospective monetary damages.

### ii.  Standing for Injunctive Relief

I also disagree with WellPet that Zeiger lacks standing to pursue an injunction. In *Davidson v. Kimberly-Clark Corporation*, the Ninth Circuit settled a divide among the district courts of this Circuit "in favor of plaintiffs seeking injunctive relief." 889 F.3d 956, 969 (9th Cir. 2018). It held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase." *Id.*

The court discussed two situations that would be sufficient to confer standing. "In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Id.* at 969–70. "In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume

36

the product was improved." *Id.* at 970.

    *Davidson* is satisfied here.  In response to questioning from WellPet's counsel, Zeiger testified that he would be "open to" purchasing the Wellness Products again if his issues with it were remedied.  *See* Dkt. No. 162-16 at 15:2–13.  That statement is more than a convenient litigating position: Zeiger purchased the WellPet products regularly for years prior to learning about the presence of the substances, demonstrating his credible interest in them.  *Cf. Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2015 WL 1248027, at *4 (N.D. Cal. Mar. 18, 2015) ("[B]ecause this consumer has already voted with her wallet, we know that she is the most likely to be injured in the absence of an injunction, not the least.").  Unlike some products that are bought rarely, Zeiger's plausible allegation that he is open to purchasing the Wellness Products in the future makes particular sense as dog food is typically purchased on a relatively regular schedule.  Moreover, Zeiger cannot know whether WellPet has begun to remove lead or arsenic absent an injunction requiring warnings if it did not and so plausibly argues that he cannot trust its packaging absent an injunction.  *See Davidson*, 889 F.3d at 969–70; *see, e.g.*, *Lilly*, 2015 WL 1248027, at *5.

    WellPet replies that "open to" purchasing it is not sufficient.  *See* SJ Mot. 24.  But "open to" a purchase—that one regularly purchased before, no less—is at least as firm as *Davidson*'s formulation of a representation that someone "might" purchase the product.

    WellPet also cites cases in which injunctive relief standing was denied, but none are like the facts here.  In *Rahman v. Mott's LLP*, standing was not denied due to issues with the credibility of a desire to purchase the product again, it was based on that court's specific finding that the consumer would not be misled by the meaning of a single discrete label because she learned its meaning during litigation.  No. 13-CV-03482-SI, 2018 WL 4585024, at *3 (N.D. Cal. Sept. 25, 2018).  Whether or not that comports with *Davidson* (which had just been decided), it is not like the situation here: among other distinctions, Zeiger alleges pure omissions, so there is no "meaning" that could be learned to remedy WellPet's alleged failure to disclose.  *Lanovaz v. Twinings North American, Inc.*, denied standing because the plaintiff testified she would not purchase the products "even if the company removed the allegedly misleading labels" and because

37

her only statement to the contrary was that she would vaguely "consider" buying them. 726 F. App'x 590, 591 (9th Cir. 2018). And in *Sciacca v. Apple, Inc.*, the court found the plaintiff only testified he would "potentially" repair the watch at issue. 362 F. Supp. 3d 787, 803 (N.D. Cal. 2019). That is a distinct situation from the facts here and *Davidson*, where a consumer has an established history of regular purchases and has stated he would be open to purchasing again in the future.

Nor does it change the analysis that Zeiger has testified that he would not purchase the products if the labels changed but they still contained the substances. *See* Dkt. No. 162 at 15:16–16–21. Counsel's questions and Zeiger's testimony are somewhat muddled; it is not clear from the transcript under exactly what conditions he believed he was saying he would not purchase the product. As noted, he stated he was "open to" purchasing it if he could believe the alleged representations and trust that the omitted information was not material. And *Davidson* teaches that "threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." 889 F.3d at 969–70.

### F. Negligent Misrepresentation

Finally, WellPet argues that Zeiger's negligent misrepresentation claim is barred by the economic loss rule. As a general matter, that rule "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). In his Opposition, Zeiger does not address this argument. The negligent misrepresentation claim cannot form the basis of a claim premised on purely economic loss. Zeiger has not alleged any property injury or personal injury from the alleged negligent misrepresentations. Nor does a *negligent* misrepresentation claim fall within the category of *intentional* misrepresentation claims that the California Supreme Court has held are not barred by the rule. *See id.* at 991 (singling out intent as defining feature of the exception). WellPet's motion is granted on this claim.

38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### G.  Conclusion

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.  It is granted (1) to the extent that Zeiger claims that the amount of BPA in the Wellness Products is a safety risk, (2) with regard to damages, and (3) on the negligent misrepresentation claim.  It is otherwise denied.

## III.    MOTION FOR CLASS CERTIFICATION

Zeiger moves for certification on all of his claims.  Zeiger proposes that three classes be certified, one for each of the Wellness Products.  His proposed definitions are as follows:

> Wellness Class: All persons in California who, from July 1, 2013, to the present, purchased Wellness Complete Health Adult Dry Whitefish and Sweet Potato dog food for household or business use, and not for resale.

> Wellness Grain-Free Class: All persons in California who, from July 1, 2013, to the present, purchased Wellness Complete Health Adult Grain Free Whitefish and Menhaden Fish Meal dog food for household or business use, and not for resale.

> Core Class: All persons in California who, from July 1, 2013, to the present, purchased Wellness CORE Adult Dry Ocean Whitefish, Herring Meal and Salmon Meal dog food for household or business use, and not for resale.

Cert. Mot. 10–11.  These classes would exclude "persons or entities who purchased the Wellness Food for business use or resale; government entities; WellPet and its affiliates, subsidiaries, employees, current and former officers, directors, agents, and representatives; and members of this Court and its staff."  Id. 11.  Zeiger moves primarily for certification under FRCP 23(b)(3) but also proposes an injunctive relief class under FRCP 23(b)(2) and an alternative liability-only class under FRCP 23(c)(4).

WellPet's primary objections to the 23(b)(3) class is that Zeiger has failed to show that common issues predominate because (1) he cannot demonstrate misrepresentation or causation on a class-wide basis and (2) damages cannot be measured on a class-wide basis.  WellPet also argues that Zeiger does not satisfy the typicality requirement, lacks standing to pursue some claims, and has not shown that his alternative injunctive relief or liability classes should be certified.

### A.  Standing

In a class action, standing is satisfied if at least one named plaintiff meets the

requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff bears the burden of pleading and showing standing. To do so, he must demonstrate three elements: (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citations omitted). An injury in fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical." *Id.* To show a causal connection, the injury must only be "fairly traceable" to the challenged conduct. *Id.*

WellPet challenges Zeiger's standing to bring claims on behalf of the proposed class to the extent he alleges that the "natural" representation was false or misleading. WellPet's Opposition to Cert. Mot. ("Cert. Oppo.") [Dkt. No. 162] 27. Its argument is identical to the argument discussed above in its motion for summary judgment. *See* Cert. Oppo. 27. For the reasons explained above, Zeiger plausibly relied on the "natural" representation and therefore was cognizably injured as a result of that alleged misrepresentation.

### B. Rule 23(a)

#### i. Numerosity

FRCP 23(a) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. (a)(1). "[C]ourts canvassing the precedent have concluded that the numerosity requirement is usually satisfied where the class comprises 40 or more members, and generally not satisfied when the class comprises 21 or fewer members." *Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013).

Zeiger has met the numerosity requirement and WellPet has no argument to the contrary. Zeiger's data shows that WellPet's total sales in California from the Wellness Products were approximately $13.7 million. Dkt. No. 151-12 at 15. Accordingly, based on the prices of the units at issue, it is certain that numerous people—far more than 40—would be included in the class.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ii.  Commonality

FRCP 23(a) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. (a)(2).  In reality, "commonality only requires a single significant question of law or fact." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012).

Zeiger meets the commonality requirement, which WellPet does not contest.  At least some of the questions at issue here are common to the class, including whether reasonable consumers would be misled by the actionable Wellness Statements and omissions; the level and danger of arsenic and lead in the Wellness Products; and whether WellPet actively concealed its purported knowledge of the inclusion of arsenic, lead, and BPA.  *See also* Cert. Mot. 12–13 (listing other potentially common questions).  *Cf. Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *5–*6 (N.D. Cal. June 13, 2014) (finding commonality on misleading labelling claims that something was "100% natural" and similar statements).

### iii.  Typicality and Adequacy

The Rule also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(3)–(4).  The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Castillo v. Bank of Am., NA,* 980 F.3d 723, 730 (9th Cir. 2020).  A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation."  *Hanon*, 976 F.2d at 508.

WellPet's only 23(a) challenge is to typicality.  It argues that Zeiger's interests would not be aligned with the class and he is subject to unique defenses: (1) Zeiger did not rely on the Wellness Statements or omissions; (2) he made purported admissions about the ubiquity of arsenic, lead, and BPA; (3) he mistrusts the label "natural"; (4) he lacks memory about what products he bought and when; (5) he concedes that pet food manufacturers and he could rely on

1    regulators' arsenic, lead, and BPA levels; and (6) he bought dog food for his pet sitting business

2    during the class period.  *See* Cert. Oppo. 24–27.

3         Many of those arguments depend on or repeat Well Pet's contentions at summary

4    judgment.  I have already rejected WellPet's arguments about (1) reliance, (2) ubiquity, and (3) the

5    "natural" label.

6         It is not clear that Zeiger's memory is so imprecise that a sufficiently realistic amount of

7    damages cannot be estimated.  Proof of every last purchase of a product like this is not required.

8    Instead, Zeiger can present evidence that he purchased the products with relative regularity over a

9    certain period to the satisfaction of a jury.  *See Comcast*, 569 U.S. at 35 (citing *Story Parchment*

10   *Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)); *Story Parchment*, 282 U.S. at

11   563 ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of

12   damages with certainty, it would be a perversion of fundamental principles of justice to deny all

13   relief to the injured person, and thereby relieve the wrongdoer from making any amend for his

14   acts.  In such case, while the damages may not be determined by mere speculation or guess, it will

15   be enough if the evidence show the extent of the damages as a matter of just and reasonable

16   inference, although the result be only approximate.").  That he bought some food for his pet sitting

17   business does not matter; he cannot recover for it as the suit is currently structured.

18        WellPet also argues that Zeiger is not an adequate representative because he agreed that the

19   FDA can be trusted to set pet food dangerousness levels.  As explained before, the FDA has not

20   set such levels as a matter of regulation.  And the question is not whether the FDA's draft

21   guidance is correct, it is whether reasonable consumers would be misled.

22        Zeiger's claims are sufficiently typical of the class and he is in adequate representative.

23        **C.  Rule 23(b)(3)**

24        A Federal Rule of Civil Procedure 23(b)(3) class can be certified if "the court finds that the

25   questions of law or fact common to class members predominate over any questions affecting only

26   individual members, and that a class action is superior to other available methods for fairly and

27   efficiently adjudicating the controversy."

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### i. Predominance and Superiority

The Rule provides that the following factors are "pertinent" to the predominance and superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Here, the common questions predominate over any individual ones. The central common questions include (1) whether the statements and omissions would be material to a reasonable consumer; (2) whether arsenic, lead, and BPA are safe and/or nutritious; and (3) whether WellPet could have removed those substances from its products. WellPet's defenses—many of which it presented at summary judgment on Zeiger's individual claims—are likely to be the other side of this coin: It is likely to argue that the amount of arsenic, lead, and BPA in its products is safe; that its Wellness Statements are not misleading; that any omission was not misleading; that it had no duty to disclose the presence of arsenic, lead, and BPA; and that it could not remove all traces from its products. The individual questions have largely to do with which and what amount of product each class member purchased, a typical issue to handle in an individualized way in a class action. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

WellPet's merits argument is that common issues do not predominate because "deception and causation" cannot be measured on a class-wide basis.

#### 1. Uniform Meaning and Materiality

WellPet first argues that,

Zeiger has not shown that the proposed class uniformly understands the challenged statements as (in his view) representing that the Wellness products are completely free of trace amounts of elements that exist everywhere in the environment and are found in nearly all pet food as well as in human food. As a result, Zeiger has not demonstrated that these alleged "misrepresentations" are material as to all class members.

43

1   Cert. Oppo. 14.  Relatedly, it asserts that the statements would not have the same *meaning* to all

2   class members.  *Id.* at 14–15.

3          This objection is foreclosed both by the nature of California consumer protection law and

4   by my summary judgment determinations.  The inquiry under California law is based on what a

5   reasonable consumer would believe, not each idiosyncratic individual.  *See, e.g.*, *Ebner*, 828 F.3d

6   at 965; *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 563–64 (N.D. Cal. 2020).  As I held at

7   summary judgement, given the admissible evidence of the dangerousness of accumulation of lead

8   and arsenic, a reasonable consumer could believe the omission of that information was material.

9   That issue is to be resolved at trial.  The statements need not have had identical subjective

10  meanings to each consumer because California applies an objective reasonable consumer test.

                           2.   Variance in Packaging

11

12         WellPet contends that the packaging varied too greatly during the class period for class

13  treatment.  *See* Cert. Oppo. 11–14.  Of course, this would not be a barrier to Zeiger's pure

14  omission theory, as he correctly argues in reply.  Even if the packaging varied considerably, it

15  would be irrelevant if WellPet had an independent duty to disclose the presence of arsenic and

16  lead based on safety concerns.

17         The Wellness Statements require more analysis, because (unlike the omissions) they varied

18  between products and over time.  To help remedy the problems that may be caused by this

19  variation, Zeiger moves to certify three classes, one based on each of the products.  That approach

20  makes sense because one of WellPet's objections is that the configuration of Wellness Statements

21  varied by product.  But WellPet argues that even separating out the class by product is insufficient

22  because the Wellness Statements on each product varied within the class period.

23         Courts applying California consumer protection law at class certification have often

24  confronted these types of arguments.  Depending on the nature and extent of the variation, they

25  have come out on both sides.  The law does not demand that the statements be identical for every

26  moment of the class period; courts have typically held that the predominance requirement is met

27  when there were relatively insubstantial variations.  *See, e.g.*, *Krommenhock*, 334 F.R.D. at 563–

28  64 ("The relevant analysis under California law does not consider whether each class member saw

44

United States District Court
Northern District of California

1    and relied on each of the Challenged Statements and in what combination, but instead whether the

2    Challenged Statements were used consistently through the Class Period, supporting an inference

3    of classwide exposure, and whether the Challenged Statements would be material to a reasonable

4    consumer."); *Combe v. Intermark Commc'ns, Inc.*, No. CV0909127SJOPJWX, 2010 WL

5    11597517, at *8 (C.D. Cal. Nov. 18, 2010) (discussing "minor variations" that do not change the

6    "center of gravity").

7         But at some point, the alleged misrepresentations might vary to such a degree to make

8    class-wide determinations impracticable.  *See, e.g.*, *Reitman v. Champion Petfoods USA, Inc.*, No.

9    CV181736DOCJPRX, 2019 WL 7169792, at *9 (C.D. Cal. Oct. 30, 2019), *aff'd*, 830 F. App'x

10   880 (9th Cir. 2020) ("Defendants point to numerous issues requiring individualized attention that

11   would predominate over any common questions.  For example, Defendants show the Court that

12   the phrases at issue require context that differs from bag to bag."); *see also Krommenhock*, 334

13   F.R.D. at 566 n.10 (distinguishing *Reitman* on numerous bases, including the creation of

14   subclasses).  A presumption of reliance does not arise when class members "were exposed to *quite*

15   disparate information from various representatives of the defendant."  *Mazza v. Am. Honda Motor*

16   *Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (emphasis added).  In *Mazza*, for instance, the claims were

17   predicated on an advertising campaign that was a "limited campaign" of brochures and

18   commercials, which the court held insufficient to imply class-wide reliance.  *Id.*

19        WellPet makes three types of arguments on this front.  The first is that the placement, size,

20   and appearance of the Wellness Statements changes, the second is that the context given for the

21   Wellness Statements changes, and the third is that which Wellness Statements are on each product

22   change.  Because the classes would be by product, I describe the changes that occurred for each

23   product during the class period.

24

25

26

27

28

United States District Court
Northern District of California

1    CORE Ocean Product.  "Uncompromising nutrition" and "with nothing in excess and

2  everything in balance" were on the packaging from "mid-to-late" 2013 until spring 2016.  Cert.

3  Oppo. 12–13.  The size of "uncompromising nutrition" also changed and it moved from the back

4  of the packing around spring 2016.  *Id.*  "Unrivaled quality standards" has been on the packaging

5  since spring 2016.  *Id.*  "Complete health" does not appear on the product.  *Id.*  "Natural" has

6  always appeared.  The following versions of the packaging have been on the market during the

7  class period (left to right from earliest to latest):

 

 

*See* Dkt. Nos. 162-4, 162-5, 162-6, 162-7.

22    Sweet Potato Product.  "Uncompromising nutrition" has been on the product for the entire

23  period; in spring 2016, it was moved from the back to the front and its font size and surrounding

24  material changed.  Cert. Oppo. 13.  "Unrivaled quality standards" has been on the packaging since

25  spring 2016.  *Id.*  "With nothing in excess and everything in balance" did not appear on the

26  packaging.  "Natural" has always appeared.  "Complete health" has always been prominently

27  displayed.  The following versions of the packaging have been on the market during the class

28  period (left to right from earliest to latest):

1

2

3

4

5

6

7

8

9

10

11

12

13

14






15    *See* Dkt. Nos. 162-8, 162-9 (reformatted for consistency), 162-10.

16        <u>Menhaden Product</u>. WellPet does not argue there has been any change in the Menhaden

17    product's packaging, which looked like this during the class period:

18

19

20

21    

22

23

24

25    *See* Dkt. No. 162-11.

26        As an initial matter, even if WellPet's argument were accepted, it would not stand in the

27    way of certifying classes in several specific ways. WellPet identifies no changes in the Menhaden

28    Product, so its arguments on this point are not a barrier to certification of that class. There is also

1    no dispute that some Wellness Statements have been virtually unchanged on the other two

2    products (such as "complete health" on the Sweet Potato Product), so the classes could be certified

3    as to those statements alone.  And, as noted above, classes could be certified on the pure omissions

4    for all three products.  I therefore turn to whether the changes in the other Wellness Statements

5    defeat predominance for the CORE Ocean and Sweet Potato Products

6         The changes that WellPet identifies between the Wellness Statements do not mean that

7    individual issues predominate.  WellPet's attempts to present the bags as being in a constantly-

8    changing state of flux do not persuade.  As the summaries and images above made clear, two of

9    the three products went through a few relatively minor changes over the course of many years.

10   The most significant of the changes occurred around spring 2016.

11        Setting this aside, WellPet's predominance argument is fundamentally misplaced.  The

12   changes that occurred here are (1) by product and (2) occurred relatively uniformly over time.

13   Zeiger has moved to certify classes by product.  Accordingly, whether common questions

14   predominate depends on whether they predominate for each product.  Because these variations

15   happened over time, they happened at the same time for the entire class, give or take the time for

16   each product to be phased out.  Put another way, the alleged misrepresentations would be the same

17   *for the class* at any given time.

18        There might be some level of individual uncertainty that results from the transition time

19   between each packaging version.  There will inevitably be some amount of time in which the old

20   packaging is on store shelves after the new version has been rolled out.  But this issue can be dealt

21   with as one of individualized *damages*.  A jury can still determine whether each version of the

22   packaging would mislead a reasonable consumer and, assuming an admissible damages model,

23   can calculate its value.  The question of which bag a consumer bought would be, as always,

24   individual.  *See Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).

25   Any uncertainty about which of two possible versions on the market an individual purchased does

26   not mean that that individual issue predominates.

27        This makes this case unlike *Reitman*, the most factually similar case WellPet has pointed to

28   that denied class certification.  There, the Ninth Circuit held that the district court did not abuse its

United States District Court
Northern District of California

48

United States District Court
Northern District of California

1    discretion in denying class certification based on the wide variation in the packaging of products

2    that would result in "individualized inquiries requiring bag-to-bag determinations." *Reitman v.*

3    *Champion Petfoods USA, Inc.*, 830 F. App'x 880, 881 (9th Cir. 2020). The district court

4    explained that at issue there were 23 different dog food formulas. *Reitman v. Champion Petfoods*

5    *USA, Inc.*, No. CV181736DOCJPRX, 2019 WL 7169792, at *1 n.1 (C.D. Cal. Oct. 30, 2019).

6    The phrases that were challenged varied across all of these different bags types. *Id.*, at *9. For

7    instance, the phrase "regional" was used to describe ingredients sometimes (which was alleged to

8    be misleading) but other times, "local" was used along with specific source identifiers for

9    ingredients. *Id.* Another example was that the ingredients identified as "fresh" varied from bag to

10   bag, so consumers would not be looking at the same representations. *Id.* Consequently, the court

11   found that there was a threat that the misrepresentations were truly individualized because the

12   class members were presented with many varying bags. *Mazza* is even farther from these facts.

13   That case concerned a limited advertising campaign that many consumers may have seen different

14   parts of or not seen at all. Here, the statements are on packaging.

15          There is one class for each formula here. While the packaging for each looks different, the

16   changes *within* each formula type are relatively minor, occurred over time in an essentially

17   uniform way, and can be addressed class-wide. Accordingly, common issues predominate.[8]

18          Zeiger has also shown that a class action is a superior mode of adjudication. Based on the

19   amount at stake for any individual, it would be impracticable for them to carry out a full consumer

20   protection case, especially given the expertise required in this one. A class action, on the other

21   hand, would permit a jury to determine essentially all of the important questions in the suit on a

22   class-wide basis. WellPet makes no specific arguments to the contrary on this point (though some

23   of its predominance arguments implicate superiority; to that extent, they are rejected).

24          **ii.  Damages**

25          "In this circuit . . . damage calculations alone cannot defeat certification." *Yokoyama*, 594

26

27   _____

     [8] Moreover, although not necessary to the outcome, the changes in each particular Wellness

28   Statement are not the primary economic focus of this case. Despite the flaws in Zeiger's damages
     model, it at least shows that the value attached to the pure omissions dwarf the value of any
     Wellness Statement or combination of them.

1   F.3d at 1094.  This is so because "the amount of damages is invariably an individual question and

2   does not defeat class action treatment."  *Id.* (internal quotation marks and alteration omitted).

3   "Thus, the presence of individualized damages cannot, by itself, defeat class certification under

4   Rule 23(b)(3)."  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

5        However, "plaintiffs must be able to show that their damages stemmed from the

6   defendant's actions that created the legal liability."  *Id.*; *see generally Comcast Corp. v. Behrend*,

7   569 U.S. 27 (2013).  Accordingly, a "damages model must measure only those damages

8   attributable to the plaintiff's theory of liability.  If the plaintiff does not offer a plausible damages

9   model that matches her theory of liability, the problem is not just that the Court will have to look

10  into individual situations to determine the appropriate measure of damages; it is that Plaintiffs

11  have not even told the Court what data it should look for."  *Hadley*, 324 F. Supp. 3d at 1103

12  (internal quotation marks and citations omitted).

13       For the reasons explained above, Zeiger's model for assessing damages is not admissible

14  under *Daubert*.  The issue is not that damages will be individualized, it is that Zeiger has not put

15  forward a damages model that can reliably show the price premium for the alleged

16  misrepresentations.  It appears possible, however, for Zeiger to put forward a price premium

17  model that reliably values a class member's harm and this single ground for denying certification

18  is narrow.  Accordingly, leave to bring a renewed motion to certify the class with such a model is

19  granted.  *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir.), *opinion amended on*

20  *denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (reviewing a renewed motion to certify after a

21  district court denied the first motion on specific grounds).  As it stands, however, a 12(b)(3) class

22  cannot be certified because there is not a sufficient showing that damages can be accurately

23  calculated.  The motion to certify the class is therefore DENIED WITHOUT PREJUDICE.

24       **D.  Rule 23(b)(2)**

25       Zeiger also moves to certify a class under Federal Rule of Civil Procedure 23(b)(2).  Under

26  that rule, a class may be certified if WellPet "has acted or refused to act on grounds that apply

27  generally to the class, so that final injunctive relief or corresponding declaratory relief is

28  appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  A 23(b)(2) action does not

United States District Court
Northern District of California

offer damages; instead, "certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195.

Zeiger has shown that such a 23(b)(2) class should be certified. For the reasons explained above, and incorporated here, there are many common questions at stake that predominate over individual ones. WellPet's actions are alleged to be equally applicable to the entire class. Injunctions against WellPet, if successful, would prohibit the alleged misrepresentations as to all class members.

WellPet has several responses, but most are restatements of arguments that have already been addressed. *See* Cert. Oppo. 27–28. Its novel argument is that the *primary* relief here is not injunctive, so a Rule 23(b)(2) class is inappropriate. But a major goal of California's consumer protection law is prevention of future consumer protection violations through injunctive relief. *See, e.g.*, *In re Tobacco II Cases*, 46 Cal. 4th at 319 ("[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction."). There is no reason to think that injunctive relief against future harm is less important than monetary relief for past harm. To hold otherwise would bar an injunctive relief class merely because damages are also available. Additionally, damages are not the main focus of the 23(b)(2) class in any case, so the primary focus of that class would be injunctive relief. Indeed, at this point, no damages class will proceed. The motion to certify Rule 12(b)(2) classes with the class definitions above is GRANTED.

### E.  Rule 23(c)(4)

Zeiger alternatively moves to certify a liability-only class under Rule 23(c)(4). That rule provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). It is intended to allow "isolate[ion of] the common issues . . . and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Zeiger's proposal is to jettison damages and decide the remaining common issues on liability.

At the hearing on these motions, I indicated that I would grant leave to recertify the class if the damages issue were all that stood in the way. Zeiger's counsel indicated that they could put

1    forward an admissible damages model after seeing my ruling.  Because Rule 23(c)(4) is the

2    fallback, certification is DENIED WITHOUT PREJUDICE on the understanding that Zeiger will

3    move to certify a class with an appropriate damages model.  At that time, Zeiger may also move

4    for a 23(c)(4) class as an alternative if he wishes.  If—after reviewing this ruling and consulting

5    with experts—Zeiger concludes that no admissible damages model can be put forward, he may

6    also elect to move again for a Rule 23(c)(4) class if he wishes.  If he does so, he should illustrate

7    that there is sufficient added utility to doing so in light of the 23(b)(2) certification.

8    **IV.    MOTIONS TO SEAL**

9          Courts "start with a strong presumption in favor of access to court records."  *Foltz v. State*

10   *Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  The public possesses a right to

11   inspect public records, including judicial records.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809

12   F.3d 1092, 1096 (9th Cir. 2016).  Accordingly, when a party seeks to seal judicial records

13   connected to motions—such as the one at issue here—that are "more than tangentially related to

14   the underlying cause of action," it "must demonstrate that there are 'compelling reasons' to do so."

15   *Id.* at 1096–99.  "When ruling on a motion to seal court records, the district court must balance the

16   competing interests of the public and the party seeking to seal judicial records."  *In re Midland*

17   *Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012).  This

18   district's local rules require that requests to seal be "narrowly tailored to seek sealing only of

19   sealable material."  Civ. L. R. 79-5(b).

20         WellPet seeks to redact and seal information and exhibits.  *See* Dkt. Nos. 160, 188, 192.

21   The motions are GRANTED.[9]  The information it seeks to seal is narrowly tailored and falls into

22   two sealable categories.  First, WellPet seeks to redact the suggested and minimum prices for its

23   products (the prices charged are public) as well as its strategy for determining those prices.  *See*

24   Dkt. Nos. 160-1, 160-3, 192.  These redactions are narrow and the information could reasonably

25   place WellPet at a competitive disadvantage if disclosed.  *See Nixon v. Warner Commc'ns, Inc.*,

26   435 U.S. 589, 598 (1978).  To the extent that prices matter to the labelling debate discussed, that

27

28   _____

[9] Zeiger's motion to seal at Dkt. No. 173 is DENIED because WellPet has indicated it no longer wishes to seal the information at issue.  *See* Dkt. No. 176.  Dkt. No. 173 shall be UNSEALED.

United States District Court
Northern District of California

1    information is disclosed in the parties' briefs; accordingly, this information does not require

2    sealing anything in this Order.  Should this information become important at trial, including for

3    purposes of calculating damages, it will be unsealed.  Second, WellPet moves to redact individual

4    consumers' identifying information, which is plainly sealable and narrowly tailed.  *See Opperman*

5    *v. Path, Inc.*, No. 13-CV-00453-JST, 2017 WL 1036652, at *7 (N.D. Cal. Mar. 17, 2017).

6                                                      **CONCLUSION**

7            The motions to exclude and motion for summary judgment are GRANTED IN PART and

8    DENIED IN PART as described.  The motion to certify a 23(b)(3) class is DENIED WITHOUT

9    PREJUDICE.  The motion to certify a 23(b)(2) class is GRANTED.

10           The parties may stipulate to a schedule for creation of a new expert report, discovery on

11   that report, a renewed motion to certify, and (perhaps) a *Daubert* motion from WellPet about the

12   proffered damages model.  Renewed briefing on class certification should focus exclusively on the

13   damages model because the issues have otherwise been settled; the page limits for both a motion

14   to certify and a *Daubert* motion shall be 15 for motions and oppositions and 8 for replies.  If the

15   parties cannot agree to a schedule within 21 days, they should submit a joint letter brief of no more

16   than 5 pages total laying out their proposed timelines and I will set one.

17           **IT IS SO ORDERED.**

18   Dated: February 26, 2021



William H. Orrick
United States District Judge